**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **Illinois Transportation Trade Association,** )<br>**Yellow Group LLC, Yellow Cab** )<br>**Affiliation Inc., Taxi Affiliation Services** )<br>**LLC, YC1 LLC, YC2 LLC, YC17 LLC,** )<br>**YC18 LLC, YC19 LLC, YC20 LLC,** )<br>**YC21 LLC, YC22 LLC, YC25 LLC,** )<br>**YC26 LLC, YC29 LLC, YC32 LLC,** )<br>**YC37 LLC, YC49 LLC, YC51 LLC,** )<br>**YC52 LLC, YC56 LLC, Transit Funding** )<br>**Associates LLC, 5 Star Flash, Inc.,** )<br>**Chicago Medallion Six LLC, Chicago** )<br>**Carriage Cab Corporation, Royal 3CCC** )<br>**Chicago Taxi Association, Tri Global** )<br>**Financial Services, Inc., Chicago Elite** )<br>**Cab Corporation, Chicago Medallion** )<br>**Brokers, One Hundred Eleven Corporate** )<br>**Medallion Owners Association, Emily's** )<br><br>**Limousine Service Company, Francis** )<br>**Koblah, Emanuel Ofosu, and Brad Saul,** )<br>)<br>**Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**The City of Chicago,** )<br>)<br>**Defendant.** ) | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**No.**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs, Illinois Transportation Trade Association ("**ITTA**"), Yellow Group LLC

("**Yellow Group**"), Yellow Cab Affiliation, Inc. ("**Yellow Affiliation**"), Taxi Affiliation

Services LLC ("**TAS**"), YC1 LLC, YC2 LLC, YC17 LLC, YC18 LLC, YC19 LLC, YC20 LLC,

YC21 LLC, YC22 LLC, YC25 LLC, YC26 LLC, YC29 LLC, YC32 LLC, YC37 LLC, YC49

LLC, YC51 LLC, YC52 LLC, YC56 LLC (collectively, "**YC Medallion Owners**"), Transit

Funding Associates LLC ("**Funding**"), 5 Star Flash, Inc. ("**Flash**"), Chicago Medallion Six LLC

1

("**CM6**"), Chicago Carriage Cab Corporation ("**Carriage**"), Royal 3CCC Chicago Taxi Association ("**Royal**"), Tri Global Financial Services, Inc. ("**Tri Global**"), Chicago Elite Cab Corporation ("**Elite**"), Chicago Medallion Brokers ("**Brokers**"), One Hundred Eleven Corporate Medallion Owners Association ("**111 Medallion Owners**"), Emily's Limousine Service Company ("**Limousine**"), Francis Koblah ("**Koblah**"), Emanuel Ofosu ("**Ofosu**"), and Brad Saul ("**Saul**") (ITTA, Yellow Group, Yellow Affiliation, TAS, the YC Medallion Owners, Funding, Flash, CM6, Carriage, Royal, Tri Global, Elite, Brokers, 111 Medallion Owners, Limousine, Koblah, Ofusu and Saul are collectively referred to herein as "**Plaintiffs**," the Plaintiffs other than Saul are collectively referred to as "**Transportation Plaintiffs**"), complain against defendant City of Chicago ("**City**") as follows:

### Summary of Relevant Facts

1.     Defendant City of Chicago is charged by state law with the power and duty of regulating the use of its streets.  Based on that authorization, the City has regulated the taxi and limousine businesses in the City of Chicago for almost one hundred years, by promulgating and enforcing elaborate, highly-detailed and very restrictive ordinances and regulations controlling virtually every aspect of the taxi and limousine businesses.  Pursuant to that authorization, the City has also at various times sold at very substantial prices taxi licenses (known as "medallions") that the City has required operators of taxis to hold in order to operate taxis.

2.     The hallmark of the marketplace in transportation services created by the City's regulations had been competition on a level playing field within a highly-regulated industry.  To ensure public safety and reasonable returns to taxi operators, the City issued approximately 6,800 medallions permitting the exclusive operation of the taxi business, subject to the City's detailed and stringent requirements.  The City, among other things, also sets uniform metered rates for

transportation by taxi. Taxi owners and operators worked in a competitive environment, all subject to the same regulations – until the advent of the unregulated providers that gives rise to this Complaint.

3. An established market for the purchase, sale and financing of medallions exists that is recognized, supported and regulated by City ordinances and regulations. In reliance on this structure, taxi owners, operators, lenders and others, including the YC Medallion Owners, CM6, 111 Medallion Owners, Koblah, Ofosu and others similarly situated, have purchased medallions and operated taxis, directly or through leases to drivers. The City has issued (and from time to time sold some of) the approximately 6,800 medallions in the Chicago market today. Plaintiffs Funding, Tri Global and others like it are in the business of lending to medallion purchasers (secured by the medallions), thereby assisting in the financing of purchases of medallions.

4. Individual medallions, allowing the owner to operate a single taxi, until recently sold for between $325,000 and $375,000. On September 13, 2013, the City announced that it would auction 50 medallions at a minimum price of $360,000. Medallions are viewed by the investment community as an asset similar in many ways to other tangible assets like real estate.

5. Illinois judicial decisions have recognized that Chicago taxi medallions are property, and that the relationship between the City and medallion holders is contractual, not merely regulatory. The property rights in medallions were described as follows by the Illinois Appellate Court in *Boonstra v. City of Chicago*, 214 Ill. App. 3d 379, 386-87 (1st Dist. 1991), which held that a City restriction on the right to sell medallions constituted an unconstitutional taking without due process and without just compensation:

> . . . for more than 20 years, the City of Chicago, pursuant to its ordinance, plainly fostered and participated in the assignment of the taxicab licenses. In effect, the

> City of Chicago created for its citizens a public market place for the assignment of its taxicab licenses. Thus, the taxicab licenses in reality became more than just mere personal permits granted by a governmental body to a person to pursue some occupation or to carry on some business subject to regulation under the police power. . . . In a functional sense, the taxicab licenses embraced the essence of property in that they were securely and durably owned and marketable.

Since *Boonstra*, the City has created and supported an additional twenty-two years of investment-backed expectations, now totaling over $2 billion in property value, in the medallion-based market.

6.    Starting in approximately 2011, certain transportation providers began to offer taxi and limousine services in Chicago in open and blatant disregard of applicable City taxi ordinances and regulations.  These providers (referred to in this Complaint as the "**Unlawful Transportation Providers**") include Uber Technologies, Inc. ("**Uber**"), Lyft, Inc. ("**Lyft**"), and Side.Cr, LLC ("**Sidecar**").  The business practices of the Unlawful Transportation Providers are more fully described in paragraphs 58-67.

7.    The Unlawful Transportation Providers operate unlicensed taxi and limousine services.  They receive requests for transportation from the public, contact drivers or operators to dispatch vehicles to transport the public for hire, collect the fares for transportation using customer credit cards, and pay the drivers for the services they provide after deducting a percentage off the fare as their charge.  They, like the Transportation Plaintiffs, use internet and smart phone-based applications to dispatch transportation to customers.  They also meter the trips and compute and collect the fares based purportedly on distance travelled and time elapsed.  Although they are functioning in all material respects as taxi companies, they have not acquired or leased medallions and are operating in violation of the extensive City ordinances and rules and regulations that govern taxis and limousines (the "**City Taxi Regulations**") upon which Plaintiffs' investment-backed expectations are based.  In addition, the "limousine" or "livery"

services they offer are actually *de facto* taxi services because their fare structure is apparently based on time and distance, as in the case of taxis.

8.     Despite the fact that there is no meaningful difference between licensed taxi businesses and the businesses of Uber, Lyft and Sidecar, the City has applied virtually none of the requirements of the City Taxi Regulations to the Unlawful Transportation Providers. As described later, this has apparently been due to a directive from the Office of the Mayor.

9.     The City's decision not to apply the City Taxi Regulations in any meaningful way to the Unlawful Transportation Providers has disrupted long-settled expectations and imposed very serious adverse consequences for the Transportation Plaintiffs, who have engaged in the taxi and limousine business in Chicago in costly reliance upon and in compliance with the market created by the City Taxi Regulations. The City's decision has the effect of threatening the existence of long-established businesses created in reliance on the City's taxi and limousine regulatory structure. The decision also threatens seriously to devalue more than 6,800 taxi medallions currently in use in Chicago, which have had a market value of at least $2.38 billion (6,800 x $350,000).

10.     The devaluation is apparent. Upon information and belief, the City's recent attempt to auction medallions for a minimum bid of $360,000 (and thereby raise $18 million for the City), which ended on October 18, 2013, was unsuccessful. Upon information and belief, the lack of success was principally caused by the threat and uncertainty resulting from the City's grant of *de facto* permission to the invasion of hundreds of drivers of unlicensed *de facto* taxicabs dispatched and enabled by the Unlawful Transportation Providers.

11.     The devaluation has repercussions far beyond the medallion owners. Affiliations like Plaintiffs Yellow Affiliation, Flash, Carriage and Royal operate based upon the regulated

medallion market the City created. Because most purchasers of medallions must finance their investment, taxi medallion lenders, such as Plaintiffs Funding and Tri Global, that hold security interests in medallions will see the value of their collateral fall if the City permits the Unlawful Transportation Providers to continue to operate outside the law. There are currently outstanding over $700 million in loans to Chicago taxi owner-operators to finance the purchase of medallions. Those loans were made in reliance on the continued application of the City Taxi Regulations, which assure exclusivity and City enforcement of the Regulations. If the medallion values continue to drop, these owners may either have to provide cash or other collateral to lenders, or may default, and in many cases become liable personally to lenders under personal guarantees. Many of these individual owners are immigrants and other small entrepreneurs, like Plaintiffs Koblah and Ofosu, who invested in medallions based on the exclusivity and extensive regulation the City established via the City Taxi Regulations. As for the lenders, their loans will have lost substantial value due to the lost value of the collateral. The drop in value and related uncertainty threatens to cause the credit market that supports financing medallions to freeze, thereby causing a spiral in which medallion values plummet even further.

12.     The City's decision not to apply the City Taxi Regulations to the Unlawful Transportation Providers also has had and (unless this Court enjoins such actions) will continue to have serious adverse consequences for the public. The City Taxi Regulations serve important public purposes that include, but are not limited to:

(i)     assuring that taxis and limousines are available to all parts of the City, not just those areas that it is most profitable to serve;

(ii)     assuring that taxis and limousines are available to people with disabilities, who require specialized services and vehicles;

(iii)     assuring that taxi and limousine services are available to persons who do not have smartphones, internet access or credit cards, including elderly and low-income persons;

(iv)     assuring that taxi and limousine services are provided exclusively by individuals possessing chauffers' licenses who have no criminal record, are tested annually for drug usage, and are properly insured for the commercial use of their vehicles;

(v)     assuring that such services are provided only in safe and inspected vehicles that are four model-years old or newer;

(vi)     establishing standardized rates in order to prevent price-gouging or in-the-street haggling or negotiations over the price of transportation services; and

(vii)     reducing traffic congestion and air pollution through limiting the number of taxis and providing incentives for fuel-efficient vehicles.

13.     Because the City has not been applying the City Taxi Regulations to the Unlawful Transportation Providers, the public, including Plaintiff Saul, is deprived of these protections and other benefits from the Unlawful Transportation Providers, while the Unlawful Transportation Providers enjoy a competitive advantage over taxi and limousine operators who comply with the law.

14.     Lyft, for example, advertises that anyone over 23 years old with a private car (2000 or newer) and a smartphone (iPhone or Android) can provide the equivalent of taxi services to the public.  Lyft calculates the price of rides by a combination of time and distance. For Chicago, Lyft charges $1.25 per mile and $.30 per minute, with a $2.00 pick-up fee and a

minimum charge of $4.00. Uber advertises that an individual with a private car can offer transportation to the public at a price determined by adding to a base fare a metered rate (which can be found on Uber's website) based on the time and distance travelled. Such services are provided in vehicles that do not satisfy the insurance, inspection, accessibility or driver-licensing requirements applicable to licensed taxi or limousine operators.

15. Unlike taxis owned by medallion owners, the Unlawful Transportation Providers do not require drivers or operators to obey City Taxi Regulations that require them to respond to calls from persons in underserved areas or to serve passengers with disabilities. Rather, their drivers are free to turn down calls and thereby cherry-pick the customers and areas of the City they deem most desirable, which benefits the affluent in and near downtown to the detriment of poorer and minority populations in outlying areas of the City.

## Summary of the Plaintiffs' Claims

16. The City's unequal treatment of the Transportation Plaintiffs and the Unlawful Transportation Providers, which, as described herein, is contrary to the City's own economic interests, is fundamentally unfair and unconstitutional. The same rules should apply to everyone engaging in substantially the same business.

17. Illinois law holds that (i) the medallions are property and (ii) the City's issuance of medallions and its regulatory scheme constitute a contract between the City and medallion owners. These rights give rise to three federal claims (Counts I-III) and three pendent state law claims (Counts IV-VI).

18. Count I is brought under 42 U.S.C. § 1983. It alleges that the City has violated the Takings Clause of the Fifth Amendment to the United States Constitution, incorporated as to the states under the Due Process Clause of the Fourteenth Amendment. Because medallions are

property under Illinois law, medallion owners, and lenders holding security interests in medallions, own property that may not be taken by the City without payment of just compensation. Before the City allowed the invasion of the Unlawful Transportation Providers, if someone wanted to provide taxicab services in the City, he or she had to buy or lease a medallion and comply with City Taxi Regulations. In return, the medallion owner received the exclusive right to provide taxi services in Chicago. Exclusivity was an essential element of the medallion owners' property rights and determined its value. Without compensation to the medallion owners or the lenders holding security interests in the medallions, the City has permitted and continues to permit the Unlawful Transportation Providers to usurp and trespass upon the exclusive property rights of medallion owners by providing those services without buying or leasing medallions or complying with the City Taxi Regulations. The City has thereby taken exclusive rights from medallion owners and transferred them to the Unlawful Transportation Providers without any compensation, let alone the just compensation that the Takings Clause requires.

19. Count II is brought under 42 U.S.C. § 1983. It alleges that the City's unequal treatment of the Transportation Plaintiffs and the Unlawful Transportation Providers violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by permitting the Unlawful Transportation Providers to engage in the *de facto* taxi business without incurring the costs and limitations of complying with applicable law, while requiring the Transportation Plaintiffs and others similarly situated to comply with the City's extensive and costly taxi and limousine regulations, including the requirements to: purchase a medallion costing in excess of $350,000 for each taxi; pay annual license fees of $600; maintain commercial liability and worker's compensation insurance; operate only newer, regularly

inspected vehicles; satisfy driver-licensing requirements, and pay thousands of dollars annually

per medallion in City and State taxes (totaling about $24 million) measured solely from the

operation of the same sort of taxi businesses that the Unlawful Transportation Providers are

permitted to operate without paying such taxes. Taxes paid to the City and State by licensed taxi

operators aggregate more than $24 million annually.  An estimate of those annual revenues is set

forth in the following chart:

| Estimated Annual City Taxi Tax Revenues | | |
|---|---|---|
| City share of state use Tax | $290,000 | |
| Medallion Transfer Tax | $8,795,000 | Actual number from 2012 |
| MPEA Airport Tax | $2,920,000 | Assumes 2000 trips/day |
| Ground Tax | $6,364,800 | Assumes 6800 medallions |
| Medallion renewal | $4,080,000 | Assumes 6800 medallions |
| Inspection fee | $1,020,000 | Semi-annual |
| License Plate | $686,800 | $101/year |
| Vehicle Sticker | $578,000 | $85/year |
| Affiliation Fee | $79,800 | |
| Total: | $24,814,400 | |

20.     By failing to collect such taxes from the Unlawful Transportation Providers, the

City is, upon information and belief, losing millions of dollars of annual revenue in addition to

the revenue it is losing from the recent failure to auction new medallions.  The Unlawful

Transportation Providers are receiving an unwarranted competitive advantage over taxi and

limousine operators who pay such taxes and otherwise comply with the City Taxi Regulations.

Indeed, the City is providing them with an inexplicable financial windfall by allowing them to

operate outside the regulations without paying the applicable taxes.  The Unlawful

Transportation Providers keep the unpaid taxes as profit, on top of the additional profits they garner by not being required to comply with the myriad other regulations requiring that they obtain commercial insurance, submit to inspections, maintain their vehicles, and operate only newer cars.

21.     Additionally, the City's failure to apply the City Taxi Regulations to the Unlawful Transportation Providers violates the equal protection rights of persons with disabilities, such as Plaintiff Saul and others similarly situated, who are in need of accessible transportation in the City.   By refusing to require the Unlawful Transportation Providers to provide accessible vehicles to persons with disabilities pursuant to the City Taxi Regulations, the City is arbitrarily treating this population differently from the non-disabled population, permitting the latter to avail themselves of this mode of transportation while excluding the former.

22.     Count III is brought under 42 U.S.C. § 1983 for the City's violation of substantive due process under the Fourteenth Amendment to the United States Constitution.   By failing to enforce the City Taxi Regulations against the Unlawful Transportation Providers, the City has denied the Transportation Plaintiffs their substantive due process rights.   The City is, or should be, aware that it owes substantive due process rights to taxi medallion owners, because that was the holding of *Flower Cab Co. v. Petitte et al.*, 658 F. Supp. 1170, 1179-80 (N.D. Ill. 1987), a case in which the United States District Court found the City's unauthorized decision to suspend a portion of the City Taxi Regulations violated the substantive due process rights of medallion owners.

23.     Counts IV, V and VI are brought pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

24. Count IV seeks damages for the City's breach of its contracts with Plaintiffs. Those contracts require that the City limit the conduct of the taxi business exclusively to parties who hold medallions or other taxi-service related licenses as "affiliations" or "dispatch" services, and otherwise require compliance with the City Taxi Regulations.

25. The City Taxi Regulations grant the exclusive rights to operate taxi and taxi-related businesses only to licensed providers of public transportation services. Their detailed and comprehensive provisions include guarantees of exclusivity and support for the medallion system.

26. City Taxi Regulations include the following ordinance provisions regarding the exclusive rights of the owners of medallions to operate taxis:

(a) It is unlawful for any person to operate a motor vehicle, or for the registered owner thereof to permit it to be operated, for the transportation of passengers for hire within the city unless it is licensed by the city as a taxicab pursuant to this chapter, or as a public passenger vehicle pursuant to Chapter 9-114.

(b) Subject to the conditions and limitations of this chapter, the city grants exclusive permission and authority to the licensees hereunder to operate the taxicab vehicles licensed hereunder unless rescinded, terminated, or revoked as hereinafter provided.

(c) It shall be unlawful for any taxicab or public passenger vehicle not licensed as such by the city to solicit or accept business within the corporate boundaries of the City of Chicago, except where the passengers have as their destination the community in which such vehicle is licensed and then only when such transportation has been arranged in advance.

Chicago Mun. Code § 9-112-020.

27. The City Taxi Regulations include numerous provisions regulating the sale and transfer of medallions, including the following, which states the City's support for maintaining the market value of medallions through periodic auctions:

12

> The commissioner shall promulgate regulations to set forth procedures by which all available taxicab licenses shall be distributed periodically (by sale, lease, or otherwise) pursuant to open and competitive bidding procedures. The procedures shall be designed to produce the maximum amount of revenues to the city consistent with serving the public interest, and to ensure that only applicants that are qualified under this chapter are awarded licenses.

Chicago Mun. Code § 9-112-480. This provision requiring open, competitive bidding and maximization of City revenues regarding "available taxicab licenses" constitutes a promise by the City to support and not materially impair the value of medallions. The City's conduct has confirmed the meaning of this provision as permitting only the sale by the City of existing medallions at market prices:

(i) for many years the City has occasionally auctioned medallions in relatively small lots of 50 or 100, setting a minimum "upset" price for bids that is approximately equal to the then-current market price for medallions;

(ii) the lots have typically been comprised only of previously issued medallions returned to the City by revocation or otherwise, not new medallions, thereby keeping constant the total number of medallions in existence; and

(iii) the City has issued new medallions only infrequently over many decades, in response to market conditions and without affecting the exclusive rights of the medallions owners to operate taxi services, or impairing materially the value of medallions; the City last issued new medallions in or about 2001.

28. The City Taxi Regulations contain several provisions regarding the enforcement of the exclusive rights of medallion owners to operate taxis, including the following:

(a) The owner of record of any motor vehicle that is used for the transportation or the solicitation for the transportation of passengers for hire in violation of Section 9-112-020 shall be liable to the city for an administrative penalty of $2,000.00 plus any towing and storage fees applicable under Section 9-92-080. Any taxicab or public passenger vehicle shall be subject to seizure and impoundment pursuant

to this section. This subsection shall not apply if the vehicle used in the violation was stolen at that time and the theft was reported to the appropriate police authorities within 24 hours after the theft was discovered or reasonably should have been discovered.

Chicago Mun. Code § 9-112-640(a). This and other enforcement provisions constitute a part of the promise by the City to medallion purchasers and lenders that the City will support the exclusivity and market value provisions by removing unlawful taxicabs from the streets and fining violators heavily.

29. By permitting the Unlawful Transportation Providers to operate without fully complying with City Taxi Regulations, the City has breached its contract with the YC Medallion Owner Plaintiffs, CM 6, the 111 Medallion Owners, Koblah, Ofosu and all other similarly situated medallion owners. It has also breached its contracts based on taxi and limousine laws and regulations with all the other Transportation Plaintiffs, each of whose business is dependent upon and operated in reliance on the equal and consistent application of applicable City taxi and limousine regulations. The City is responsible in damages for (i) the Transportation Plaintiffs' current and future loss of business to the Unlawful Transportation Providers, (ii) all diminution in the market value of the Transportation Plaintiffs' medallions, (iii) all cash or the value of other collateral that Plaintiffs Funding and Tri Global will be required to provide to its lenders as additional security due to the diminution in market value of City medallions, and (iv) any damages to Funding, Tri Global and all other medallion lenders that currently rely on the medallion value to collateralize more than $700 million in outstanding loans for Chicago taxi medallions.

30. Persons with disabilities such as Plaintiff Saul and others similarly situated are intended third-party beneficiaries of the foregoing contracts between the City and the Transportation Plaintiffs, which (among other things) impose obligations on the Transportation

Plaintiffs to provide wheelchair accessible vehicles and to accept government-subsidized vouchers in partial payment of taxi fares. By failing to enforce regulations intended to make taxi transportation more accessible to persons with disabilities, the City has breached its contractual obligations to them.

31.     Count V is pleaded in the alternative to Count IV and seeks damages under principles of promissory estoppel. For many years the City has sold and taxed the sales of medallions as part of the comprehensive regulatory program it established and fostered that, among other things, establishes the total number of medallions and guarantees medallion owners the exclusive right to provide taxi services in Chicago. This regulatory program constitutes the City's promise to medallion owners and lenders holding security interests in medallions that, subject to compliance with the obligations under the City Taxi Regulations, the City will provide the exclusive rights and benefits summarized above that include:

> (i) exclusivity, *i.e.*, only medallion owners will be permitted to operate taxis,

> (ii) market support, *i.e.*, the City will cap the total number of medallions and resell medallions so as not to impair materially the value of medallions, and

> (iii) enforcement, *i.e.*, the City will impound and fine vehicles violating the exclusivity promise by providing taxi services without medallions.

Plaintiffs foreseeably and detrimentally relied on these promises by collectively investing hundreds of millions of dollars to purchase medallions, incur debt to finance such purchases, lend money to finance the purchases secured by the medallions, and/or create and operate taxi affiliations.

32.     Count VI seeks damages under principles of equitable estoppel. The City's enactment and past enforcement of the City Taxi Regulations, as well as its sales of medallions,

constitute affirmative acts by the City upon which the Transportation Plaintiffs reasonably relied to their detriment as summarized in the preceding paragraph. The City is estopped from creating a *de facto* system under which the Unlawful Transportation Providers are allowed to provide taxi services without being required to comply with the obligations imposed upon Transportation Plaintiffs, who undertook such obligations in reliance on the exclusive, regulated medallion system.

33. The City has drafted an ordinance that might purport to create a separate class of smartphone-dispatched transportation providers to accommodate the Unlawful Transportation Providers. If enacted, such an ordinance would merely ratify and codify the City's federal and state law violations described herein.

34. Among numerous flaws in the draft ordinance that the City has provided to Plaintiffs are: (i) it is not necessary to write new rules regarding smartphone apps because smartphone dispatching to licensed taxis or liveries that obey the law already exists, (ii) the draft ordinance will not solve the existing non-enforcement problem, because the Unlawful Transportation Providers have flouted similar laws in other localities and can be expected to flout the proposed new ordinance, if enacted, just as they have been flouting the existing City Taxi Regulations; (iii) the proposed ordinance would purport to legalize hundreds or thousands of *de facto* taxis driven by individuals without chauffeur licenses or adequate training, who would not have to incur the cost of buying medallions and who would pay lower annual fees on a per vehicle basis than medallion owners; (iv) the proposed ordinance would place the City's imprimatur on a separate and unequal class of public transportation available only to privileged individuals with smartphones and credit cards, resulting in a disparate impact on minority, disabled and elderly populations in violation of the Illinois Civil Rights Act and fundamental

fairness; (v) the proposed ordinance would impose sharply reduced public safety requirements on the Unlawful Transportation Providers, as compared to the Transportation Plaintiffs, regarding vehicle age and other operating requirements; and (vi) the proposed ordinance, when combined with the influx of hundreds or thousands of drivers who would pay virtually nothing to the City to operate as *de facto* taxis, would destroy the $2.4 billion investment of persons and firms that have expended large sums to purchase and operate under the City's long-standing, exclusive medallion system. If such an ordinance is adopted, unless its final terms preserve a level playing field and the investment-backed expectations of medallion owners and lenders, including their exclusivity rights to operate taxis, it will violate Plaintiffs' rights. Plaintiffs will seek to amend this Complaint accordingly.

### The City Has Placed Plaintiffs in an Unfair Position and Aided Uber in Litigation With Yellow Group

35. In an action titled Yellow Group, LLC, et al v. Uber Technologies, Inc., No. 12 C 7967 (N.D. Ill.), pending before Hon. Sara Ellis (after being reassigned from Hon. Sharon Johnson Coleman), certain of the plaintiffs in this case sued Uber for violations of the Lanham Act and Illinois state claims of tortious interference with contractual relations and unfair competition. In a pair of rulings attached hereto as Exhibits 1 and 2, of which the Court may take judicial notice, Judge Coleman denied most of Uber's motion to dismiss the complaint and held that plaintiffs had shown a likelihood of success on the merits of certain of their unfair competition claims, finding, among other things, that "Plaintiffs have also shown that the activities complained of give defendant competitive advantages." Ex. 2 at 1. Nevertheless, she denied preliminary injunctive relief because plaintiffs had not shown that an injunction was "required" to prevent the harms they were experiencing, because "plaintiffs have made no showing that city regulation of defendant's practices would be ineffective in curtailing the

ordinance violations that are the subject of the claims at issue here." Ex. 2 at 2. However, as shown in this Complaint, Judge Coleman's assumption that the City would enforce its laws was incorrect: she was unaware that, upon information and belief, the Office of the Mayor had quietly handcuffed the Commissioner of Business Affairs and Consumer Protection ("Commissioner") from taking steps to regulate the Unlawful Transportation Providers. As a result, the City in fact has not been regulating the practices of Uber and other Unlawful Transportation Providers, and the harms recognized by Judge Coleman from the ordinance violations have not been – and will not be – remedied by the City regulatory enforcement she assumed would occur.

36. It should be noted that the record developed before Judge Coleman did not include Uber's implementation in recent months of UberX, which, as described herein, is imposing far greater harm on Plaintiffs than the Uber Taxi and UberBlack Car services that were the focus of the record in the case before her.

37. The record developed before Judge Coleman also did not include the fact, admitted to the press by David Spielfogel, the Chief of Policy & Strategic Planning in the Office of the Mayor, that rules proposed by the Commissioner in November 2012 (which would have clarified the City's already-existing prohibition on the use of any device, including smartphones, to calculate fares for livery vehicles) had been placed on indefinite hold. Spielfogel stated that those rules were on hold pending the outcome of the federal lawsuit before Judge Coleman. This hold was not publicly revealed until a *Chicago Tribune* story ran on October 13, 2013, after Judge Coleman's ruling.

38. Upon information and belief, the City put on ice not merely the proposed rules of 2012, but any meaningful enforcement of the City Taxi Regulations against the Unlawful

18

Transportation Providers. The City's secret hold had the effect of aiding Uber's litigation position before Judge Coleman, as Uber had asked her to defer entering any injunction until the City acts on its regulations, while the City was quietly holding its regulations in abeyance pending the outcome of that litigation.

39. The City's secret hold on enforcing the City Taxi Regulations against the Unlawful Transportation Providers has enabled the Unlawful Transportation Providers to continue to dispatch well over a million illegal rides in the City, to the financial detriment of the Transportation Plaintiffs and to the detriment of public safety, while costing the City millions of dollars of medallion, tax and fee revenue.

40. The extent of the City's failure to apply the City Taxi Regulations to the Unlawful Transportation Providers, and the resulting harm, is shown by certain demonstrative exhibits Uber introduced in evidence at the preliminary injunction hearing before Judge Coleman, a true and correct copy of which is attached hereto as Exhibit 3. (Although marked confidential, the Exhibits were in fact not subject to protective order and were introduced in open court.) According to Uber's testimony at the hearing, these exhibits show that approximately four hundred thousand taxi and limousine rides were requested by Uber customers prior to the April 29, 2013 hearing date from areas outside of the Downtown and Near-North/Lincoln Park areas of Chicago. An Uber witness testified that this represented 36% of Uber's requests during that time period. Thus, 64% (about 700,000) requests were made in the Downtown and Near-North/Lincoln Park areas during the same period. Those figures, reflecting about 1.1 million rides in the aggregate, predate the implementation of UberX in or about late April 2013. Since that implementation, it is likely that hundreds of thousands of additional rides have been dispatched in Chicago through the various Uber services, as well as those of Lyft and Sidecar.

The City has applied the City Taxi Regulations to virtually none of these rides, which may collectively now substantially exceed one million rides per year.

41.     An additional exhibit introduced at the preliminary injunction hearing illustrates how Uber's rides are heavily concentrated downtown and in affluent wards of the City while neglecting poorer and minority wards.  Attached as Exhibit 4 is a demonstrative exhibit in which ride statistics generated by Uber itself are superimposed on a census tract map of Chicago.  The larger colored dots and lines show the greatest frequency of Uber rides.  With the notable exception of Midway Airport, the rides are heavily concentrated in the darker census tracts containing the highest *per capita* income.  Vast stretches of the south, southwest, southeast, west and northwest sides have virtually no service from Uber.  By City ordinance, the Transportation Plaintiffs are required to respond to ride requests from anywhere within the City.  Because the City is not enforcing the City Taxi Regulations against Uber and the other Unlawful Transportation Providers, they are free to cherry-pick rides in wealthier areas, focus their availability only in wealthier, geographically contiguous areas, and seriously underserve most poorer and minority neighborhoods in the City.  Because the Transportation Plaintiffs comply with the law by serving such underserved areas, the Transportation Plaintiffs lose other customers, good will and substantial revenue to the Unlawful Transportation Providers.

**The Parties**

42.     Plaintiff ITTA is a not-for-profit corporation organized and existing under the laws of the State of Illinois.  ITTA has its principal place of business at 3351 West Addison Street, Chicago, Illinois.  ITTA is an association of taxi affiliations, medallion owners, medallion managers and other transportation providers such as livery companies.  ITTA's objectives

include representing and furthering the interests of its members in, among other things, fair and uniform enactment and enforcement of laws governing the transportation industry.

43.    Plaintiff Yellow Group is a limited liability company organized and existing under the laws of the State of Delaware.  Yellow Group has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.  Yellow Group's principal business activity consists of providing taxi transportation services to the Chicago public through its wholly owned subsidiaries.

44.    Plaintiff Yellow Affiliation is a corporation organized and existing under the laws of the State of Illinois.  Yellow Affiliation has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.  Yellow Affiliation is a licensed taxi affiliation in the City of Chicago and a wholly owned subsidiary of Yellow Group.  Taxi affiliations are entities existing under City ordinances and regulations to provide services, including a common color scheme, dispatch and insurance, to their licensed medallion members.  Every medallion owner who leases to a driver or owns two or more Chicago taxi medallions is required to belong to an affiliation, and almost all medallion owners belong to an affiliation whether or not so required.

45.    Plaintiff TAS is a limited liability company organized and existing under the laws of the State of Delaware.  TAS has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.  TAS is a wholly owned subsidiary of Yellow Group.  TAS' principal business activity consists of providing various administration services to taxi affiliations.

46.    The Plaintiffs comprising the YC Medallion Owners are each a limited liability corporation organized and existing under the laws of the State of Delaware.  Each YC Medallion Owner has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.  Each is a

licensed medallion owner owning multiple medallions in the City of Chicago and a member of Yellow Affiliation.

47.     Plaintiff Funding is a limited liability company organized and existing under the laws of the State of Delaware.  Its principal place of business is at 3351 W. Addison Street, Chicago, Illinois.  Funding is in the business of providing loans to finance the purchase of Chicago taxi medallions.

48.     Plaintiff Flash is a corporation organized and existing under the laws of the State of Illinois.  Flash has its principal place of business at 9696 W. Foster, Chicago, Illinois.  Flash's principal business activity is as a taxi affiliation providing services, including a common color scheme, dispatch and insurance, to its licensed medallion members.

49.     Plaintiff CM6 is a limited liability corporation existing under the laws of the State of Illinois.  CM6 has its principal place of business at 9696 W. Foster, Chicago, Illinois.  CM6 is a licensed medallion owner owning multiple medallions in the City of Chicago and a member of the Flash affiliation.

50.     Plaintiff Carriage is a corporation organized and existing under the laws of the State of Illinois.  Carriage has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois.  It is a licensed taxi affiliation in the City of Chicago whose principal business activity as a taxi affiliation is to provide services, including a common color scheme, dispatch and insurance, to its licensed medallion members.

51.     Plaintiff Royal is a corporation organized and existing under the laws of the State of Illinois.  Royal has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois. It is a licensed taxi affiliation in the City of Chicago whose principal business activity as a taxi

affiliation is to provide services, including a common color scheme, dispatch and insurance, to its licensed medallion members.

52.     Plaintiff Tri Global is a corporation organized and existing under the laws of the State of Illinois. Tri Global has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois.  Tri Global is in the business of providing loans to finance the purchase of Chicago taxi medallions.

53.     Plaintiff Elite is a corporation organized and existing under the laws of the State of Illinois.  Elite has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois. Elite is a licensed taxicab medallion manager in the City of Chicago.

54.     Plaintiff Brokers is a corporation organized and existing under the laws of the State of Illinois.  Brokers has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois.   Brokers is a licensed taxicab broker in the City of Chicago and brokers sellers and buyers of Chicago taxicab medallions

55.     Plaintiffs 111 Medallion Owners consist of one hundred eleven corporations organized under Illinois law, each of which owns one or more Chicago taxi medallions.  Each has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois.  A list naming each of the 111 Medallion Owners is included herein as Appendix 1, following the signature page.

56.     Plaintiff Limousine is a corporation organized and existing under the laws of the State of Illinois.  Limousine has its principal place of business at 8533 South Kolin Avenue, Chicago, Illinois.  Plaintiff Limousine operates livery services that provide limousine, sedan, and SUV transportation.

57.     Plaintiff Francis Koblah is an individual owner-operator of a licensed Chicago taxi.  Mr. Koblah is an immigrant from Ghana who has driven Chicago taxis since 2007.  In or

about April 2013, he pursued the American Dream by purchasing a medallion and operating his own taxi. He bought the medallion from a private party for $370,000 and paid the City a 5% transfer tax of $18,500. The purchase was financed by a loan secured by the medallion. Mr. Koblah's revenues have declined materially since the Unlawful Transportation Providers began operating, threatening his ability to continue to make payments on his loans and sustain his business. He and his wife, a nursing student, depend on his taxi earnings.

58.     Unlike the drivers deployed by the Unlawful Transportation Providers, Koblah not only made a substantial investment in a medallion and paid substantial taxes to the City, he is required to comply with the City Taxi Regulations. For example, when he sought to use his medallion with his 2009 Toyota Camry Hybrid, the City refused because of its rules requiring newer vehicles. As a result of the City's enforcement of the City Taxi Regulations against him, he incurred the expense and debt associated with buying a 2013 Toyota, and he pays about $158 per week to an affiliation in order to carry the commercial liability insurance required by the City Taxi Regulations. In contrast, as explained elsewhere in this Complaint, the City is not requiring drivers deployed by the Unlawful Transportation Providers to operate newer vehicles, and many of them operate older and smaller personal cars without insurance covering rides for hire.

59.     Plaintiff Emmanuel Ofosu is an individual owner-operator of a licensed Chicago taxi. Mr. Ofosu is an immigrant from Ghana who has driven Chicago taxis since 2006. In or about November 2010, he pursued the American Dream by purchasing a medallion from a private party for $190,000. He paid the City a $9,500 transfer tax in connection with the purchase. He financed (and later refinanced) the purchase through loans secured by the medallion. Mr. Ofosu's revenues have declined materially since the Unlawful Transportation Providers began operating, threatening his ability to continue to make payments on his loans and

24

sustain his business.  On a typical day his revenues have declined 30-40%.  He has seen a marked decline in street hails since the Unlawful Transportation Providers began operating. Unlike the Unlawful Transportation Providers, he pays approximately $146 per week to an affiliation in order to carry the commercial liability insurance required by the City Taxi Regulations.

60.     Plaintiff Saul is a Chicago resident, successful entrepreneur and long-time advocate for the rights of disabled persons.  Among his many accomplishments are the following:  He is the founder and CEO of Matrix Media, United Broadcasting Company and WebTalkRadio.net, and pioneered a number of broadcast firsts.  Traditional broadcast accomplishments include the creation of the Sear's College Football Game of the Week and the NBA Radio Network.  Over his 34-year career, Saul has introduced such innovative concepts to radio as home shopping, more than 175 original radio series and programs as well as numerous award-winning specials.  Saul was also instrumental in the development of the in-flight entertainment industry.  In the mid 1980's through the late 1990's, he pioneered in-flight advertising-supported audio programs as well as in-flight advertiser-supported television on numerous airlines, most notably American Airlines.  He also has been involved in the development of software to make websites more accessible to persons with disabilities.  Saul was diagnosed with multiple sclerosis in 1991.  He needs a wheelchair for mobility, and requires a ramp to get access to a car or van.  Although he owns an accessible van, he has from time to time used wheelchair accessible vehicles provided by certain Transportation Plaintiffs pursuant to the City Taxi Regulations and by other paratransit services.  He would occasionally make use of such accessible vehicles if provided by the Unlawful Transportation Providers.  At present such Providers do not make such vehicles available to Saul or other passengers in wheelchairs.

61.     Defendant City of Chicago is a municipal corporation created pursuant to Illinois law.  The City is authorized by statute to regulate taxis and all others pursuing like occupations. See 65 ILCS 5/11-42-6.

62.     The Commissioner is the highest-ranking City administrative officer responsible for the enforcement of the City Taxi Regulations.  The Commissioner is not formally joined in her official capacity because it would be duplicative of joining the City.

**Transportation Services Provided
by the Unlawful Transportation Providers**

63.     Uber is a corporation organized and existing under the laws of the State of Delaware.  Uber maintains its principal place of business at 182 Howard St. #8, San Francisco, California.  Uber currently offers three forms of taxi service in Chicago through a smartphone application:

a.  Uber implemented what it calls "UberX" in Chicago in or about late April 2013. Through UberX a passenger uses the app to ask Uber to send an ordinary, unmarked private vehicle to a designated location.  Uber sends the request to private operator/drivers who have contracted with Uber to accept its dispatches. Those operator/drivers are not required to have chauffeur licenses, and may operate virtually any type of unmarked car of any age and condition.  Uber has recruited and contracted with such operator/drivers as part of its fleet to function as the equivalent of a taxi.  If the operator chooses to accept the dispatch, Uber notifies the passenger of the operator's name, the type of vehicle and expected time of arrival.  The fare is computed by Uber using information from the smartphone's GPS system, based on distance and time rates set by Uber.  For example, prior to January 9, 2014, the minimum standard rates in Chicago for

UberX were: $3.15 base fare, plus $0.40 per minute for speeds under 11 miles per hour, $1.75 per mile for speeds above 11 miles per hour, with a $6 minimum fare and a $5 cancellation fee. On or about January 9, 2014, Uber adjusted its standard UberX rates to a $2.40 base fare, plus $0.24 per minute plus $1 per mile, with a $3.20 minimum fare and a $5 cancellation fee. However, as more fully described below, through its "surge pricing" program, Uber regularly inflates these rates by factors of two to eight during periods of high demand. (By comparison, the City's established base taximeter rates for licensed taxis as of that date for a single passenger were: $3.25 base fare, $1.80 for each mile, and $0.20 for each 36 seconds of time elapsed, with no minimum (other than the base fare), no cancellation fee, and no "surge" pricing. *See* http://www.cityofchicago.org/city/en/depts/bacp/supp_info/2012_passenger_information.html.) The fare is paid to Uber via the passenger's credit card, which must be previously registered with Uber. Upon information and belief, Uber remits 80% of the fare to the Uber operator/driver and keeps 20% as its fee.

b. Through what it refers to as "UberBlack" and "UberSUV," a passenger uses the app to ask Uber to send either a "black car" or an SUV to a designated location. Uber sends the request to private drivers operating large cars or SUVs, whom Uber has recruited as part of its fleet. If the Uber operator chooses to accept the dispatch, Uber notifies the passenger of the operator/driver's name, the type of vehicle and expected time of arrival. The fare is calculated by Uber, using the smartphone's GPS system, based on distance and time rates set by Uber. For example, prior to January 9, 2014, the standard rates in Chicago (when Uber is not employing "surge pricing") for UberBlack were: $7 base fare, plus

$0.85 per minute for speeds under 11 miles per hour, $3.50 per mile for speeds above 11 miles per hour, with a $15 minimum fare and a $10 cancellation fee. On or about January 9, 2014, Uber adjusted the UberBlack minute and distance rates to $0.35 per minute plus $3.25 per mile. Prior to January 9, 2014, the standard rates in Chicago for UberSUV were a $14 base fare, plus $1.05 per minute for speeds under 11 miles per hour, $4.50 per mile for speeds above 11 miles per hour, with a $25 minimum fare and a $10 cancellation fee. On or about January 9, 2014, Uber adjusted the UberSUV minute and distance rates to $0.55 per minute plus $4.05 per mile. The fare is paid to Uber via the passenger's credit card registered with Uber. Upon information and belief, Uber remits 80% of the fare to the driver and keeps 20% as its fee.

c. Through what it refers to as "UberTaxi," a passenger uses the app to ask Uber to send a marked and medallion-bearing taxi to a designated location. Uber sends the request to a smartphone used by a taxi driver in the area. If the driver chooses to accept the dispatch, Uber notifies the passenger of the taxi number and the expected time of arrival. The fare is computed by the taximeter in the taxi, based on distance and time rates set by the City. The fare is paid to Uber via the passenger's credit card, which the passenger registers with Uber when signing up for the app. Uber adds a booking fee of $1.25 to the fare, as well as a default driver gratuity of 20%, which the passenger may modify via Uber's web site, in advance of the ride. Uber remits the fare and gratuity to the taxi driver, less the booking fee and a credit card processing fee.

64. Uber also deploys what it calls "surge pricing" to charge customers a multiple of its standard applicable rates and minimum fares during periods of high demand. Its website states that: "At times of intense demand, our rates change over time to keep vehicles available."

Pursuant to this provision, at certain times Uber charges its customers fares to ride in ordinary 'UberX' cars or UberBlack or UberSUV cars at double or even higher rates than are legally permissible under the taximeter rates established by the City Taxi Regulations. Uber deployed this practice after gouging customers in New York City following Hurricane Sandy in 2012, and Uber continues to employ surge pricing in Chicago, and did so, for example, on Friday night, September 27, 2013, at which time some UberX riders were surprised to be notified that they were being charged double the ordinary UberX rates, which was about double the legally permissible taximeter rates. In other instances of high demand, such as the recent cold and snowy New Year's Eve, Uber has charged as much as eight times its regular rates during "surge" periods with much higher minimum fares, such that customers were charged well over $100 to travel short distances. (Plaintiff taxi operators and all other Chicago taxi operators are not permitted to engage in such "surge pricing.")

65.     Lyft is a corporation organized and existing under the laws of the State of Delaware. Lyft maintains its principal place of business at 548 Market Street #68514, San Francisco, California. Lyft provides what it calls "ridesharing" services in Chicago. Passengers with iPhones or Androids (and a Facebook account) can use the Lyft app to request a ride. Lyft asks the passenger for their pick-up location and sends the request to available drivers, who, it advertises, are not required to have chauffer licenses, but must have "a relatively clean driving record." (*See* Exhibit 5.) If a driver accepts the request, the Lyft app provides the passenger with a picture of the driver and the car to expect. Until recently, at the end of the ride, the passenger would receive a "suggested donation" amount on his or her app, which could be adjusted upwards or downwards within 24 hours of the ride. On information and belief, the "suggested donation" was calculated based on the distance and time travelled. Lyft received an

"administrative fee" of up to 20% of each donation. (*See* Exhibit 6.) Recently, Lyft moved away from the fictitious "donation" system. In Chicago, Lyft now charges based on a time and distance calculation. As of February 4, 2014, Lyft's charge per mile is $1.25, the cost per minute is $.30, there is a $2.00 pickup fee and a $1.00 "Trust & Safety Fee" (Lyft markets this as supporting its purported safety standards), with a $4.00 minimum fare and a $5.00 cancellation fee. Lyft also has its own version of "surge" pricing, which it refers to as "Prime Time Tips." During "busy peak times," Lyft uses the "Prime Time Tips" system, under which Lyft determines a mandatory tip percentage to be charged for rides. (See Exhibit 7.) Lyft informs customers before they confirm a ride that Prime Time Tips are in effect and the percentage of the tip. During the December 2013 holiday-period, Lyft advertised that "Prime Time Tips" were capped at 200%. (*Id.*) According to its materials, Lyft does not take a percentage of Prime Time Tips. (*Id.*)

66. Sidecar is a limited liability company organized and existing under the laws of the State of Delaware. Sidecar maintains its principal place of business at 360 Pine Street, Suite 700, San Francisco, California. Like Lyft, Sidecar provides what it calls "ridesharing" services in Chicago. Passengers can request a ride through the Sidecar smartphone app by inputting their pick-up and drop-off locations. Until recently, Sidecar then provided the passenger with an estimated "suggested donation." If the passenger completed the request after reviewing the estimated "suggested donation," Sidecar sent the request to available drivers in the area. Once a driver accepted the request, Sidecar provided the passenger with a picture of the driver, a description of the car to expect, and an estimated time of arrival. At the end of the ride, the passenger received a "suggested donation" amount on their app, which could be adjusted upwards or downwards within 24 hours of the ride. If the passenger did not confirm or adjust the

"suggested donation" within 24 hours, the passenger's card was charged the "suggested donation." According to the Sidecar app, the "suggested donation" was calculated based on what others are paying for trips of similar distance and time travelled. Sidecar retained a percentage of the "donation." (*See* Exhibit 8.) Upon information and belief, Sidecar ended the "donation" fiction, and charges fares in a manner similar to that used by UberX and Lyft.

### Uber, Lyft and Sidecar Operate Unlicensed Taxi Businesses in Violation of the City Taxi Regulations

67.    Uber, Lyft and Sidecar operate unlicensed taxi businesses providing services that are identical in all material respects to the services offered by the Transportation Plaintiffs and other firms and individuals that operate in compliance with the City Taxi Regulations. The Unlawful Transportation Providers do so by providing the following services to the public:

i)    Like the Transportation Plaintiffs, they offer, arrange for, and dispatch transportation services;

ii)    Like the Transportation Plaintiffs, they use dispatch communication devices to connect an operator/driver and vehicle to a customer who requests transportation. The Unlawful Transportation Providers use only a smartphone app to arrange the ride, while the Transportation Plaintiffs make available to passengers both smartphone apps (such as Hailo, Taxi Magic or Go Fast Taxi) and telephone as ways to request a ride (other than a street hail or airport queue). Contrary to marketing puffery by the Unlawful Transportation Providers, use of their smartphone apps to arrange rides is neither revolutionary nor materially different from the smartphone apps used by the Transportation Plaintiffs in providing rides to the public. Indeed, Plaintiffs Yellow and Flash alone receive over 38,000

service requests per month through smartphone apps, as well as nearly 20,000 via web or text message;

iii)     Like the Transportation Plaintiffs, Uber uses a metering system based on distance and time to determine the fare; Uber's metering system is GPS-based and uses a smartphone as the hardware;

iv)     Lyft and, on information and belief, Sidecar also determine the fare based upon a time and distance calculation; Lyft and Sidecar charge a fee for arranging the transportation;

v)     Like the Transportation Plaintiffs, Uber, Lyft and Sidecar accept credit card payment for the fare; all three require payment by credit card prearranged with the customer;

68.     Uber also provides UberBlack, a so-called black car/limo service.  UberBlack provides de facto taxi services because the cost of transportation is based on a meter-based fare determination.  It is a taxi in every respect except that its cars are big and black.  Not only are Uber's black cars acting as unlicensed taxis, but they are doing so in violation of the City's ordinance that prohibits licensed limousines and liveries to use metering devices to determine fares.  *See* Chicago, Ill., Mun. Code ("Mun. Code") §9-114-060.

69.     Upon information and belief, the Unlawful Transportation Providers operate in violation of the following requirements of state law and the City Taxi Regulations:

i)     City Taxi Regulations set maximum meter rates (*id*. §9-112-600); UberBlack and UberX set their own rates based on time and distance metered by smartphone GPS data; Lyft and, on information and belief, Sidecar suggest a fare based on time and distance;

ii) UberTaxi imposes, in addition to the meter rate, an additional booking fee and a default "gratuity," of which Uber receives at least the booking fee and a credit card processing fee; the City has permitted Uber to charge the booking fee even though it rejected previous requests by some Transportation Plaintiffs to charge a booking fee;

iii) City Taxi Regulations require affiliations, medallion owners and taxis to accept cash and debit cards from the Taxi Accessible Program (as well as other similar programs), not just payment by credit cards (*id.* §9-112-510; City of Chicago Taxicab Medallion License Holder Rules and Regulations ("Taxi Regs.") TX5.07); Uber, Lyft and Sidecar accept only credit card payments, and require that the customers have been pre-approved for credit card charges;

iv) City Taxi Regulations prohibit a dispatcher from charging fees to drivers, including for radio service (City of Chicago Rules and Regulations for Radio Dispatch Services ("Dispatcher Regs.") R. No. 8(b)); the Unlawful Transportation Providers receive a share of the fees paid for transportation, thus receiving a fee from the drivers;

v) City Taxi Regulations require affiliations to service and dispatch taxis to underserved areas of the City (Mun. Code §9-112-320; Dispatcher Regs. R. No. 5(c)); the Unlawful Transportation Providers do not require drivers to serve any areas;

vi) City Taxi Regulations limit dispatching to affiliation members or individual licensees who have dispatching affiliation agreements that meet City requirements

(Mun. Code §9-112-550; Dispatcher Regs. R. Nos. 1-2, 6); the Unlawful Transportation Providers do not have such agreements, yet dispatch to drivers;

vii)    City Taxi Regulations require a "two-way" radio dispatch system (Mun. Code §9-112-320; Dispatcher Regs. R. No. 1(d)); the Unlawful Transportation Providers have only one-way text transmissions by smartphone (which inevitably creates incidents of driving-while-texting);

viii)    City Taxi Regulations require every taxi driver to have their dispatch radio turned on, and taximeters must be connected to an active dispatch radio (Mun. Code §9-112-320(c); Taxi Regs. TX5.02(c)(4), 5.10); the Unlawful Transportation Providers do not meet any such requirements;

ix)    City Taxi Regulations require the dispatch service to have its principal place of business in Chicago (Mun. Code §9-112-550(b); Dispatcher Regs. R. No. 2); Uber dispatches from California; the other Unlawful Transportation Providers are believed to dispatch from locations outside Chicago;

x)    City Taxi Regulations prohibit a single dispatch service dispatching for both taxis and liveries (limousines) (Mun. Code §9-112-320; Dispatcher Regs. R. No. 3); Uber markets itself as both a taxi and a livery service, and purports to dispatch to purchasers of both types of transportation from the same app;

xi)    City Taxi Regulations prohibit an affiliation from using or dispatching to drivers lacking a chauffeur license and lacking specific commercial insurance (Mun. Code §9-112-330; City of Chicago Rules and Regulations for Affiliations ("Affiliation Regs.") R. No. 6.6(f); Dispatcher Regs. R. Nos. 4-4.1); the Unlawful

Transportation Providers dispatch to drivers who do not hold a chauffeur license or have insurance covering rides for hire;

xii) City Taxi Regulations require medallion owners to carry public liability insurance with a minimum coverage for each taxicab of $350,000 per occurrence, as well as workers' compensation insurance (Mun. Code Sec. 9-112-330); The Unlawful Transportation Providers are not required to carry insurance covering the commercial, "for hire" use of the cars or workers' compensation insurance covering the drivers of the cars they operate;

xiii) City Taxi Regulations require affiliations to provide continuing education to drivers (Mun. Code §9-112-350; City of Chicago Rules and Regulations for Affiliations ("Affiliation Regs.") R. No. 2.4); the Unlawful Transportation Providers do not provide continuing education;

xiv) City Taxi Regulations require taxi drivers, medallion owners and affiliations to accept requests for transportation from and to accommodate people with disabilities; licensees with at least 20 taxis are required to provide wheelchair accessible vehicles (Mun. Code §§9-112-570, 575, 580; Affiliation Regs. R. Nos. 2.3, 2.6; Dispatcher Regs. Nos. 5.1, 5.3); the Unlawful Transportation Providers do not meet any similar requirements;

xv) City Taxi Regulations require licensees and affiliations to comply with all Federal, State and City non-discrimination laws; and require drivers not to refuse service to any person regardless of destination unless the driver is en route to pick up another passenger or out-of-service. Indeed, drivers are prohibited from even asking the passenger's destination before the passenger enters the taxicab. (Mun.

Code § 9-112-180; Chauffeur Regs. Rule CH5.02.); the Unlawful Transportation Providers are, upon information and belief, operating in violation of these Regulations in various respects:

(1) their drivers may choose to reject passengers based on destination;

(2) the rating systems of the smartphone apps result in passengers getting different "grades" from drivers, thereby encouraging subsequent drivers to reject certain "lower-rated" passengers in favor other others with "higher" ratings; and

(3) Lyft's profile of each passenger includes a picture of the passenger, thereby enabling their drivers to either avoid or prefer certain passengers based on perceived race, ethnicity, religion, disability or gender. This also creates a public safety issue, since unlicensed drivers without adequate background checks receive photographs and, on information and belief, cellphone numbers of their passengers.

xvi) City Taxi Regulations require affiliations to provide service anywhere in Chicago within 30 minutes of receipt of a request, upon penalty of fines for non-compliance (Affiliation Regs. R. Nos. 5(g), 5.2; Dispatcher Regs. Nos. 5(e)); drivers for the Unlawful Transportation Providers may and do disregard requests at their discretion;

xvii) City Taxi Regulations control the age (no older than four model years for conventional cars and five for hybrids), condition and model of taxi vehicles (Taxi Regs. TX3.01-3.05); the Unlawful Transportation Providers allow vehicles to be used that do not meet these requirements;

xviii)   City Taxi Regulations require medallion owners to submit to regular City-performed vehicle inspections (Mun. Code §§9-112-050, 060, 070; Taxi Regs. TX3.03); the Unlawful Transportation Providers do not submit to such inspections;

xix)   City Taxi Regulations require medallion owners to meet specific driver safety equipment requirements (Mun. Code §9-112-140; Taxi Regs. TX6.01-6.03); the Unlawful Transportation Providers do not;

xx)   City Taxi Regulations prohibit medallion owners from leasing to drivers who are not licensed chauffeurs in good standing or are otherwise below a certain age, have negative driving records or criminal records, or who fail an annual drug test; additionally, medallion owners and drivers must be in compliance with court-ordered child support obligations (Mun. Code §§ 4-4-152, 9-104-030, 9-112-160, 9-112-200); the Unlawful Transportation Providers do not comply with these requirements; indeed, upon information and belief, Uber has contracted with former taxi drivers whose chauffeur licenses had been suspended for violations of the City Taxi Regulations;

xxi)   City Taxi Regulations require the Commissioner to suspend the license of any medallion owner who is charged with a felony (Mun. Code §9-112-370(e)); the Unlawful Transportation Providers may dispatch drivers charged with a felony without regard to this restriction;

xxii)   City Taxi Regulations prohibit medallion owners from permitting any taxi driver to operate a cab for more than 12 consecutive hours during any 24-hour period or to begin a 12-hour shift without at least 8 hours of non-operation in advance

(Mun. Code §9-112-250); upon information and belief, the Unlawful Transportation Providers do not impose such restrictions or monitor whether their drivers work excessive hours;

xxiii) City Taxi Regulations require medallion owners to equip all taxis with meters that meet standards published by the National Institute of Standards and Technology and that must be active whenever the taxi is engaged for hire in the City, and to have the meters inspected and tested annually (Mun. Code §9-112-510; Taxi Regs. TX5.02-5.05); the Unlawful Transportation Providers use smartphone apps as the metering device that are not subject to use limits or calibration testing;

xxiv) City Taxi Regulations require medallion owners to collect taxi data, to transmit it and to make it available to the City for compliance review (Affiliation Regs. R. Nos. 2.69(E), 5(f), 5.1); the Unlawful Transportation Providers do not impose this requirement on their drivers or cars;

xxv) City Taxi Regulations prohibit a party who does not have a public passenger vehicle license (Mun. Code §9-114-020) from providing livery service; Uber offers its "Black" or "Limo" service although it does not have a public passenger vehicle license;

xxvi) City Taxi Regulations require livery cars to charge a flat rate fixed in advance (Mun. Code §9-114-010, 060); UberBlack/SUV do not comply because they use GPS metering based on distance and time.

70.    The Unlawful Transportation Providers also operate in violation of specific Illinois state law requirements:

i)  The Unlawful Transportation Providers are subject to Illinois law requiring the filing with the State of proof of commercial liability insurance (625 ILCS 5/8-101, 102); on information and belief, the Unlawful Transportation Providers have not complied;

ii)  The Unlawful Transportation Providers do not comply with the Illinois Taxi Safety Act of 2007, which requires that the taxi driver's picture, license or registration number, and exterior identification number be visibly posted in each cab; and that a telephone number for the passenger to call be visibly posted so that the passenger can report reckless driving.  625 ILCS 55/5.  The cars dispatched by UberX, Lyft and Sidecar have no driver identification, photograph or phone number posted.  They are indistinguishable from ordinary passenger cars (except that Lyft utilizes the marketing gimmick of having many of its drivers affix a large pink, removable mustache to the grills of their cars).

71.     The foregoing is not an exhaustive list of all respects in which the Unlawful Transportation Providers provide unlicensed taxi and limousine services in violation of City and State requirements.

72.     The City has vigorously enforced and continues to vigorously enforce the City Taxi Regulations against the Transportation Plaintiffs, who are regularly required to appear at administrative hearings to respond to citations alleging violations of the Regulations, and sometimes pay substantial fines when the allegations have been sustained.  The City has issued only a few nominal citations and impoundments against the Unlawful Transportation Providers despite the fact that every ride they dispatch and every dime they charge and collect is done in open and blatant disregard and violation of the City Taxi Regulations.

**The City's Discrimination On the Basis of Disability, Race and Other Factors**

73.     The City Taxi Regulations contain several regulations intended to make taxi services more accessible to persons with disabilities.   Plaintiff Saul and other persons with disabilities are the intended beneficiaries of these accessibility provisions.

74.     As noted above, a licensee that "owns or controls" 20 or more licenses must use wheelchair accessible vehicles for at least five percent of its fleet.  (Mun. Code §9-112-570(b).) Upon information and belief, each of the Unlicensed Transportation Providers contracts with and controls more than 20 vehicles, each of which should be licensed under the City Transportation Regulations.   However, probably none is wheelchair accessible, and, in any event, these Providers currently have no means on their systems to dispatch such accessible vehicles.

75.     The City Transportation Regulations also provide incentives to licensees and affiliations to provide wheelchair accessible vehicles.  For example, such vehicles may be older than ordinary licensed taxicabs (Mun. Code §9-112-070); the two-year licensing renewal fee is $1,200 for non-accessible vehicles and $1,000 for wheelchair accessible vehicles; the $200 difference is deposited in a "Wheelchair Accessible Taxicab Fund" administered by the Commissioner to promote wheelchair accessible taxicab vehicles (Mun. Code §9-112-150(b), (g)).

76.     In order to further promote accessibility, the City administers financial benefits to people with disabilities and imposes obligations on the Transportation Plaintiffs.   The City Transportation Regulations require the Transportation Plaintiffs, "[a]s a condition of being licensed, . . . to participate in and comply with [Taxi Access Program, "T.A.P."] or similar program providing for increased access to taxicab service to persons with disabilities."  (Mun. Code §9-112-580.)   Under the T.A.P. program qualified individuals can get their taxi rides

subsidized by PACE. Such persons can pay $5.00 for a credit of up to $13.50 per taxicab ride, and redeem the subsidy by swiping a debit card in the credit card reader taxicabs are required to maintain under the City Taxicab Regulations. "Compliance with T.A.P. includes accepting and processing T.A.P. forms of payment, such as the T.A.P. swipe card." (*Id.*) The Transportation Plaintiffs typically do not receive payment from PACE for rides provided to T.A.P. customers for 30-45 days. Moreover, because PACE sometimes determines that certain riders were not qualified for the subsidy, the reimbursement rate is less than 100%, and the Transportation Plaintiffs lose thousands of dollars each year for such unreimbursed rides.

77. The City is not requiring the Unlawful Transportation Providers to comply with these accessibility obligations. They do not provide wheelchair accessible vehicles, and they do not and cannot accept T.A.P. debit cards because their drivers do not have credit card readers in their cars. As a result, persons needing a wheelchair accessible vehicle cannot avail themselves of any of the rides provided by the Unlawful Transportation Providers, and qualified persons with disabilities who are able to gain access to the vehicles deployed by the Unlawful Transportation Providers cannot avail themselves of the substantial governmental discounts to which they are entitled.

78. Plaintiff Saul has asked Uber if it could provide a wheelchair accessible vehicle to him and Uber has replied that it cannot do so. Plaintiff Saul has informed the City of this refusal.

79. The City is aware that the Unlawful Transportation Providers are not providing accessible vehicles or participating in the T.A.P. program. The City's inaction has not only arbitrarily divided the taxicab industry into two classes (the regulated taxicabs like the Transportation Plaintiffs and the unregulated taxicabs like the Unlawful Transportation Providers), it has arbitrarily divided the riding public into disabled and non-disabled classes, the

first of whom can only request rides from and obtain governmental subsidies through the Transportation Plaintiffs and other regulated taxicab services, while the second of whom can request rides from any taxicab, whether or not regulated.

80.     As stated above, the City is also failing to require the Unlawful Transportation Providers to comply with the provisions in the City Taxi Regulations that taxicabs comply with all Federal, State and City anti-discrimination laws, respond to dispatches to anywhere in the City, accept cash, and not refuse a ride based on the passenger's destination. The Unlawful Transportation Providers are free to pick and choose passengers based on who they are, where they will be picked up and where they will be dropped off. This enables the Providers to favor riders and neighborhoods based on perceived race and ethnicity. Additionally, the City's failure to require the Unlawful Transportation Providers to accept cash has a disparate impact on poor, elderly and minority populations, large portions of whom do not have smartphones or credit cards.

81.     The City's refusal to require the Unlawful Transportation Providers to comply with these accessibility, availability and anti-discrimination rules arbitrarily discriminates against Plaintiff Saul and others similarly situated, while imposing greater obligations on the Transportation Plaintiffs as compared to the Unlawful Transportation Providers, thereby exacerbating the competitive advantages they already garner from the City's arbitrary refusal to regulate them.

**Uber Has Admitted that it and the Other Unlawful
Transportation Providers Gain Unfair Advantages When the
City Allows Them to
Operate in Violation of the City Taxi Regulations**

82.     In a television interview, Uber CEO Travis Kalanick candidly admitted the unlawfulness of its business model and how unfair it is for taxi services, like the Transportation

Plaintiffs, to be required to compete against unlawful taxi services that do not comply with the regulations.[1] Referring to companies like Lyft and Sidecar, Kalanick said that they were engaging in "regulatory arbitrage," and that each ride they arranged in violation of the law constituted a separate "criminal misdemeanor." He complained that they operate without carrying insurance. Because they operate outside the regulatory structure and the costs thereby imposed he said that they "eat you up from the bottom up."

83. Rather than insist on compliance with the law, Mr. Kalanick admitted that Uber has developed a "playbook" under which it would (and did) join the other lawbreakers in markets, like Chicago, where they operate. Uber notified municipal authorities that if they did not enforce the law within thirty days against the violators (Lyft and Sidecar), Uber would declare a state of "regulatory ambiguity" to exist, after which Uber would join the other scofflaws in operating a taxi service without licenses and in knowing and disregard of established law (notwithstanding that Uber was already acting in violation of law and subject to the same complaints from Plaintiffs).

84. Uber also described its "playbook" in a "White Paper" issued on April 12, 2013. In the White Paper, Uber stated that Lyft and Sidecar were regularly violating applicable laws and regulations by providing transportation services in privately-owned vehicles operated by persons without chauffeurs' licenses. Uber stated that it intended to follow their practices based on the tacit approval of regulatory agencies. A copy of the White Paper is attached as Exhibit 9.

85. In the White Paper, Uber identified "a host of clone companies [that] have emerged, most notably Lyft and Sidecar, whose goal is to offer incredibly low-cost

_____

[1]     See http://tech.fortune.cnn.com/2013/07/23/travis-kalanick-uber/

transportation by working exclusively with unlicensed, non-commercially insured vehicles and drivers." Uber stated:

> Over the last year, new startups have sought to compete with Uber by offering transportation services without traditional commercial insurance or licensing. Uber refrained from participating in this technology sector — known as ridesharing — due to regulatory risk that ridesharing drivers may be subject to fines or criminal misdemeanors for participating in non-licensed transportation for compensation.
>
> In most cities across the country, regulators have chosen not to enforce against nonlicensed transportation providers using ridesharing apps. This course of non-action resulted in massive regulatory ambiguity leading to one-sided competition which Uber has not engaged in to its own disadvantage. It is this ambiguity which we are looking to address with Uber's new policy on ridesharing:
>
>> 1. Uber will roll out ridesharing on its existing platform in any market where the regulators have given tacit approval;
>>
>> 2. In the absence of regulatory leadership, Uber will implement safeguards in terms of safety and insurance that will go above and beyond what local regulatory bodies have in place for commercial transportation.

Uber identified Chicago as a location in which "the regulators have chosen NOT to enforce existing regulations against non-licensed operators." (Uber's emphasis.)

86.     Thereafter, Uber began offering its UberX service in the Chicago area. Uber provides transportation to the public in Chicago from any driver who signs up for the UberX program and uses his or her own car, with no requirement that he or she have a chauffeur license, insurance covering rides-for-hire, or meet the other City and State requirements applicable to taxis and limousines.

87.     As stated in the Uber White Paper, Uber did so based on "tacit approval" from the City. In the Chicago market, Uber relies upon the tacit approval of the City in providing UberX

services without complying with the City Taxi Regulations. The City has provided its tacit approval by not taking meaningful action to enforce the City Taxi Regulations in the face of Uber's public challenge to regulators stated in the White Paper, and repeated requests for enforcement from Plaintiffs and others. The City's tacit approval is also reflected by the recent public statement of Spielfogel that enforcing rules against Uber and other Unlawful Transportation Providers had been put on indefinite hold. The actions of Uber and the City constitute and reflect the existence of an agreement between them not to enforce the City Taxi Regulations against Uber and other Unlawful Transportation Providers.

88.     Contrary to Uber's assertion in the White Paper, there has not been any regulatory ambiguity concerning the relevant law and regulations. The extensive City Taxi Regulations are clear. By permitting the Unlawful Transportation Providers to operate in violation of these laws and regulations, and by tacitly agreeing to such violations after Uber notified the City of its intent to violate the law, the City has aided, abetted and enabled the Unlawful Transportation Providers to damage Plaintiffs and to destroy Transportation Plaintiffs' businesses.

89.     The City's tacit agreement with Uber is particularly egregious because Uber's White Paper and other public pronouncements falsely convey a concern for public safety that is belied by the actual terms of Uber's contract with the public who use its services. For example:

  a.  Uber's White Paper states, "Extensive and strict background checks will be performed on any ridesharing transportation provider allowed on the Uber platform. The criteria for which a driver will be disqualified will be stricter than what any existing local regulatory body already has in place for commercial transportation providers." Ex. 9 at 6. This is false. Uber's Terms and Conditions in its smartphone app (viewed on January 7, 2014, and dated May 17, 2013)

expressly state in capital letters that Uber will not conduct background checks or be liable for any injury caused by their drivers: "THE COMPANY MAY INTRODUCE YOU TO THIRD PARTY TRANSPORTATION PROVIDERS FOR THE PURPOSES OF PROVIDING TRANSPORTATION. WE WILL NOT ASSESS THE SUITABILITY, LEGALITY OR ABILITY OF ANY THIRD PARTY TRANSPORTATION PROVIDERS AND YOU EXPRESSLY WAIVE AND RELEASE THE COMPANY FROM ANY AND ALL LIABILITY, CLAIMS OR DAMAGES ARISING FROM OR IN ANY WAY RELATED TO THE THIRD PARTY TRANSPORTATION PROVIDER. YOU ACKNOWLEDGE THAT THIRD PARTY TRANSPORTATION PROVIDERS PROVIDING TRANSPORTATION SERVICES REQUESTED THROUGH UBERX MAY OFFER RIDESHARING OR PEER-TO-PEER TRANSPORTA-TION SERVICES AND MAY NOT BE PROFESSIONALLY LICENSED OR PERMITTED. THE COMPANY WILL NOT BE A PARTY TO DISPUTES, NEGOTIATIONS OF DISPUTES BETWEEN YOU AND ANY THIRD PARTY PROVIDERS. WE CANNOT AND WILL NOT PLAY ANY ROLE IN MANAGING PAYMENTS BETWEEN YOU AND THE THIRD PARTY PROVIDERS. RESPONSIBILITY FOR THE DECISIONS YOU MAKE REGARDING SERVICES OFFERED VIA THE APPLICATION OR SERVICES (WITH ALL ITS IMPLICATIONS) RESTS SOLELY WITH YOU. WE WILL NOT ASSESS THE SUITABILITY, LEGALITY OR ABILITY OF ANY SUCH THIRD PARTIES AND YOU EXPRESSLY WAIVE AND RELEASE THE COMPANY FROM ANY AND ALL LIABILITY CLAIMS,

CAUSES OF ACTION OR DAMAGES ARISING FROM YOUR USE OF THE APPLICATION OR SERVICE, OR IN ANY WAY RELATED TO THE THIRD PARTIES INTRODUCED TO YOU BY THE APPLICATION OR SERVICE."

b. Contrary to Uber's extensive limitations on its responsibilities to its passengers quoted above, Uber's White Paper states: "Innovation and consumer safety are at the core of Uber's culture. . . . We wanted to set the rules in a place where everyone would agree that safety and welfare of consumers was taken care of." Ex. 9 at 6. This is false. It is contradicted by the language quoted above, as well as by additional disclaimers in its app's terms and conditions: "THE QUALITY OF THE TRANSPORTATION SERVICES SCHEDULED THROUGH THE USE OF THE SERVICE OR APPLICATION IS ENTIRELY THE RESPONSIBILITY OF THE THIRD PARTY PROVIDER WHO ULTIMATELY PROVIDES SUCH TRANSPORTATION SERVICES TO YOU. YOU UNDERSTAND, THEREFORE, THAT BY USING THE APPLICATION AND THE SERVICE, YOU MAY BE EXPOSED TO TRANSPORTATION THAT IS POTENTIALLY DANGEROUS, OFFENSIVE, HARMFUL TO MINORS, UNSAFE OR OTHERWISE OBJECTIONABLE AND THAT YOU USE THE APPLICATION AND THE SERVICE AT YOUR OWN RISK."

c. Uber's White Paper states: "At minimum, there will be a $2,000,000 insurance policy applicable to ridesharing trips. This insurance applies to any ridesharing trip requested through the Uber technology platform." Ex. 9 at 5. This is either false or highly misleading. Upon information and belief, Uber's policy is only an "excess" policy that does not provide coverage unless the driver's personal

liability policy provides coverage, which it does not.  An agency of the State of California recently determined that Uber's "excess" policy does not provide insurance coverage for the UberX drivers, passengers or the public.  Uber has not released its insurance policy publicly or filed it (or the policies of its drivers) with the State as required by 625 ILCS 5/8-101.  Even if such coverage actually existed regarding so-called ridesharing trips, it is misleading and illusory for Uber to tout coverage for liability because the very same disclaimers of liability quoted above purport to hold Uber harmless from any potential claim for damages that an insurer may have to defend from a passenger involved in an accident.

90.     The falsity of Uber's insurance representations was recently exposed in connection with an accident in San Francisco in late 2013 in which an UberX driver caused the death of a six-year old pedestrian.  Uber has publicly asserted that it is not responsible for an accident caused by this driver.

91.     Uber's purported disclaimers of liability not only contradict its false assertions of concern about public safety, they violate Illinois law.  Notwithstanding Uber's attempts to characterize itself as a mere matchmaker of riders and drivers, Uber (as well as the other Unlawful Transportation Providers) is a common carrier as a matter of law.  A common carrier owes its passengers the duty to use the highest degree of care consistent with the type of vehicle used in the practical operation of its business.  *Rotheli v. Chicago Transit Authority*, 7 Ill.2d 172 (1955).  Illinois law prohibits the Unlawful Transportation Providers from disclaiming liability for their own negligence or other breaches of their duty to use the "highest degree of care."

92.     Uber has also admitted that it cannot compete with the Transportation Plaintiffs on a level playing field.  Its business model depends upon the "regulatory arbitrage" through

which it can operate in an unrestricted fashion while traditional taxicab companies operate by the rules, which include the substantial expense of carrying commercial insurance and remaining potentially liable to the riding public.  This truth was highlighted in November 2012, when the Commissioner published draft proposed rules that would have expressly prevented Uber from using the GPS function on smartphones to calculate fares on a time and distance basis for its "Black Car" livery service.  (In fact, these proposed rules only clarified existing rules that already prohibited limousine fares from being calculated on a time-distance basis and required taximeters for time-distance calculation of fares for taxicabs.)  Uber responded to these proposed regulations via a lobbying and public relations campaign in which it admitted that such regulations, if enacted and enforced, would prohibit Uber's "Black Car" service.  Upon information and belief, it was shortly after Uber's objection to the proposed regulations that Spielfogel quietly directed the Commissioner not to implement the regulations and instituted the general moratorium on enforcement of the City Taxi Regulations against Uber and the other Unlawful Transportation Providers.

93.     Plaintiffs' representatives and others have repeatedly requested the City to enforce the City Taxi Regulations against the Unlawful Transportation Providers.  Except for minor, isolated actions, the City has refused to do so, despite its knowledge that the Unlawful Transportation Providers are operating without insurance covering injuries to passengers or pedestrians, while continuing to enforce those regulations vigorously against the Transportation Plaintiffs.

94.     The Commissioner has admitted the lawlessness and public danger created by the uninsured and unlicensed operation of *de facto* taxicabs by the Unlawful Transportation Providers.  In several "tweets" posted on her Twitter account, she urged the public to take only

licensed and insured Chicago-medallion taxicabs or liveries. A true and correct copy of some of these tweets is attached as Group Exhibit 10. For example:

    a. In a tweet on August 9, 2013 (Ex. 10A), she tweeted "It's the weekend. Make the safe choice! It's easy: Remember '4 digits or less' on license plate! LY & TX." Posted below the text is a heading, "Make the safe choice: Ride in a licensed Chicago taxi!" While the focus of this tweet was to choose Chicago taxis over suburban taxis, her reasons for doing so apply even more so to the Unlicensed Transportation Providers, who:

> don't go through the following rigorous City inspections: + Annual Chauffeur drug test + Annual Chauffeur physical exam + Monthly reviews of Chauffeur's red light violations + Monthly reviews of Chauffeur's Secretary of State record + Bi weekly revise of CPD arrests and violations + 311 complaint numbers + Mandated continuing education classes for Chauffeurs + Twice annual mechanical inspection of vehicle

    b. In a tweet on August 16, 2013 (Ex. 10B), she tweeted "It's Friday – be safe! And remember 4 digits or less with a TX or LY on the plate! Posted below the text is a photo of a patient in a hospital bed in traction with the caption, "Look at me! I saved a dollar riding in an unlicensed cab."

    c. In a tweet on October 11, 2013 (Ex. 10C), she tweeted "Be an educated consumer – know what you're getting into. Have a safe holiday weekend." Posted below the text is a heading stating "EDUCATE YOURSELF! KNOW THE TERMS & CONDITIONS." Beneath the heading is a photo of a crumpled wreck of a car with a caption quoting from an "Actual Sentence From A Company's Discliamer [*sic*]," "YOU UNDERSTAND, THEREFORE, THAT BY USING THE APPLICATION AND THE SERVICE, YOU MAY BE EXPOSED TO

TRANSPORTATION THAT IS POTENTIALLY DANGEROUS, OFFENSIVE, HARMFUL TO MINORS, UNSAFE OR OTHERWISE OBJECTIONABLE, AND THAT YOU USE THE APPLICATION AND THE SERVICE AT YOUR OWN RISK." This language comes from Uber's terms and conditions, quoted above in Paragraph 90.

    d.   In a tweet on October 25, 2013 (Ex. 10D), she tweeted "It's the Friday night—Stay safe. Take only licensed taxis!" Posted below that text is a heading "Ridesharing: Are you covered?" over a photo of a totally wrecked car, followed by the caption: "Standard Auto Insurance will not pay for loss 'which occurs while [your personal vehicle] is being used as a public or livery conveyance.'"

95.    The Commissioner's tweets have been symbolic and ineffectual because there has been no systematic enforcement to support them, due, upon information and belief, to direction from the Office of the Mayor. Exhortation via Twitter is not enforcement.

96.    In sum, the Unlawful Transportation Providers are engaging in systematic, intentional, brazen, open and notorious lawlessness that the City has enabled, aided and abetted. With the knowledge of the City, they deploy unlicensed, uninspected and non-accessible vehicles, many older than four years; they are driven by unlicensed and unchecked drivers using smartphones while driving; the drivers are permitted to reject any passenger or destination; they provide no insurance against injuries to the public; they attempt to disclaim any liability to the public they are serving; they charge rates often far in excess of those set by City law; and those rates are calculated by uncalibrated smartphone devices.

97.    As a result of the foregoing, lawful operators of taxi and limousine services, like the Transportation Plaintiffs, are required to compete at a government-sanctioned disadvantage

with unlawful, unlicensed operators like the Unlawful Transportation Providers. The resulting unlawful discrimination against lawful operators will continue to worsen unless this Court requires the City apply the City Taxi Regulations impartially and in a non-arbitrary manner to all similarly-situated transportation providers while respecting the investment-backed expectations the City has created and fostered.

98. The City's failure to enforce the City Taxi Regulations has already begun to impact the market value of taxi medallions.

99. As noted above, until recently, the market value of medallions was about $360,000 or more. In a typical medallion sale, the purchaser would pay 25% of the price in cash and borrow 75% of the price from entities like Plaintiff Funding, Plaintiff Tri Global or commercial banks such as Capital One. Typically, the loans would be secured by the medallions and personal guarantees.

100. Plaintiffs Funding, Tri Global (and other entities with similar business models) are particularly prejudiced from the City's failure to enforce the City Taxi Regulations. Funding and Tri Global borrow money from commercial lenders, which they then loan to purchasers of medallions, secured by the medallions and personal guaranties. Funding and Tri Global's loan agreements with their lenders require them to maintain a loan-to-value ratio in their portfolio of loans of no greater than 70% to 75% of the trailing three-month rolling average of medallion values. They are required to file periodic certificates with their lenders, incorporating data showing the prices from recent medallion sales, to demonstrate that the requisite ratio is maintained. If medallion values drop, the certificates would reflect the decline. In that event, to avoid default Funding and Tri Global would be required to post additional cash or collateral to restore the ratio to no greater than the 70% or 75% figure in the relevant agreement. The

collective value of Funding and Tri Global's loan portfolios exceeds $250 million. If medallion values drop, Funding and Tri Global would be required to post tens of millions of dollars in cash or collateral to avoid default.

101.   Because of the City's failure to require the Unlawful Transportation Providers to comply with the City Taxi Regulations, medallion values have already begun to fall, and if the trend continues, the consequences to Transportation Plaintiffs and other medallion owners and lenders would be catastrophic:  defaults will occur, medallion values will fall further, lenders will not finance future sales of medallions, medallion owners will be unable to sell, and the system, including owners, lenders, brokers and affiliations, will collapse.

102.   The Unlawful Transportation Providers have not been required to purchase medallions and outlay the cash or incur the debt to do so.  This – along with their failure to obtain insurance covering injuries to the public, require newer, inspected vehicles, deploy licensed drivers and comply with the myriad other regulations – gives them a huge and unfair competitive advantage over Transportation Plaintiffs, an advantage the City has inexplicably permitted to occur and grow.

103.   The violations alleged in this Complaint arise from an official policy or practice of the City acting through the Office of the Mayor and the Commissioner, the officer charged by City law with the duty to enforce the City Taxi Regulations.

### Count I – Violation of the Takings Clause

104.   Plaintiffs incorporate and reallege paragraphs 1-104.

105.   The Takings Clause of the Fifth Amendment to the United States Constitution, incorporated against the states under the Due Process Clause of the Fourteenth Amendment,

provides that the City may not take property unless it is for a public purpose and just compensation is paid to the property owner.

106.    Medallions are property as a matter of Illinois law.

107.    Plaintiff medallion owners and lenders holding security interests in medallions own property that may not be taken by the City without payment of just compensation.

108.    Without compensation to the medallion owners or the lenders holding security interests in the medallions, the City has permitted and continues to permit the Unlawful Transportation Providers to usurp and trespass upon the exclusive property rights of medallion owners by providing *de facto* taxi services without buying or leasing medallions or complying with the City Taxi Regulations.    The City has thereby taken those exclusive property and contract rights from medallion owners without any compensation, let alone the just compensation that the Takings Clause requires.

109.    Plaintiffs are entitled to the following relief under Count I:

    a.    An injunction enjoining the City from continuing to violate the Takings Clause Act by allowing the Unlawful Transportation Providers to operate *de facto* taxis without medallions or compliance with the City Taxi Regulations;

    b.    Just compensation resulting from the City's takings, which consists of:

        i.    For the Plaintiff medallion owners, an amount equal to the diminution in medallion value caused by the City's failure to require the Unlawful Transportation Providers to acquire medallions and otherwise to enforce the City Taxi Regulations against the Unlawful Transportation Providers and/or amounts of cash or the value of other collateral they may be

required to provide to their lenders to maintain the loan-to-value ratio required under their financing agreements;

ii. For the Plaintiffs who extended loans to medallion owners secured by the medallions, an amount of cash sufficient to restore the ratio of loan amount to medallion value that existed prior to the diminution in medallion value caused by the City's failure to require the Unlawful Transportation Providers to acquire medallions and otherwise to enforce the City Taxi Regulations against the Unlawful Transportation Providers;

c. An award of the Plaintiffs' attorneys' fees and litigation expenses;

d. Such other relief as the Court deems appropriate.

## Count II – Violation of the Equal Protection Clause

110. Plaintiffs reallege paragraphs 1-110.

111. The City's actions in enforcing the City Taxi Regulations against the Plaintiffs but not against the Unlawful Transportation Providers deny Plaintiffs equal protection of the laws in that the Unlawful Transportation Providers are permitted to offer taxi services to the public without complying with the City Taxi Regulations, while the Plaintiffs are not so permitted.

112. The Transportation Plaintiffs who have purchased costly medallions or the Transportation Plaintiffs whose businesses depend upon the medallion system as the exclusive means to enter the taxi business, constitute a distinct business classification that has been created and supported by long-standing City laws, regulations and practices, including by the City's support of the medallion system. Against this unique historical background, any action by the City, whether under existing ordinances and regulations or those that may be enacted for the benefit of the Unlawful Transportation Providers, violates the equal protection rights of the

Transportation Plaintiffs so long as it permits *de facto* taxi operations by the Unlawful Transportation Providers on an uneven playing field.

113.    The City has not offered any rational justification for the unequal application of the City Taxi Regulations.  As described herein, the City's decision to apply the City Taxi Regulations unequally is not rationally related to any legitimate governmental interest.

114.    Plaintiffs are suffering and will continue to suffer direct and tangible losses and damages from the City's actions and inactions in that, without limitation, (i) the market and collateral value of the medallions and their marketability are being or will be reduced by the unequal application of the City Taxi Regulations, (ii) the Plaintiffs who operate taxis directly are being injured in that the revenues derived from their lawful operations will be reduced as a result of the Unlawful Transportation Providers' unlawful operation of unlicensed taxis, (iii) the Plaintiffs who operate affiliations and dispatch services are required to meet and comply with a host of costly and burdensome City Taxi Regulations when the Unlawful Transportation Providers are not required to comply; and (iv) public taxi customers with disabilities, like Plaintiff Saul and others similarly situated, are being deprived of access to the wheelchair accessible taxis and the T.A.P. discounts that would be provided to them if the City were enforcing the City Taxi Regulations against the Unlawful Transportation Providers.

115.    The City's actions and inaction are intentional.  The City and the Commissioner are fully aware that the Unlawful Transportation Providers are operating in violation of the City Taxi Regulations.  The City has known at least since the Court's decision in *Mustfov v. Rice et al and City of Chicago*, 663 F. Supp. 1255, 1262-63 (N.D. Ill. 1987), that the Equal Protection Clause of the United States Constitution is applicable to the City's unequal application of the City laws to some but not all taxi and limousine drivers.

116.    Plaintiffs are entitled to the following relief under Count II:

a.    An injunction enjoining the City from unequal enforcement of the City Taxi
Regulations;

b.    Damages resulting from the City's unequal enforcement of the City Taxi
Regulations;

c.    An award of their attorneys' fees and litigation expenses;

d.    Such other relief as the Court deems appropriate.

## Count III – Violation of Substantive Due Process Rights

117.    Plaintiffs reallege paragraphs 1-117.

118.    The City's administration of the City Taxi Regulations, applying them to Plaintiffs and other licensed medallion owners, dispatch operators and affiliations, while choosing not to apply them to the Unlawful Transportation Providers, is arbitrary and capricious and deprives Plaintiffs of their property interests in their medallions and in the businesses they operate based upon the City Taxi Regulations.

119.    Neither State law nor City ordinances provide a basis for the City to ignore or effectively repeal the City Taxi Regulations as applied to the Unlawful Transportation Providers.

120.    The Commissioner is not authorized to grant express or tacit approval to the Unlawful Transportation Providers to operate in violation of the City Taxi Regulations.  Neither Spielfogel nor the Mayor is authorized to grant express or tacit approval to the Unlawful Transportation Providers to operate in violation of the City Taxi Regulations.

121.    The City is well aware that it is obligated to enforce City Taxi Regulations and that executive officers of the City, such as the Commissioner or Spielfogel, are not empowered to suspend the operation of the City Taxi Regulations.

122. Such knowledge is based, among other things, upon the fact that in 1982 the City Commissioner of Consumer Affairs, the Commissioner's predecessor, suspended the operation of City Taxi Regulations that required the City to permit the transfer of taxi medallions. In the ensuing lawsuit brought under 42 U.S.C § 1983 against the Commissioner and the City, the court held that the action constituted a violation of substantive due process rights.

123. In *Flower Cab Co. v. Petitte et al.*, 658 F. Supp. 1170, 1179-80 (N.D. Ill. 1987), the court stated:

> . . . even the City Council cannot unilaterally suspend the enforcement of one of its ordinances. It follows that the Commissioner, an administrative agent whose powers and functions derive from ordinances passed by the Council, possessed no legal authority to issue the moratorium announced in July of 1982. Reference to the statute outlining her duties establishes that the City Council has never authorized the Commissioner to take this sort of action. Chap. 16, § 16–4 of the Municipal Code defines the scope of the Commissioner's power and authority. It contains no reference to the unprecedented action taken in this case. In fact, its provisions place significant constraints on the Commissioner's ability to affect the existing terms of the taxicab ordinance and clearly establishes the impropriety of her conduct.
>
> * * * * *
>
> Thus, the responsibility for revising and changing the code clearly lies with the Mayor and the City Council. Nothing in the City's ordinances authorized the Commissioner's unexpected and unprecedented imposition of this moratorium. This court implicitly recognized the invalidity of the Commissioner's action in its order granting the preliminary injunction. *See* Transcript of Proceedings, Friday, January 22, 1982 at 12–13, 15–16. Accordingly, the court finds that the Commissioner's imposition of this moratorium was arbitrary and had no basis in law. Therefore, the court concludes that the moratorium deprived plaintiffs of their substantive due process rights.

124. The present case is controlled by the principles stated in *Flower Cab.*

125. Plaintiffs are entitled to the following relief under Count III:

a.  An injunction enjoining the City from failing to enforce the City Taxi Regulations against the Unlawful Transportation Providers;

b.  Damages resulting from the City's failure to enforce the City Taxi Regulations against the Unlawful Transportation Providers;

c.  An award of Plaintiffs' attorneys' fees and litigation expenses;

d.  Such other relief as the Court deems appropriate.

### Count IV – Breach of Contract

126.  Plaintiffs reallege paragraphs 1-126.

127.  The City Taxi Regulations, coupled with the Transportation Plaintiffs' reliance on such Regulations and their expenditure of very large sums of money to purchase medallions and operate the Transportation Plaintiffs' taxi-related businesses, including the businesses of dispatching taxis, operating taxi affiliations, leasing the right to operate taxis pursuant to licenses from the City, and loaning money to purchase medallions secured by the medallions subject to the City Taxi Regulations give rise to contractual rights on the part of Plaintiffs.

128.  The resulting licenses to operate affiliations, dispatch services and to own medallions and the right to operate taxis pursuant to the ownership of licenses, give rise to a binding contractual relationship between the City and each of the Plaintiffs (the "**Regulated Taxi Operators' Contract**").

129.  Illinois law recognizes that the relationship between taxi operators and the City, although structured as a "license," is also a contract.  The Illinois Supreme Court so held in *Yellow Cab Co. v. City of Chicago*, 396 Ill. 388, 401-02 (1947):

> *The question to be determined in the case at bar is whether or not a licensing ordinance can constitute a contract between the city and the licensees. It is the opinion of this court that the licensing ordinances in the case at bar did create a contract between the city and the licensees.* In the case of Peoria Railway Co. v.

Peoria Railway Terminal Co., 252 Ill. 73, 96 N.E. 689, we held that the privilege to use the streets of a city having been granted by an ordinance was not recoverable at the will of the city after it had been accepted by the license had been also held that where the license had been acted upon in a substantial manner and the revocation thereof would be inequitable, the same could not be revoked. This court in the case of American Can Co. v. Emerson, 288 Ill. 289, 123 N.E. 581, held that a license granted to a foreign corporation to do business in the State of Illinois constitutes a contract between the foreign corporation and the State of Illinois. (Italics added.)

130. Likewise, in the present case, Plaintiffs acted in reliance upon the licenses granted by the City in many important respects, including by paying large amounts for taxi medallions (including a 5% City of Chicago transfer tax) and creating businesses that relied upon the even-handed enforcement of the City Taxi Regulations against all who operate taxi-service businesses. It would be inequitable for the City to act in disregard of the contract rights that have arisen as a result of the City Taxi Regulations and the City's history of enforcement thereof.

131. A principal term of the rights created by the Regulated Taxi Operators' Contract is that the City agreed to require all who purport to operate taxi affiliations, taxi dispatch services, taxis or limousines to do so only pursuant to the comprehensive City Taxi Regulations.

132. As stated in the City's taxi ordinance quoted in paragraph 27, "the city grants *exclusive* permission and authority to the licensees hereunder to operate the taxicab vehicles licensed hereunder unless rescinded, terminated, or revoked as hereinafter provided." (Italics added.) The Regulated Taxi Operators' Contract between the City and the Plaintiffs, therefore, grants to the Plaintiffs the *exclusive* right to operate taxis, taxi affiliation and taxi dispatch services pursuant to the city ordinances and regulations. In exchange, the Transportation Plaintiffs, among other things, have paid substantial amounts to the City in the form of payments for taxi medallions and taxes and have otherwise incurred additional expense complying with extensive regulations and requirements, including requirements to provide services in otherwise underserved areas of the City.

133.     The City has materially breached the Regulated Taxi Operators' Contract by allowing the Unlawful Transportation Providers to offer services that are virtually identical to the services offered by the Transportation Plaintiffs, but without requiring that they obtain licenses or otherwise comply with applicable law and regulations.

134.     The City's breach of the Regulated Taxi Operators' Contract has damaged the Transportation Plaintiffs by causing loss of revenues and profits, and reducing the value of their businesses, assets and their taxi licenses.

135.     Plaintiff Saul and others similarly situated are intended third-party beneficiaries of the Regulated Taxi Operators' Contract.   The City has materially breached this Contract by failing to require the Unlawful Transportation Providers to comply with the accessibility requirements in the City Taxicab Regulations.   The City's breach as to them has reduced the pool of paratransit services that would otherwise be available to them.

136.     The City is liable to Plaintiffs for all damages incurred.

137.     To the extent such damages are difficult to compute or otherwise incapable of full compensation by money damages, Plaintiffs' remedies at law are inadequate, and Plaintiffs are entitled to injunctive relief.

138.     Plaintiffs are entitled to the following relief under Count IV:

    a.   An award of their damages for the City's breach of the Regulated Taxi Operators' Contract;

    b.   An injunction enjoining the City from further breaches of the Regulated Taxi Operators' Contract;

    c.   An injunction requiring the City to enforce the exclusive licensing rules contained in the City Taxi Regulations against the Unlawful Transportation Providers;

    d.   Such other relief as the Court deems appropriate.

<strong>Count V – Promissory Estoppel</strong>

139.    Plaintiffs reallege paragraphs 1-126.

140.    Count V is pleaded in the alternative to Count IV.

141.    The City has agreed with and promised the Transportation Plaintiffs by means of the City Taxi Regulations and by the City's conduct in implementing them to maintain the exclusive rights of medallion owners to operate taxis and to maintain the market value of medallions, as more fully described in paragraphs 25-29 above.

142.    The Transportation Plaintiffs relied on such promises by, *inter alia,* investing millions of dollars to purchase medallions, to finance medallions and/or to create and operate taxi affiliations, as more fully described above.

143.    The Transportation Plaintiffs' reliance on the City Taxi Regulations and City conduct in implementing the Regulations was expected and foreseeable by the City.  Indeed, the City intentionally induced such reliance to create and maintain a well-regulated, safe and orderly taxi system in Chicago, and to realize for the City the large amounts of revenues (estimated at more than $24 million annually) that result from the operation of the Chicago taxi system pursuant to the City Taxi Regulations.

144.    The Transportation Plaintiffs relied on the promises and actions of the City to their detriment.

145.    Plaintiffs are entitled to the following relief under Count V:

    a.   An award of their damages for the City's breach of their promises;

    b.   An injunction enjoining the City from further breaches of their promises;

c. An injunction requiring the City to enforce the exclusive licensing rules contained in the City Taxi Regulations against the Unlawful Transportation Providers;

d. Such other relief as the Court deems appropriate.

### Count VI – Equitable Estoppel

146. Plaintiffs reallege paragraphs 1-146.

147. The City's enactment and past enforcement of the City Taxi Regulations, as well as its sales of medallions, constitute affirmative acts by the City over the course of decades.

148. The Transportation Plaintiffs substantially and reasonably relied to their detriment upon these affirmative City acts by, *inter alia,* investing millions of dollars through purchasing medallions, financing medallions and/or creating and operating taxi affiliations.

149. The City is estopped from enabling and condoning a system of *de facto* taxi operation by Unlawful Transportation Providers that are not required to comply with the many obligations the City imposes upon the Transportation Plaintiffs.  Estoppel is necessary to remedy a serious injustice.

150. Plaintiffs are entitled to the following relief under Count VI:

a. An award of their damages caused by the City's failure to enforce the City Taxi Regulations;

b. An injunction requiring the City to enforce the exclusive licensing rules contained in the City Taxi Regulations against the Unlawful Transportation Providers;

c. Such other relief as the Court deems appropriate.

* * * * * *

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL CLAIMS TRIABLE TO A JURY.**

Dated:  February 6, 2014                    Respectfully submitted,

                                            Plaintiffs,


                                            By:   /s/ Edward W. Feldman
                                                    One of their attorneys

Michael L. Shakman
Edward W. Feldman
Stuart M. Widman
Melissa B. Pryor
**MILLER SHAKMAN & BEEM LLP**
180 N. LaSalle Street, Suite 3600
Chicago, Illinois 60601
312-263-3700

## APPENDIX 1 – LIST OF THE 111 MEDALLION OWNER PLAINTIFFS

The following is a list of the plaintiff entities comprising the 111 Medallion Owner Association, each of which owns one or more medallions:

Ample Sun Cab Corp.
Aqua Zone Cab Co.
Argentine Open Corp.
August Cab Corp.
Baby Cab Corp.
Baby Sienna Cab Corp.
Barbie In Chicago Cab Corp.
Barometer II Hacking Corp.
Blue Eyes Cab Corp.
Bonus Taxi, Inc.
Bori Bus, Inc.
Brown Eyes Cab Corp.
Chicago Auction Cab Co.
Chicago Polo I, Inc.
Chicago Polo II, Inc.
Chicago Polo III, Inc.
Chicago Polo IV, Inc.
Chicago Polo IX, Inc.
Chicago Polo V, Inc.
Chicago Polo VI, Inc.
Chicago Polo VII, Inc.
Chicago Polo VIII, Inc.
Chicago Polo X, Inc.
Chicago Polo XI, Inc.
Chicago Polo XII, Inc.
Chicago Polo XIII, Inc.
Chicago Polo XIV, Inc.
Chicago Polo XV, Inc.
Chicago Polo XVI, Inc.
Chicago Polo XVII, Inc.
Chicago Seven Cab, Inc.
Chicago Seven, Inc.
Chicago Shane Hacking Corp.
Crazy Jeffrey Cab Corp.
D&G Cab Corp.
Damma Cab Corp.
Daniella Cab Corp.
Dolce Cab Corp.
Dolfina Taxi, Inc.
Enetochka Taxi, Inc.
Five Kids Hacking Corp.

Forcast II Hacking Corp.
Funny Monica in Chicago Inc.
Gala Cab Corp.
Galina Cab Corp.
Gap Cab Corp.
Gem and R Cab Corp.
Geri's Cab Corp.
Green Eyes Cab Corp.
Green Tea Cab Corp.
Hail Hacking Corp.
Humidity II Hacking Corp.
I&B Midwest Enterprise, Inc.
Jasmin Taxi, Inc.
July Cab Corp.
June Cab Corp.
Killer Dog Cab Corp.
King Edward Cab Corp.
Koshechka Taxi, Inc.
Kukla Cab Corp.
Light Breeze Cab Corp.
Lilly Cab Corp.
Lucky Four Cab Corp.
Lucky in Chicago, Inc.
Lucky Seven Chicago One, Inc.
Lucky Seven Chicago Three, Inc.
Lucky Seven Chicago Two, Inc.
Lucky Seven Chicago, Inc.
Magenta Zone Cab Corp.
Mama Four Cab Corp.
Mauve Zone Cab Corp.
Misha Cat Cab Corp.
Moisture II Hacking Corp.
Monaco Taxi, Inc.
Moneta Taxi, Inc.
MZ Chicago Cab Corp.
Nev Cab Co.
November Cab Corp.
Pink Zone Cab Corp.
Playing Polo in Chicago, Inc.
Pretty Rachel in Chicago, Inc.
Princess Taxi, Inc.
Rachel Taxi, Inc.
Rainstorm II Hacking Corp.
Reservoir II Hacking Corp.
Samson Cab Corp.
Samuel Taxi Corp.

Scorpion Cab Co.
Shane Taxi, Inc.
Shaun Jr. Taxi, Inc.
Shaun Loves Chicago, Inc.
Showers II Hacking Corp.
Sienna Zone Cab Corp.
Siro, Inc.
Sleet Hacking Corporation
SLSJET Cab Corp.
SLSJETS I Cab Corp.
SLSJETS II Cab Corp.
SLSJETS III Cab Corp.
SLSJETS IV Cab Corp.
SLSJETS V Cab Corp.
Snowblind Cab Corp.
Snowfall II Hacking Corp.
Snowstorm II Hacking Corp.
Susan Cab Corp.
Taxale Taxi, Inc.
Thin Ice Hacking Corp.
Tyler Crazy About Chicago, Inc.
Valex Cab Corp.
Violet Zone Cab Corp.
Zhanet Cab Corp.