**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Illinois Transportation Trade Association, | ) | |
| Yellow Group LLC, Yellow Cab | ) | |
| Affiliation Inc., Taxi Affiliation Services | ) | |
| LLC, YC1 LLC, YC2 LLC, YC17 LLC, | ) | |
| YC18 LLC, YC19 LLC, YC20 LLC, | ) | |
| YC21 LLC, YC22 LLC, YC25 LLC, | ) | |
| YC26 LLC, YC29 LLC, YC32 LLC, | ) | |
| YC37 LLC, YC49 LLC, YC51 LLC, | ) | |
| YC52 LLC, YC56 LLC, Transit Funding | ) | |
| Associates LLC, 5 Star Flash, Inc., | ) | |
| Chicago Medallion Six LLC, Chicago | ) | |
| Carriage Cab Corporation, Royal 3CCC | ) | |
| Chicago Taxi Association, Tri Global | ) | |
| Financial Services, Inc., Chicago Elite | ) | |
| Cab Corporation, Chicago Medallion | ) | |
| Brokers, One Hundred Eleven Corporate | ) | |
| Medallion Owners Association, Emily's | ) | |
| Limousine Service Company, Assabill | ) | |
| and Associates, Afrikico, Inc., and John | ) | |
| Henry Assabill, individually, and by | ) | |
| certain plaintiffs on behalf of others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 14-CV-00827 |
| | ) | |
| The City of Chicago, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

<u>**SECOND AMENDED COMPLAINT**</u>

Plaintiffs, Illinois Transportation Trade Association ("**ITTA**"), Yellow Group LLC

("**Yellow Group**"), Yellow Cab Affiliation, Inc. ("**Yellow Affiliation**"), Taxi Affiliation

Services LLC ("**TAS**"), YC1 LLC, YC2 LLC, YC17 LLC, YC18 LLC, YC19 LLC, YC20 LLC,

YC21 LLC, YC22 LLC, YC25 LLC, YC26 LLC, YC29 LLC, YC32 LLC, YC37 LLC, YC49

LLC, YC51 LLC, YC52 LLC, YC56 LLC (collectively, "**YC Medallion Owners**"), Transit

Funding Associates LLC ("**Funding**"), 5 Star Flash, Inc. ("**Flash**"), Chicago Medallion Six LLC ("**CM6**"), Chicago Carriage Cab Corporation ("**Carriage**"), Royal 3CCC Chicago Taxi Association ("**Royal**"), Tri Global Financial Services, Inc. ("**Tri Global**"), Chicago Elite Cab Corporation ("**Elite**"), Chicago Medallion Brokers ("**Brokers**"), One Hundred Eleven Corporate Medallion Owners Association ("**111 Medallion Owners**"), Emily's Limousine Service Company ("**Limousine**"), Assabill & Associates, Inc., Afrikico, Inc. and John Henry Assabill (collectively, "**Assabill**"), complain against defendant City of Chicago ("**City**") as follows.

The Plaintiffs are collectively referred to as "**Transportation Plaintiffs.**" The subset of Transportation Plaintiffs consisting of the YC Medallion Owners, CM6, 111 Medallion Owners and Assabill are collectively referred to as "**Medallion Owner Plaintiffs**," who sue on behalf of themselves and all other similarly situated medallion owners.

### Overview

1.      Plaintiffs are individuals and entities engaged in the licensed taxi and livery industry in Chicago. They have brought this case because the City of Chicago has arbitrarily violated their constitutional rights by applying burdensome and costly taxi and limo regulations to them, while permitting so-called Transportation Network Companies ("TNCs") (like Uber, Lyft, Sidecar and others) to compete without complying with those requirements or incurring the very large costs the City imposes on Plaintiffs. Both the Plaintiffs and the TNCs engage in the very same business – driving individual passengers for hire ("For-Hire Transportation").

2.      The City is violating Plaintiffs' constitutional rights to just compensation, equal protection and due process by arbitrarily:

    a.      Requiring taxi operators to buy expensive City taxi licenses (known as "medallions") – which Illinois courts treat as property, not mere licenses – which

have in recent years cost hundreds of thousands of dollars each, while destroying their most essential property right and much of their value by allowing the TNC's to operate without them.

b.    Imposing more onerous burdens on the taxi industry, as compared to the TNCs (also referred to herein as "*de facto* taxi companies"), even though both engage in the same business – For-Hire Transportation. The City requires members of the taxi industry to spend hundreds of thousands of dollars *per taxi* to engage in the taxi business and to comply with its vast set of regulations, while the City permits the *de facto* taxi companies to compete in the same business for a small fraction of the cost, and under fewer and much laxer rules.

c.    Imposing extensive, costly and burdensome safety-related obligations on the taxi industry, but not on the TNCs.

3.    The For-Hire Transportation business consists of four simple elements, whether the service is provided by a taxi, a limo or a TNC: a driver, a vehicle, a passenger and payment. These elements do not depend on how the connection between driver and passenger is made, whether visual (by street hail or taxi queue), or electronic (by telephone, smartphone or web site).

4.    For decades the City heavily regulated all For-Hire Transportation providers under uniform rules. The rules were designed to protect the public, regulate traffic, address congestion and provide public service. They consisted of the following:

a.    Taxi and livery drivers had to comply with detailed qualifications, background checks, training and rules, and obtain chauffeur licenses;

b.    Their vehicles had to be newer and serviced and inspected regularly by the City;

3

c. Payments had to be measured and imposed by meters with City-mandated rates that the provider could not alter, and that the City has not increased for eight years (or, for liveries, by a pre-arranged flat fare agreed to in advance);

d. Their passengers were insured because all operators had to carry expensive primary commercial liability insurance that applied whenever taxis were picking up, carrying or looking for passengers, or even when off duty.

5. In addition, the City requires taxi owners to pay large sums for the "exclusive" license to engage in the business of For-Hire Transportation. For decades, taxi owners accepted these burdens and expenses as part of a *quid pro quo* with the City for the exclusive rights granted. The City promised, in return, that taxi and livery owners, and the taxi affiliations and drivers who operate taxis, would have the exclusive right to provide For-Hire Transportation to individual passengers. In reliance on the City's decades-long promise of exclusivity, taxi and livery owners and related businesses have invested hundreds of millions of dollars.

6. The Transportation Plaintiffs have brought this lawsuit because the City now permits by law the *de facto* taxi companies to operate under much laxer and less expensive rules, even though they engage in the same business as Transportation Plaintiffs, For-Hire Transportation, *i.e.*, they provide passenger transportation in cars for money.

7. The *de facto* taxi companies (Uber, Lyft and Sidecar) do exactly the same thing that traditional taxi companies do. They dispatch drivers to passengers who pay fares based on the time and distance traveled. That the *de facto* taxi companies dispatch the car and driver via smartphone does not distinguish their business activity from that of traditional taxis, which also now use smartphones as one means of connecting driver and passenger.

8.      Use of a smartphone app does not change the nature of the business.  It does not alter the need for uniform rules for all who engage in it.  Use of an app merely provides an alternative means of dispatch and payment.   The service provided remains For-Hire Transportation.  An app does not make a car safer, qualify or train a driver, protect the passenger, or insure the public when accidents occur.  Because cars, drivers and passengers exist and travel in the real world, not the virtual world, the same public safety concerns exist regardless of how passenger and driver connect.  Therefore, the rules governing the activity should be substantially the same for all.  Because they are not, the City has been and is giving an unfair competitive advantage to the TNPs, which operate under fewer, less expense and laxer regulations.

9.      The City arbitrarily imposes very different rules on traditional taxis as compared to the *de facto* taxis, including the following (which are described in greater detail later in this Second Amended Complaint):

(a)     Traditional taxis must buy and display the license or "medallion" that the City required as the exclusive gateway to the right to provide For-Hire Transportation. In recent years the cost of the City-issued and City-required medallions often exceeded $350,000 per taxi.  But the City has not required the *de facto* taxi companies to buy a medallion, and until recently imposed no license fee on them whatsoever.   Under a new ordinance enacted on May 28, 2014, effective September 2, 2014, in which the *de facto* taxis are defined as "Transportation Network Providers" ("TNP Ordinance"), their license fee is nominal and will likely average well under $100 per car for each of the *de facto* taxi companies;

(b)     The City requires taxi operators to invest in and operate only cars that are no more than four model years old (six for hybrids), and are subject to regular City

5

inspections.  But the City allows *de facto* taxi companies to deploy private drivers in their own personal cars of any age or condition that, until recently, were subject to no inspection requirement.  Even under the new TNP Ordinance, the cars can still be older than taxis, and will be subject only to private inspection under laxer standards than apply to taxis;

(c)     The City requires taxi operators to maintain expensive primary commercial liability insurance that applies at all times to the taxis.  But until the recent enactment of the TNP Ordinance, the City was not enforcing its own laws requiring the *de facto* taxi companies to carry such commercial insurance; worse, it knowingly permitted the TNCs to give hundreds of thousands of uninsured rides to unwary Chicagoans and visitors without insurance.  Under the TNP Ordinance, the City allows the *de facto* taxi companies to carry sub-standard insurance (excess, non-primary) at a far lower level than traditional taxis when the *de facto* taxi drivers are cruising the streets (and looking at their smart phones) for the next dispatch;

(d)     The City requires taxi drivers to obtain chauffeur licenses following weeks of formal training, to submit to regular independently-administered drug tests, and to undergo a rigorous background check by the Chicago Police Department.  Until the enactment of the recent ordinance, the City was not enforcing its own laws requiring the drivers of *de facto* taxis to meet any of these requirements.  Even under the TNP Ordinance, the City will not require most *de facto* taxi drivers to obtain a chauffeur license or undergo the training to acquire one, to undergo drug testing or to be vetted by the Chicago Police Department.

(e)     The City sets meter rates for traditional taxis that apply to all taxi rides, even when taxis accept passengers via a smartphone dispatch in an identical fashion as the *de facto* taxis.  Yet the City permits the *de facto* taxi companies to charge any rate, and to impose large surcharges during times of high demand; as a result, passengers have had to pay two to eight times normal rates, sometimes costing them hundreds of dollars per ride.  This pricing policy not only harms the public, but gives the *de facto* taxi companies an unfair competitive advantage in recruiting drivers from traditional taxi companies, since the drivers of *de facto* taxis usually pocket 80% of every "surge-priced" dollar.

(f)     The City requires many owners of taxis to buy and operate very expensive wheelchair accessible vehicles, but it imposes no such obligation on the *de facto* taxi companies.

10.     Such arbitrary favoritism damages the Transportation Plaintiffs by reducing their revenues.  It also serious handicaps their ability to compete fairly against the *de facto* taxi companies to recruit drivers, which threatens to destroy their businesses entirely.

11.     The arbitrary favoritism is particularly harmful to individual owner-operators like Plaintiff John Henry Assabill, an immigrant taxi driver who, in reliance on the promises inherent in the City Taxi Regulations, pursued the American Dream by taking the substantial personal risk of acquiring medallions and buying taxis in 2004 and 2008.  Had he openly flouted the law by providing For-Hire Transportation in his own cars, without buying a medallion, in violation of the City Taxi Regulations, the City could and would have impounded his cars and fined him $2,000.  Instead, Mr. Assabill obeyed the law and made the six-figure investment the City mandated as a pre-condition to engaging in the business.

12.     Within a few years, the City destroyed Assabill's property rights and permitted the *de facto* taxi companies to flout the law with open impunity by deploying an invasion of thousands of unlicensed cars and drivers with no requirement of any medallion or other meaningful investment or compliance with the City Taxi Regulations.  As a result, Assabill's revenue has declined substantially, impairing his ability to honor his continuing obligations associated with paying for the medallion, the license fees and the insurance obligations the City continues to impose upon him (but not upon the *de facto* taxi companies), as well as his ability to support his family.

13.     Both traditional taxi companies and *de facto* taxi companies must put drivers in cars to be profitable.  An idle taxi loses money.  It generates no revenue but still requires a large capital investment when purchased, the costly medallion, and on-going maintenance and insurance costs.  Indeed, because of the enormous burden and expense imposed by City licenses, rules, taxes and fees, if more than 20% of a taxi fleet is idle, the business becomes unprofitable and unsustainable.

14.     Drivers of both traditional and *de facto* taxis are usually independent contractors. Many choose to drive for the providers who offer the most attractive compensation package. These compensation packages can result in higher total fares, despite the fact that they occur, in the case of the *de facto* taxis, with less City regulation.  By requiring traditional taxis to operate under burdensome regulations and to charge only City-dictated prices, while allowing *de facto* taxis to pay lower fees, lower taxes, and charge fares that escalate well above the taximeter at times of high demand, the City has given the *de facto* taxi companies an unfair advantage in recruiting drivers.  Transportation Plaintiffs have, as a result, lost many drivers to the *de facto*

taxi companies, resulting in a higher percentage of idle taxis and millions of dollars of lost revenue.

15.     While the Equal Protection Clause often permits government to draw distinctions that are rationally related to legitimate governmental interests, the distinctions summarized above and detailed below do not pass constitutional muster.  They are arbitrary, fundamentally unfair and unconstitutional.  The City has arbitrarily forced participants in the same business to operate by very different rules.  Transportation Plaintiffs are entitled to damages resulting from the City's imposition of unequal rules, and to injunctive relief in order to restore the level playing field that had previously governed the business of For-Hire Transportation in the City.

16.     The constitutional protections of equal protection and due process rest on bedrock principles of fundamental fairness.  Under our constitutional system, government must apply reasonable rules fairly to similarly situated persons.  People engaging in the same business activity must be held to the same rules.  The rules must rationally relate to a legitimate governmental objective.  The City's disparate treatment of Transportation Plaintiffs and TNPs violates all of these principles.

17.     Principles of fundamental fairness also animate the constitutional right to just compensation when the government takes private property.  That right is particularly important where, as here, the government itself created the property right, sold it to private parties and developed a system under which hundreds of private parties were induced and *required by government* to invest and risk hundreds of millions of dollars as a precondition to engaging lawfully in business.

18.     These constitutional protections – equal protection, due process and just compensation – allow people to take investment risks and allow businesses to compete fairly.

9

These safeguards and protections from arbitrary government action distinguish the United States and other mature democracies from banana republics and other corrupt or arbitrary forms of government.

### Summary of Relevant Facts

19.     Defendant City of Chicago is charged by state law with the power and duty of regulating the use of its streets.  Based on that authorization, the City has regulated the taxi and limousine businesses in the City of Chicago for almost one hundred years, by promulgating and enforcing elaborate, highly-detailed and very restrictive ordinances and regulations controlling virtually every aspect of the taxi and limousine businesses.  Pursuant to that authorization, the City has also at various times sold at very substantial prices taxi licenses ("medallions") that the City has *required* operators of taxis to own in order to operate taxis.

20.     The hallmark of the marketplace in transportation services created by the City's regulations had been competition on a level playing field within a highly-regulated industry.  To ensure public safety and reasonable returns to taxi operators, the City issued approximately 6,800 medallions permitting the exclusive operation of the taxi business, subject to the City's detailed and stringent requirements.  The City, among other things, also sets uniform metered rates for transportation by taxi.  Taxi owners and operators worked in a competitive environment, all subject to the same regulations – until the advent of the *de facto* taxi companies that gives rise to this Complaint.

21.     An established market for the purchase, sale and financing of medallions existed that was recognized, supported and regulated by City ordinances and regulations.  In reliance on this structure, taxi owners, operators, lenders and others, including the YC Medallion Owners, CM6, 111 Medallion Owners, Assabill and others similarly situated, have purchased medallions

10

and operated taxis, directly or through leases to drivers. The City has issued (and from time to time sold some of) the approximately 6,800 medallions in the Chicago market today. Plaintiffs Funding, Tri Global and others like it are in the business of lending to medallion purchasers (secured by the medallions), thereby assisting in the financing of purchases of medallions.

22.     Individual medallions, allowing the owner to operate a single taxi, until recently sold for between $325,000 and $375,000. On September 13, 2013, the City announced that it would auction 50 medallions at a minimum price of $360,000. Medallions are viewed by the investment community as an asset similar in many ways to other tangible assets like real estate.

23.     Illinois judicial decisions have recognized that Chicago taxi medallions are property, and that the relationship between the City and medallion holders is contractual, not merely regulatory. The property rights in medallions were described as follows by the Illinois Appellate Court in *Boonstra v. City of Chicago*, 214 Ill. App. 3d 379, 386-87 (1st Dist. 1991), which held that a City restriction on the right to sell medallions constituted an unconstitutional taking without due process and without just compensation:

> . . . for more than 20 years, the City of Chicago, pursuant to its ordinance, plainly fostered and participated in the assignment of the taxicab licenses. In effect, the City of Chicago created for its citizens a public market place for the assignment of its taxicab licenses. Thus, the taxicab licenses in reality became more than just mere personal permits granted by a governmental body to a person to pursue some occupation or to carry on some business subject to regulation under the police power. . . . In a functional sense, the taxicab licenses embraced the essence of property in that they were securely and durably owned and marketable.

After *Boonstra*, the City continued to generate an additional twenty-two years of investment-backed expectations, which included the purchase of medallions, the property rights of which had a market value of over $2 billion. Medallion ownership was not merely one way to operate taxis. The City made it the exclusive way.

24.     Starting in approximately 2011, certain transportation providers began to offer taxi and limousine services in Chicago in open and blatant disregard of applicable City taxi ordinances and regulations, including the law requiring medallion ownership.  These providers (the "***de facto* taxi companies**") include Uber Technologies, Inc. ("**Uber**"), Lyft, Inc. ("**Lyft**"), and Side.Cr, LLC ("**Sidecar**").  The business practices of the *de facto* taxi companies are more fully described in paragraphs 90-158.

25.     For about two years, until the September 2, 2014 effective date of the TNP Ordinance, the *de facto* taxi companies operated unlicensed taxi and limousine services in open violation of City law to which the City (with a few inconsequential exceptions) deliberately turned a blind eye.  Like the Transportation Plaintiffs, their operations consisted of the four basic elements of For-Hire Transportation:  they received requests for transportation from the public, contacted drivers or operators to dispatch vehicles to transport the public for hire, collected the fares for transportation using customer credit cards, and paid the drivers for the services they provide after deducting a percentage off the fare as their charge.  They metered the trips and computed and collected the fares based purportedly on distance travelled and time elapsed.  Although they functioned in all material respects as taxi companies, they did not acquire or lease medallions and operated in violation of the extensive City ordinances and rules and regulations that then governed taxis and limousines (the "**City Taxi Regulations**" or "**Regulations**") upon which Transportation Plaintiffs' investment-backed expectations were and are based.  In addition, the "limousine" or "livery" services they offer are actually *de facto* taxi services because their fare structure is apparently based on time and distance, as in the case of taxis.  The *de facto* taxi companies have continued to conduct business since September 2, 2014 without complying with the City Taxi Regulations.

26.     Despite the fact that there is no meaningful difference between licensed taxi businesses and the businesses of Uber, Lyft and Sidecar, the City applied virtually none of the requirements of the City Taxi Regulations to the *de facto* taxi companies prior to May 28, 2014, and will not apply such requirements under the TNP Ordinance enacted on that date (and effective September 2, 2014).  As described below, the City's decision not to enforce its ordinances and rules against the *de facto* taxi companies prior to May 28, 2014, was apparently due to a directive from the Office of the Mayor.

27.     After knowingly permitting the *de facto* taxi companies to flout the City Taxi Regulations with impunity, allowing those providers to expand and flourish at the expense of the Transportation Plaintiffs, the City purported to legitimize their activity in the TNP Ordinance.  A copy of the TNP Ordinance is attached as Exhibit 1.

28.     The City's decision not to apply the City Taxi Regulations in any meaningful way to the *de facto* taxi companies after enactment of the TNP Ordinance continues, ratifies and codifies the City's prior unconstitutional regulatory and enforcement regime.  It has disrupted long-settled expectations and imposed very serious adverse consequences on the Transportation Plaintiffs, who engaged in the taxi and limousine business in Chicago in costly reliance upon and in compliance with the market created by the City Taxi Regulations.  The City's decision threatens the existence of long-established businesses created in reliance on the City's taxi and limousine regulatory structure.  The City's actions also deprived Transportation Plaintiffs of the fundamental property right that the City expressly granted with the sale of the medallion:  the exclusive right of medallion owners to provide For-Hire Transportation in the City.  This deprivation, for which the City has provided no compensation, has seriously devalued more than

6,800 taxi medallions currently in use in Chicago that previously have had a market value of at least $2.38 billion (6,800 x $350,000).

29.     The devaluation resulting from the property deprivation is substantial and growing.  Upon information and belief, the City's October 2013 attempt to auction medallions for a minimum bid of $360,000 (and thereby raise $18 million for the City) was unsuccessful. No medallions were sold.  Upon information and belief, the lack of success was principally caused by the threat and uncertainty resulting from the City's grant of *de facto* permission to the invasion of hundreds of drivers of unlicensed *de facto* taxicabs dispatched and enabled by the *de facto* taxi companies.

30.     The devaluation resulting from the City's property deprivation has repercussions far beyond the medallion owners.  Affiliations like Plaintiffs Yellow Affiliation, Flash, Carriage and Royal based their operations upon the medallion market the City created by law and regulation.  Because most purchasers of medallions finance their investment in a medallion, taxi medallion lenders such as Plaintiffs Funding and Tri Global, which hold security interests in medallions, have experienced (and will continue to experience) a significant decline in the value of their collateral as the City continues to permit the *de facto* taxi companies to operate without complying with the same requirements imposed on the Transportation Plaintiffs.

31.     There are currently outstanding over $900 million in loans to Chicago taxi owner-operators and fleet owners to finance the purchase of medallions.  Those loans were made in reliance on the continued application of the City Taxi Regulations, which had assured exclusivity and City enforcement of these Regulations.  If medallion values continue to drop, the owners who financed their purchases of medallions will either have to provide cash or other collateral to lenders, or may default, and in many cases become liable personally to lenders under personal

14

guarantees. Many of these individual owners are immigrants and other small entrepreneurs, like Plaintiff Assabill, who invested in medallions based on the exclusivity and extensive regulation the City established via the City Taxi Regulations. As for the lenders, their loans will lose substantial value due to the lost value of the collateral. The drop in value caused by the City's actions and related uncertainty has, in turn, caused the credit market that supports financing of medallion purchases to freeze, triggering a spiral in which medallion values will plummet even further.

32.     Upon information and belief, in or about January 2014, one lender, Capital One, which had loaned over $200 million to finance medallion purchases, suspended any further medallion-based lending due to the City's actions.

33.     Signature Financial, a lender that had loaned over $160 million to finance medallion purchases, decreased its lending activity in Chicago in March 2014 and stopped altogether on or about May 31, 2014, two days after the passage of the TNP Ordinance. Signature Financial informed Transportation Plaintiffs that "[i]n light of the recent Chicago City Council decision to promote and promulgate ride sharing regulations which contravene and undermine the existing regulatory framework for long-standing transportation concerns, Signature Financial is pausing its financing activity for Chicago Taxi Medallions until further notice."

34.     A third major medallion finance company, Medallion Funding, also dramatically curtailed its lending activity earlier in 2014.

35.     These three lenders account for over $500 million in outstanding loans secured by medallions in Chicago, about two-thirds of the loan total.

36.     The majority of medallion loans have three-year terms.  The City's decision to deprive medallion owners of the formerly exclusive right to provide For-Hire Transportation services, which has caused the finance companies to suspend lending activity, means that little to no funding will be available to refinance these loans when they come due.

37.     Medallion owners, including Medallion Owner Plaintiffs, are personally liable for unpaid balances on such loans.

38.     Without credit to finance medallion purchases, the market for medallions will continue to shrink substantially or crash, defaults will occur, and the value of medallions will continue to decrease substantially, in an amount unknown as of the date of the filing of this Second Amended Complaint (September 19, 2014).

39.     The same lenders typically also made loans to finance the purchase of vehicles to use as taxis.  As mentioned above and described below, the City Taxi Regulations require taxis to be no more than four model years old (six for hybrids), which means that taxi owners must regularly buy new taxis to replace those that "age out" under the City's strict requirements. Upon information and belief, as a result of the City's deprivation of medallion owner's property rights, these lenders also intend to curtail or entirely cease financing the purchase of new taxis. The result will be that many existing taxi owners will be unable to equip the newer vehicles the City requires of them (but does not require of the *de facto* taxi companies), and their livelihoods will be impaired.

40.     Before filing this lawsuit, in discussions concerning the then-proposed TNP Ordinance, Transportation Plaintiffs repeatedly warned the City that if it did not enforce the City Taxi Regulations and if it enacted the TNP Ordinance, most or all commercial lenders would leave the medallion-lending market and it would crash, destroying long-established property

16

rights the City had required Medallion Owner Plaintiffs to purchase, and drying up an important source of City revenue from the 5% transfer tax it imposes on each medallion transfer. That decline is now well underway. In the first three full months since the enactment of the TNP Ordinance, only nine medallions sold (all in private sales). The sharp drop in the number of medallion sales in recent months compared to historical norms is shown below (data taken from City of Chicago website as of September 2, 2014):

**Number of Medallion Sales in Chicago**

|  | 2012 | 2013 | 2014 |
| --- | --- | --- | --- |
| April | 31 | 33 | 13 |
| May | 38 | 23 | 6 |
| June | 28 | 3 | 4 |
| July | 26 | 52 | 1 |
| August | 61 | 49 | 4 |
| **Total** | **184** | **160** | **28** |
| **Average** | **37** | **32** | **6** | (Rounded to nearest whole number)

Source: http://www.cityofchicago.org/content/dam/city/depts/bacp/publicvehicleinfo/medallionowners/taxicabmedalliontransferprices09022014.pdf

41. The City caused a liquid market for medallions to become highly illiquid and killed demand for these forms of property that it had required Medallion Owner Plaintiffs to purchase as a pre-condition to engaging in For-Hire Transportation. While the City has not banned the sale of medallions as it did in *Boonstra*, its market-destroying actions have caused substantially the same result, precisely what the City was told would happen.

42. The City's decision not to apply the City Taxi Regulations to the *de facto* taxi companies also has had and (unless this Court enjoins such actions) will continue to have serious

adverse consequences for the public. The City Taxi Regulations serve important public-service purposes that include, but are not limited to those summarized in paragraphs 9 above and 96-158 below.

43. Because the City has not been and will not be applying the City Taxi Regulations to the *de facto* taxi companies, the public is deprived of these protections and other benefits from the *de facto* taxi companies, while the *de facto* taxi companies enjoy a competitive advantage over taxi and limousine operators who comply with the law.

44. Lyft, for example, advertises that an individual over 21 years old with a private car (just model year 2000 or newer) and a smartphone (iPhone or Android) can provide the equivalent of taxi services to the public. Lyft calculates the price of rides by a combination of time and distance. In Chicago, as of early September 2014, Lyft charges $0.90 per mile and $.22 per minute, with a base charge of $1.71, a $1.00 "Trust & Safety Fee" and a minimum charge of $3.00. Uber advertises that anyone with a valid driver's license, personal car insurance, a clean record and a car – no special driver's license or prior experience required – can offer transportation to the public at a price determined by adding to a base fare a metered rate (which can be found on Uber's website) based on the time and distance travelled. Such services are provided in vehicles that do not satisfy the insurance, inspection, accessibility or driver-licensing requirements applicable to licensed taxi or limousine operators.

45. Unlike taxis driven or leased by medallion owners, the *de facto* taxi companies have not required drivers or operators to obey City Taxi Regulations that require them to respond to calls from persons in underserved areas or to serve passengers with disabilities. Rather, their drivers have been free to turn down calls and thereby cherry-pick the customers and areas of the

City they deem most desirable. This benefits the affluent who live in and near downtown, to the detriment of poorer and minority populations in outlying areas of the City.

46. The TNC's cherry-picking of service in Chicago's Loop and affluent areas of the North, South Loop and Near-West Sides is evident from a chart that Uber proudly displayed on its web site (https://www.uber.com/100/images/maps/7.png, viewed April 23, 2014, airport labels inserted):



The dark areas of the map indicate the routes most frequented by Uber drivers, showing that its drivers concentrate heavily on routes in the busy, wealthy areas around the city-center, posher north-side and near-west side neighborhoods, and to and from the airports. Chicago is not even depicted below about 65th Street.

### Summary of the Plaintiffs' Claims

47. The City's unequal treatment of the Transportation Plaintiffs and the *de facto* taxi companies, as described herein, is contrary to the City's own economic interests, is fundamentally unfair and unconstitutional. Substantially the same rules should apply to everyone engaging in substantially the same business.

48.    Illinois law holds that (i) the medallions are property and (ii) the City's issuance of medallions and its regulatory scheme constitute a contract between the City and medallion owners.  These rights give rise to four federal claims (Counts I-IV) and three pendent state law claims (Counts V-VII).

49.    The Court has federal question jurisdiction over Counts I-IV under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over Counts V-VII under 28 U.S.C. §1367.

50.    Count I is brought under 42 U.S.C. § 1983.  It alleges that the City has violated the Takings Clause of the Fifth Amendment to the United States Constitution, incorporated as to the states under the Due Process Clause of the Fourteenth Amendment.  Because medallions are property under Illinois law, medallion owners, and lenders holding security interests in medallions, own property that may not be taken by the City without payment of just compensation.  Before the City allowed the invasion of the *de facto* taxi companies, if someone wanted to provide taxicab services in the City, the City required that he or she buy or lease a medallion and comply with the City Taxi Regulations.  In return, the medallion owner received the exclusive right to provide taxi services in the City.  A hallmark of property is the right to exclude, and exclusivity was an essential element of the medallion owners' property rights and determined the value of those rights.  Without compensation to the medallion owners or the lenders holding security interests in the medallions, the City has permitted and continues to permit the *de facto* taxi companies to usurp and trespass upon the exclusive property rights of medallion owners by providing those services without buying or leasing medallions or complying with the City Taxi Regulations.  The City has thereby taken exclusive rights from medallion owners and transferred them to the *de facto* taxi companies without any compensation, let alone the just compensation that the Takings Clause requires.

51.     Counts II and III are brought under 42 U.S.C. § 1983.  They allege that the City's unequal treatment of the Transportation Plaintiffs and the *de facto* taxi companies violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by permitting the *de facto* taxi companies to engage in the *de facto* taxi business without incurring the costs and limitations of complying with applicable law, while requiring the Transportation Plaintiffs and others similarly situated to comply with the City's extensive and costly taxi and limousine regulations, including the requirements to:  purchase a medallion previously costing in excess of $350,000 for each taxi; pay annual license fees of $600; maintain commercial liability and worker's compensation insurance; operate only newer, regularly inspected vehicles; satisfy driver-licensing requirements, and pay thousands of dollars annually per medallion in City and State fees and taxes (totaling about $24 million) measured solely from the operation of the For-Hire Transportation businesses that the *de facto* taxi companies are permitted to operate without paying such taxes.

52.     The fees and taxes paid by the Transportation Plaintiffs are generated from operation of the same business of For-Hire Transportation that the *de facto* taxi companies have been permitted to operate in without paying such fees and taxes. Fees and taxes paid to the City and State by licensed taxi operators have aggregated more than $24 million annually.   An estimate of those annual revenues is set forth in the following chart:

21

| Estimated Annual City Taxi Tax Revenues | | |
|---|---|---|
| City share of state use Tax | $290,000 | |
| Medallion Transfer Tax | $8,795,000 | Actual number from 2012 |
| MPEA Airport Tax | $2,920,000 | Assumes 2000 trips/day |
| Ground Tax | $6,364,800 | Assumes 6800 medallions |
| Medallion renewal | $4,080,000 | Assumes 6800 medallions |
| Inspection fee | $1,020,000 | Semi-annual |
| License Plate | $686,800 | $101/year |
| Vehicle Sticker | $578,000 | $85/year |
| Affiliation Fee | $79,800 | |
| Total: | $24,814,400 | |

53. By failing to collect such fees and taxes from the *de facto* taxi companies, the City is, upon information and belief, losing millions of dollars of annual revenue in addition to the revenue it is losing from the recent failure to auction new medallions. The *de facto* taxi companies are receiving an unwarranted competitive advantage over taxi and limousine operators who pay such taxes and otherwise comply with the City Taxi Regulations. Indeed, the City has provided the *de facto* taxi companies with an inexplicable financial windfall by allowing them to operate outside the regulations without paying the applicable taxes.

54. The taxes and fees imposed by the new TNP Ordinance are far lower than those imposed on the Transportation Plaintiffs and will not come close to remedying the unfair imbalance. The *de facto* taxi companies keep the unpaid fees and taxes as profit, on top of the additional profits they garner by not being required to comply with the many other regulations requiring that they obtain adequate commercial insurance, submit their drivers' vehicles to City inspections, maintain their drivers' vehicles, and dispatch only to newer cars.

55. Count IV is brought under 42 U.S.C. § 1983 for the City's violation of substantive due process under the Fourteenth Amendment to the United States Constitution. By failing to

enforce the City Taxi Regulations against the *de facto* taxi companies before the effective date of the TNP Ordinance, the City denied the Transportation Plaintiffs their substantive due process rights. The City was, or should have been, aware that it owes substantive due process rights to taxi medallion owners, because that was the holding of *Flower Cab Co. v. Petitte et al.*, 658 F. Supp. 1170, 1179-80 (N.D. Ill. 1987), a case in which the United States District Court found the City's unauthorized decision to suspend a portion of the City Taxi Regulations violated the substantive due process rights of medallion owners.

56.     The City's unauthorized and unconstitutional decision to suspend the law is illustrated by its response to the few instances in which Chicago Police attempted to enforce the City Taxi Regulations. A *Chicago Tribune* article of June 12, 2014, describes several instances in which Chicago Police ticketed UberX and Lyft drivers, and towed their cars, for driving unlicensed vehicles in violation of the City Taxi Regulations. However, most of the tickets were dismissed because the City chose not to enforce them while it was pushing for enactment of the TNP Ordinance. In other words, although the *de facto* taxi companies were operating in plain violation of the law, the City chose to apply an un-enacted proposed ordinance rather than existing law. The City administration is bound by existing laws, not un-enacted future laws.

57.     Count V seeks damages for the City's breach of its contracts with Plaintiffs. Those contracts require that the City limit the conduct of the taxi business exclusively to parties who hold medallions or other taxi-service related licenses as "affiliations" or "dispatch" services, and otherwise require compliance with the City Taxi Regulations.

58.     The City Taxi Regulations grant the exclusive rights to operate taxi and taxi-related businesses only to licensed providers of public transportation services. Their detailed and

comprehensive provisions include guarantees of exclusivity and support for the medallion system.

59. City Taxi Regulations include the following ordinance provisions regarding the exclusive rights of the owners of medallions to operate taxis (which exclusivity was abrogated in May 2014 in the TNP Ordinance by adding the italicized language below in an attempt to legalize the previously illegal operations of the *de facto* taxi companies):

> (a) It is unlawful for any person to operate a motor vehicle, or for the registered owner thereof to permit it to be operated, for the transportation of passengers for hire within the city unless it is licensed by the city as a taxicab pursuant to this chapter, or as a public passenger vehicle pursuant to Chapter 9-114*, or used to provide a transportation network service pursuant to Chapter 9-115*.

> (b) Subject to the conditions and limitations of this chapter, the city grants exclusive permission and authority to the licensees hereunder to operate the taxicab vehicles licensed hereunder unless rescinded, terminated, or revoked as hereinafter provided.

> (c) It shall be unlawful for any taxicab or public passenger vehicle not licensed as such by the city to solicit or accept business within the corporate boundaries of the City of Chicago, except where the passengers have as their destination the community in which such vehicle is licensed and then only when such transportation has been arranged in advance.

Chicago Mun. Code § 9-112-020.

60. The City Taxi Regulations include numerous provisions regulating the sale and transfer of medallions, including the following, which states the City's support for maintaining the market value of medallions through periodic auctions:

> The commissioner shall promulgate regulations to set forth procedures by which all available taxicab licenses shall be distributed periodically (by sale, lease, or otherwise) pursuant to open and competitive bidding procedures. The procedures shall be designed to produce the maximum amount of revenues to the city consistent with serving the public interest, and to ensure that only applicants that are qualified under this chapter are awarded licenses.

Chicago Mun. Code § 9-112-480. This provision requiring open, competitive bidding and maximization of City revenues regarding "available taxicab licenses" constitutes a promise by the City to support the property rights of medallion owners and not materially impair the value of medallions. The City's conduct has confirmed the meaning of this provision as permitting only the sale by the City of existing medallions at market prices:

(i) for many years the City has occasionally auctioned medallions in relatively small lots of 50 or 100, setting a minimum "upset" price for bids that is approximately equal to the then-current market price for medallions;

(ii) the lots have typically been comprised only of previously issued medallions returned to the City by revocation or otherwise, not new medallions, thereby keeping constant the total number of medallions in existence; and

(iii) the City has issued new medallions only infrequently over many decades, in response to market conditions and without affecting the exclusive rights of the medallions owners to operate taxi services, or impairing materially the property rights of medallion owners or the value of medallions; the City last issued new medallions in or about 2001.

61. The City Taxi Regulations contain several provisions regarding the enforcement of the exclusive rights of medallion owners to operate taxis, including the following:

(a) The owner of record of any motor vehicle that is used for the transportation or the solicitation for the transportation of passengers for hire in violation of Section 9-112-020 shall be liable to the city for an administrative penalty of $2,000.00 plus any towing and storage fees applicable under Section 9-92-080. Any taxicab or public passenger vehicle shall be subject to seizure and impoundment pursuant to this section. This subsection shall not apply if the vehicle used in the violation was stolen at that time and the theft was reported to the appropriate police authorities within 24 hours after the theft was discovered or reasonably should have been discovered.

Chicago Mun. Code § 9-112-640(a). This and other enforcement provisions constitute a part of the promise by the City to medallion purchasers and lenders that the City will support the exclusivity and market value provisions by removing unlawful taxicabs from the streets and fining violators heavily.

62. By permitting the *de facto* taxi companies to operate without fully complying with City Taxi Regulations, the City has breached its contract with the YC Medallion Owner Plaintiffs, CM 6, the 111 Medallion Owners, Assabill and all other similarly situated medallion owners. It has also breached its contracts based on taxi and limousine laws and regulations with all the other Transportation Plaintiffs, each of whose business is dependent upon and operated in reliance on the equal and consistent application of applicable City taxi and limousine regulations. The City is responsible in damages for (i) the Transportation Plaintiffs' current and future loss of business to the *de facto* taxi companies, (ii) all diminution in the market value of the Transportation Plaintiffs' medallions, (iii) all cash or the value of other collateral that Plaintiffs Funding and Tri Global will be required to provide to its lenders as additional security due to the diminution in market value of City medallions, and (iv) any damages to Funding, Tri Global and all other medallion lenders that currently rely on the medallion value to collateralize more than $900 million in outstanding loans for Chicago taxi medallions.

63. Count VI is pleaded in the alternative to Count V and seeks damages under principles of promissory estoppel. For many years the City has sold and taxed the sales of medallions as part of the comprehensive regulatory program it established and fostered that, among other things, establishes the total number of medallions and guarantees medallion owners the exclusive right to provide taxi services in Chicago. This regulatory program constitutes the City's promise to medallion owners and lenders holding security interests in medallions that,

subject to compliance with the obligations under the City Taxi Regulations, the City will provide the exclusive rights and benefits summarized above that include:

(i) exclusivity, *i.e.*, only medallion owners will be permitted to operate taxis,

(ii) market support, *i.e.*, the City will cap the total number of medallions and resell medallions so as not to impair materially the property right in or value of medallions, and

(iii) enforcement, *i.e.*, the City will impound and fine vehicles violating the exclusivity promise by providing taxi services without medallions.

Plaintiffs foreseeably and detrimentally relied on these promises by collectively investing hundreds of millions of dollars to purchase medallions, incur debt to finance such purchases, lend money to finance the purchases secured by the medallions, and/or create and operate taxi affiliations.

64. Count VII seeks damages under principles of equitable estoppel. The City's enactment and past enforcement of the City Taxi Regulations, as well as its sales of medallions, constitute affirmative acts by the City upon which the Transportation Plaintiffs reasonably relied to their detriment as summarized in the preceding paragraph. The City is estopped from creating the *de facto*, and, recently, the *de jure*, system under which the *de facto* taxi companies are allowed to provide taxi services without being required to comply with the obligations imposed upon Transportation Plaintiffs, who undertook such obligations in reliance on the exclusive, regulated medallion system.

65. The recently enacted TNP Ordinance purports to create a separate class of smartphone-dispatched transportation providers to accommodate the *de facto* taxi companies and attempt to render legal their illegal operations. The TNP Ordinance purports to ratify and codify the City's federal and state law violations described herein.

27

66.     Among numerous equal protection violations reflected in the City's actions and in the TNP Ordinance are:  (i) the TNP Ordinance purports to legalize hundreds or thousands of *de facto* taxis driven by individuals without chauffeur licenses or adequate training, who would not have to incur the cost of buying medallions and who would pay lower annual fees on a per vehicle basis than medallion owners; (ii) the TNP Ordinance places the City's imprimatur on a separate and unequal class of public transportation available only to privileged individuals with smartphones and credit cards, resulting in a disparate impact on minority, disabled and elderly populations in violation of the Illinois Civil Rights Act and fundamental fairness; (iii) the TNP Ordinance imposes sharply reduced public safety requirements on the *de facto* taxi companies, as compared to the Transportation Plaintiffs, regarding vehicle age and other operating requirements; and (iv) the TNP Ordinance, when combined with the influx of hundreds or thousands of drivers who would pay virtually nothing to the City to operate as *de facto* taxis, is destroying the $2.4 billion investment of persons and firms that have expended large sums to purchase and operate under the City's long-standing, exclusive medallion system.  Because the TNP Ordinance codifies an unlevel playing field and destroys the investment-backed expectations of medallion owners and lenders, including their exclusive rights to operate taxis, it violates Plaintiffs' rights.

### The City Has Placed Plaintiffs in an Unfair Position and Aided Uber in Litigation With Yellow Group

67.     In an action titled <u>Yellow Group, LLC, et al v. Uber Technologies, Inc.</u>, No. 12 C 7967 (N.D. Ill.), pending before Hon. Sara Ellis (after being reassigned from Hon. Sharon Johnson Coleman), certain of the plaintiffs in this case sued Uber for violations of the Lanham Act and Illinois state claims of tortious interference with contractual relations and unfair competition.  In a pair of rulings attached hereto as Exhibits 2 and 3, of which the Court may

28

take judicial notice, Judge Coleman denied most of Uber's motion to dismiss the complaint and held that plaintiffs had shown a likelihood of success on the merits of certain of their unfair competition claims, finding, among other things, that "Plaintiffs have also shown that the activities complained of give defendant competitive advantages." Ex. 3 at 1. Nevertheless, she denied preliminary injunctive relief because plaintiffs had not shown that an injunction was "required" to prevent the harms they were experiencing, because "plaintiffs have made no showing that city regulation of defendant's practices would be ineffective in curtailing the ordinance violations that are the subject of the claims at issue here." Ex. 3 at 2. However, as shown in this Second Amended Complaint, Judge Coleman's assumption that the City would enforce its laws was incorrect: she was unaware that, upon information and belief, the Office of the Mayor had quietly handcuffed the Commissioner of Business Affairs and Consumer Protection ("Commissioner") from taking steps to regulate the *de facto* taxi companies. As a result, the City in fact was not regulating the practices of Uber and other *de facto* taxi companies until the effective date of the TNP Ordinance in early-September 2014, and the harms recognized by Judge Coleman from the ordinance violations were not remedied by the City regulatory enforcement she assumed would occur.

68. It should be noted that the record developed before Judge Coleman did not include Uber's implementation in April 2013 of UberX, which, as described herein, is imposing far greater harm on Plaintiffs than the UberTaxi and UberBlack services that were the focus of the record in the case then before her.

69. The record developed before Judge Coleman also did not include the fact, admitted to the press by David Spielfogel, the Chief of Policy & Strategic Planning in the Office of the Mayor, that rules proposed by the Commissioner in November 2012 (which would have

clarified the City's already-existing prohibition on the use of any device, including smartphones, to calculate fares for livery vehicles) had been placed on indefinite hold. Spielfogel stated that those rules were on hold pending the outcome of the federal lawsuit before Judge Coleman. This hold was not publicly revealed until a *Chicago Tribune* story ran on October 13, 2013, after Judge Coleman's ruling.

70. Upon information and belief, the City put on ice not merely the proposed rules of 2012, but any meaningful enforcement of the City Taxi Regulations against the *de facto* taxi companies. The City's secret hold had the effect of aiding Uber's litigation position before Judge Coleman, as Uber had asked her to defer entering any injunction until the City acted on its regulations, while the City was quietly holding its regulations in abeyance pending the outcome of that litigation.

71. The City's secret hold on enforcing the City Taxi Regulations against the *de facto* taxi companies has enabled the *de facto* taxi companies to continue to dispatch well over a million illegal rides in the City, to the financial detriment of the Transportation Plaintiffs and to the detriment of public safety, while costing the City millions of dollars of medallion, tax and fee revenue.

**The Parties**

72. Plaintiff ITTA is a not-for-profit corporation organized and existing under the laws of the State of Illinois. ITTA has its principal place of business at 3351 West Addison Street, Chicago, Illinois. ITTA is an association of taxi affiliations, medallion owners, medallion managers and other transportation providers such as livery companies. ITTA's objectives include representing and furthering the interests of its members in, among other things, fair and uniform enactment and enforcement of laws governing the transportation industry.

73.     Plaintiff Yellow Group is a limited liability company organized and existing under the laws of the State of Delaware.  Yellow Group has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.  Yellow Group's principal business activity consists of providing taxi transportation services to the Chicago public through its wholly owned subsidiaries.

74.     Plaintiff Yellow Affiliation is a corporation organized and existing under the laws of the State of Illinois.  Yellow Affiliation has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.  Yellow Affiliation is a licensed taxi affiliation in the City of Chicago and a wholly owned subsidiary of Yellow Group.  Taxi affiliations are entities existing under City ordinances and regulations to provide services, including a common color scheme, dispatch and insurance, to their licensed medallion members.  Every medallion owner who leases to a driver or owns two or more Chicago taxi medallions is required to belong to an affiliation, and almost all medallion owners belong to an affiliation whether or not so required.

75.     Plaintiff TAS is a limited liability company organized and existing under the laws of the State of Delaware.  TAS has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.  TAS is a wholly owned subsidiary of Yellow Group.  TAS' principal business activity consists of providing various administration services to taxi affiliations.

76.     The Plaintiffs comprising the YC Medallion Owners are each a limited liability corporation organized and existing under the laws of the State of Delaware.  Each YC Medallion Owner has its principal place of business at 3351 W. Addison Street, Chicago, Illinois.  Each is, or after January 1, 2012, was, a licensed medallion owner owning multiple medallions in the City of Chicago and a member of Yellow Affiliation.

77.     Plaintiff Funding is a limited liability company organized and existing under the laws of the State of Delaware.  Its principal place of business is at 3351 W. Addison Street, Chicago, Illinois.  Funding is in the business of providing loans to finance the purchase of Chicago taxi medallions.

78.     Plaintiff Flash is a corporation organized and existing under the laws of the State of Illinois.  Flash has its principal place of business at 9696 W. Foster, Chicago, Illinois.  Flash's principal business activity is as a taxi affiliation providing services, including a common color scheme, dispatch and insurance, to its licensed medallion members.

79.     Plaintiff CM6 is a limited liability corporation existing under the laws of the State of Illinois.  CM6 has its principal place of business at 9696 W. Foster, Chicago, Illinois.  CM6 is a licensed medallion owner owning multiple medallions in the City of Chicago and a member of the Flash affiliation.

80.     Plaintiff Carriage is a corporation organized and existing under the laws of the State of Illinois.  Carriage has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois.  It is a licensed taxi affiliation in the City of Chicago whose principal business activity as a taxi affiliation is to provide services, including a common color scheme, dispatch and insurance, to its licensed medallion members.

81.     Plaintiff Royal is a corporation organized and existing under the laws of the State of Illinois.  Royal has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois. It is a licensed taxi affiliation in the City of Chicago whose principal business activity as a taxi affiliation is to provide services, including a common color scheme, dispatch and insurance, to its licensed medallion members.

82.     Plaintiff Tri Global is a corporation organized and existing under the laws of the State of Illinois. Tri Global has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois.  Tri Global is in the business of providing loans to finance the purchase of Chicago taxi medallions.

83.     Plaintiff Elite is a corporation organized and existing under the laws of the State of Illinois.  Elite has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois. Elite is a licensed taxicab medallion manager in the City of Chicago.

84.     Plaintiff Brokers is a corporation organized and existing under the laws of the State of Illinois.  Brokers has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois.  Brokers is a licensed taxicab broker in the City of Chicago and brokers sellers and buyers of Chicago taxicab medallions

85.     Plaintiffs 111 Medallion Owners consist of one hundred eleven corporations organized under Illinois law, each of which owns one or more Chicago taxi medallions.  Each has its principal place of business at 2617 S. Wabash Ave., Chicago, Illinois.  A list naming each of the 111 Medallion Owners is included herein as Appendix 1, following the signature page.

86.     Plaintiff Limousine is a corporation organized and existing under the laws of the State of Illinois.  Limousine has its principal place of business at 8533 South Kolin Avenue, Chicago, Illinois.  Plaintiff Limousine operates livery services that provide limousine, sedan, and SUV transportation.

87.     Plaintiff John Henry Assabill is an individual owner-operator of licensed Chicago taxis.  He is a principal in two corporate entities, Plaintiffs Assabill and Associates, Inc. and Afrikico, Inc., each of which owns a medallion.  Each of these corporate plaintiffs is an Illinois corporation with its principal place of business in Chicago, Illinois.

88.     Mr. Assabill is an immigrant from Ghana who has driven Chicago taxis since 1996.  In or about 2004 and 2008 he pursued the American Dream by acquiring medallions.  He acquired the first medallion from the City for no charge in 2004, and bought the second medallion from a private party in or about 2008 for $150,000.  He paid the City a $7,500 transfer tax in connection with the purchase.  He financed (and later refinanced) the purchase through loans secured by the medallions, and currently is indebted for approximately $243,000 on these loans.  He drives one of the taxis and his wife, Gladys, drives the other.  Mr. Assabill's revenues have declined materially since the de facto taxi companies began operating, threatening his ability to continue to make payments on his loans and sustain his business.  On a typical day his revenues have declined 30-40%.  He has seen a marked decline in street hails since the de facto taxi companies began operating, especially during rush hours.   Unlike the de facto taxi companies, he pays approximately $199 per week to an affiliation for each taxi in order to carry the commercial liability insurance required by the City Taxi Regulations.

89.     Defendant City of Chicago is a municipal corporation created pursuant to Illinois law.  The City is authorized by statute to regulate taxis and all others pursuing like occupations.  See 65 ILCS 5/11-42-6.

90.     The Commissioner is the highest-ranking City administrative officer responsible for the enforcement of the City Taxi Regulations.  The Commissioner is not formally joined in her official capacity because it would be duplicative of joining the City.

### Transportation Services Provided
### by the *De Facto* Taxi Companies

91.     Uber is a corporation organized and existing under the laws of the State of Delaware.  Uber maintains its principal place of business at 182 Howard St. #8, San Francisco,

California. Uber currently offers four forms of taxi service in Chicago through a smartphone application:

a. Uber implemented what it calls "UberX" in Chicago in or about late April 2013. Through UberX a passenger uses the app to ask Uber to send an ordinary, unmarked private vehicle to a designated location. Uber sends the request to private operator/drivers who have contracted with Uber to accept its dispatches. Those operator/drivers are not required to have chauffeur licenses, and may operate virtually any type of unmarked car of any condition. Uber has recruited and contracted with such operator/drivers as part of its fleet to function as the equivalent of a taxi. If the operator chooses to accept the dispatch, Uber notifies the passenger of the operator's name, the type of vehicle and expected time of arrival. The fare is computed by Uber using information from the smartphone's GPS system, based on distance and time rates set by Uber. For example, prior to January 9, 2014, the minimum standard rates in Chicago for UberX were: $3.15 base fare, plus $0.40 per minute for speeds under 11 miles per hour, $1.75 per mile for speeds above 11 miles per hour, with a $6 minimum fare and a $5 cancellation fee. Uber has regularly adjusted its standard UberX rates. On or about September 8, 2014, its rates were: a $1.70 base fare, plus $0.20 per minute plus $0.90 per mile, plus as $1.00 "Safe Rides Fee," plus a $0.30 "City of Chicago Transit Tax & Accessibility Fee," with a $2.70 minimum fare and a $5 cancellation fee. (The $0.30 "Transit Tax & Accessibility Fee" is a pass-through by which Uber collects from the passenger a $0.20 per ride ground tax and $0.10 per ride fee for the wheelchair accessibility fund, which were enacted as part of the TNP Ordinance.) However, as more fully described below, through its "surge pricing"

program, Uber regularly inflates these rates by factors of two to eight during periods of high demand. (By comparison, the City's established base taximeter rates for licensed taxis as of that date for a single passenger were: $3.25 base fare, $1.80 for each mile, and $0.20 for each 36 seconds of time elapsed, with no minimum (other than the base fare), no cancellation fee, and no "surge" pricing. *See* http://www.cityofchicago.org/city/en/depts/bacp/supp_info/2012_passenger_informat ion.html.) The fare is paid to Uber via the passenger's credit card, which must be previously registered with Uber. Upon information and belief, Uber remits 80% of the fare to the Uber operator/driver and keeps 20% as its fee.

b. Through what it refers to as "UberXL," Uber offers a service similar to UberX, except that it uses larger SUVs to provide room for multiple passengers. A passenger uses the app to request that Uber send an ordinary, unmarked private SUV (*e.g.* Toyota Highlander, Honda Pilot, Acura MDX) to a designated location. As with UberX, Uber sends the request to private operator/drivers of SUVs who have contracted with Uber to accept its dispatches. Those operator/drivers are not required to have chauffeur licenses, and may operate virtually any type of unmarked SUV of any condition. If the operator chooses to accept the dispatch, Uber notifies the passenger of the operator's name, the type of vehicle and expected time of arrival. The fare is computed by Uber using information from the smartphone's GPS system, based on distance and time rates set by Uber. As of September 8, 2014, the minimum standard rates in Chicago for UberXL were: $3.00 base fare, plus $0.35 per minute plus, $1.75 per mile, plus a $1.00 "Safe Rides Fee," plus a $.30 "City of Chicago Transit Tax & Accessibility Fee," with a $6.00 minimum fare and a $5 cancellation

fee.  Uber advertises that its UberXL rates can be up to 50% lower than those of its "premium UberSUV" (described below).

c.  Through what it refers to as "UberBlack" and "UberSUV," a passenger uses the app to ask Uber to send either a "black car" or an SUV to a designated location.  Uber sends the request to private drivers operating large cars or SUVs, whom Uber has recruited as part of its fleet.  If the Uber operator chooses to accept the dispatch, Uber notifies the passenger of the operator/driver's name, the type of vehicle and expected time of arrival.  The fare is calculated by Uber, using the smartphone's GPS system, based on distance and time rates set by Uber.  For example, prior to January 9, 2014, the standard rates in Chicago (when Uber is not employing "surge pricing") for UberBlack were:  $7.00 base fare, plus $0.85 per minute for speeds under 11 miles per hour, $3.50 per mile for speeds above 11 miles per hour, with a $15.00 minimum fare and a $10.00 cancellation fee.  As of September 8, 2014, Uber had adjusted the UberBlack rates to: $7.00 base fare, plus $0.40 per minute plus $3.50 per mile, with a minimum fare of $15.00 and a cancellation fee of $10.00.  Prior to January 9, 2014, the standard rates in Chicago for UberSUV were a $14.00 base fare, plus $1.05 per minute for speeds under 11 miles per hour, $4.50 per mile for speeds above 11 miles per hour, with a $25 minimum fare and a $10 cancellation fee.  As of September 8, 2014, Uber had adjusted the UberSUV rates to: a $14.00 base fare, plus $0.55 per minute, plus $4.05 per mile, with a minimum fare of $25.00 and a cancellation fee of $10.00.   The fare is paid to Uber via the passenger's credit card registered with Uber. Upon information and belief, Uber remits 80% of the fare to the driver and keeps 20% as its fee.

    d.  Through what it refers to as "UberTaxi," a passenger uses the app to ask Uber to send a marked and medallion-bearing taxi to a designated location. Uber sends the request to a smartphone used by a taxi driver in the area. If the driver chooses to accept the dispatch, Uber notifies the passenger of the taxi number and the expected time of arrival. The fare is computed by the taximeter in the taxi, based on distance and time rates set by the City. The fare is paid to Uber via the passenger's credit card, which the passenger registers with Uber when signing up for the app. Uber adds a booking fee of $2.00 to the fare, as well as a default driver gratuity of 20%, which the passenger may modify via Uber's web site, in advance of the ride. Uber remits the fare and gratuity to the taxi driver, less the booking fee and a credit card processing fee.

92.    Uber also deploys what it calls "surge pricing" to charge customers a multiple of its standard applicable rates and minimum fares during periods of high demand. Its website states that: "During times of high demand fares will be subject to a surge multiplier, causing your rate to by higher than the typical rate," and "[w]ith surge pricing, Uber rates increase to get more cars on the road and ensure reliability during the busiest times. (*See* Exhibit 4). Pursuant to this provision, at certain times Uber charges its customers fares to ride in ordinary 'UberX' cars, UberXL SUVs, or UberBlack or UberSUV cars at double or even higher rates than are legally permissible under the taximeter rates established by the City Taxi Regulations. Uber deployed this practice after gouging customers in New York City following Hurricane Sandy in 2012, and Uber continues to employ surge pricing in Chicago, and did so, for example, on Friday night, September 27, 2013, at which time some UberX riders were surprised to be notified that they were being charged double the ordinary UberX rates, which was about double the legally

permissible taximeter rates.  In other instances of high demand, such as the recent cold and snowy New Year's Eve of 2013/2014, Uber has charged as much as eight times its regular rates during "surge" periods with much higher minimum fares, such that customers were charged well over $100 to travel short distances.  (Plaintiff taxi operators and all other Chicago taxi operators are not permitted to engage in such "surge pricing.")

93.  Lyft is a corporation organized and existing under the laws of the State of Delaware.  Lyft maintains its principal place of business at 548 Market Street #68514, San Francisco, California.  Lyft provides what it calls "ridesharing" services in Chicago.  Passengers with iPhones or Androids can use the Lyft app to request a ride.  Lyft asks the passenger for their pick-up location and sends the request to available drivers, who, it advertised, are not required to have chauffer licenses, but must have "a relatively clean driving record."  (*See* Exhibit 5.)  If a driver accepts the request, the Lyft app provides the passenger with a picture of the driver and the car to expect.  When Lyft began operating in Chicago, at the end of the ride, the passenger would receive a "suggested donation" amount on his or her app, which could be adjusted upwards or downwards within 24 hours of the ride.  On information and belief, the "suggested donation" was calculated based on the distance and time travelled.  Lyft received an "administrative fee" of up to 20% of each donation.  (*See* Exhibit 6.)  Lyft moved away from the fictitious "donation" system.  In Chicago, Lyft now charges based on a time and distance calculation.  As of September 8, 2014, Lyft's charge per mile is $0.90, the cost per minute is $.22, there is a $1.71 base charge and a $1.00 "Trust & Safety Fee" (Lyft markets this as supporting its purported safety standards), with a $3.00 minimum fare and a $5.00 cancellation fee.  Lyft also has its own version of "surge" pricing, which it refers to as "Prime Time."  According to Lyft, "[w]hen the ride requests from passengers greatly outnumber available drivers on the road, our

system will automatically turn on Prime Time." (*See* Exhibit 7.) The increased price during Prime Time varies based on demand. (*Id.*) Lyft states that it informs customers before they confirm a ride that Prime Time Tips are in effect and the percentage of the tip. During the December 2013 holiday-period, Lyft advertised that "Prime Time" was in effect.

94. Sidecar is a limited liability company organized and existing under the laws of the State of Delaware. Sidecar maintains its principal place of business at 360 Pine Street, Suite 700, San Francisco, California. Like Lyft, Sidecar bills itself as a ridesharing app and, when it first launched, accepted "donations," not fares. Sidecar recently ended the "donation" fiction and now operates more like UberX and Lyft. Passengers request a ride through the Sidecar app by inputting their pick-up and drop-off locations. After the drop-off location is input, Sidecar provides the passenger with a list of available drivers from whom to choose, providing: pictures of the driver and the car, the drivers' ETA, and the price each driver will charge. Sidecar allows the driver to set his or her own price and markets it as way to provide cheaper rides by having the drivers compete for business by lowering their rates. (*See* Exhibit 8.)

**Uber, Lyft and Sidecar Operated Unlicensed Taxi Businesses
in Violation of the City Taxi Regulations**

95. Uber, Lyft and Sidecar operate taxi businesses providing services that are identical in all material respects to the services offered by the Transportation Plaintiffs and other firms and individuals that operate in compliance with the City Taxi Regulations. The *de facto* taxi companies have done so by providing the following services to the public:

i) Like the Transportation Plaintiffs, they offer, arrange for, and dispatch transportation services;

ii) Like the Transportation Plaintiffs, they use dispatch communication devices to connect an operator/driver and vehicle to a customer who requests transportation.

The *de facto* taxi companies use only a smartphone app to arrange the ride, while the Transportation Plaintiffs make available to passengers both smartphone apps (such as Hailo, Taxi Magic or Go Fast Taxi) and telephone as ways to request a ride (other than a street hail or airport queue or taxi stand). Contrary to marketing puffery by the *de facto* taxi companies, use of their smartphone apps to arrange rides is neither revolutionary nor materially different from the smartphone apps used by the Transportation Plaintiffs in providing rides to the public. Indeed, Plaintiffs Yellow and Flash alone receive over 38,000 service requests per month through smartphone apps, as well as nearly 20,000 via web or text message;

iii)    Like the Transportation Plaintiffs, Uber and Lyft use a metering system based on distance and time to determine the fare; the metering systems are GPS-based and use a smartphone as the hardware;

iv)    Uber, Lyft and Sidecar charge a fee for arranging the transportation;

v)    Like the Transportation Plaintiffs, Uber and Lyft and Sidecar accept credit card payment for the fare; all three require payment by credit card prearranged with the customer;

96.    Uber also provides UberBlack, a so-called black car/limo service and UberSUV, a "premium" SUV service. UberBlack and UberSUV provide *de facto* taxi services because the cost of transportation is based on a meter-based fare determination. They are taxis in every respect except that the cars are big and black. Not only are Uber's black cars and SUVs acting as unlicensed taxis, but, until the effective date of the TNP Ordinance, they were doing so in violation of the City's ordinance that prohibits licensed limousines and liveries to use metering devices to determine fares. *See* Chicago, Ill., Mun. Code ("Mun. Code") §9-114-060.

97.     Although the *de facto* companies are engaging in the same business activity as Transportation Plaintiffs, upon information and belief, prior to the effective date of the TNP Ordinance, the *de facto* taxi companies operated in violation of numerous requirements of state law and the City Taxi Regulations set forth in paragraphs 97-158 below, to which the City deliberately turned a blind eye.  By enacting the TNP Ordinance, the City has ratified these disparities, systematically imposing numerous more onerous requirements on Transportation Plaintiffs as compared to the *de facto* taxi companies, giving the latter a substantial competitive advantage regarding insurance, driver qualifications, vehicle qualifications, fares and other matters.

98.     Several of the regulatory requirements described below that the City has imposed and continues to impose upon the Transportation Plaintiffs have no counterpart for the *de facto* taxi companies under the TNP Ordinance.  And even where the TNP Ordinance regulates the *de facto* taxi companies, it not only does so less rigorously, but also often permits them to police themselves, a substantial competitive advantage generally prohibited for the Transportation Plaintiffs.

99.     For example, as described below, the City requires taxi drivers to undergo a Chicago Police Department background check, while it will permit *de facto* taxi companies to do their own checks of drivers; the City requires taxi drivers to submit to annual drug tests conducted by authorities approved by the Commissioner, while it will permit the *de facto* taxi companies to develop their own drug policy that need not include drug tests; and the City requires taxis to undergo regular safety and maintenance inspections by the City, while it will permit the *de facto* taxi vehicles to be inspected elsewhere under an as-yet undefined standard.

100.    Because the *de facto* taxi companies have been operating in open violation of existing laws in Chicago and elsewhere in the country, there is little reason to expect that self-policing will be effective.  Regardless, there is no rational basis for the City to allow these companies to self-police while continuing to impose more rigorous, costly and time-consuming external policing requirements on the Transportation Plaintiffs.

*Disparate treatment regarding insurance.*

101.    Among the many ways in which the City has created an unlevel and unfair playing field is its disparate treatment of Transportation Plaintiffs and the *de facto* taxi companies concerning automobile liability insurance.

102.    City Taxi Regulations require medallion owners to carry public liability insurance "from an insurance company *authorized to do business in the State of Illinois*, and *qualified under the laws of Illinois to assume the risk in the amounts hereinafter set forth*," with a minimum coverage for each taxicab of $350,000 per occurrence, as well as workers' compensation insurance (Mun. Code § 9-112-330) (emphasis added).

103.    The costs the City imposes on Transportation Plaintiffs under this requirement are substantial, typically well over $4,000 per year per taxi for the automobile liability coverage.

104.    Until the enactment of the TNP Ordinance and its effective date of September 2, 2014, the City failed to require the *de facto* taxi companies to carry any insurance covering the commercial, "for hire" use of the cars or workers' compensation insurance covering the drivers of the cars they operate, despite the fact that the City Taxi Regulations required such insurance.

105.    The TNP Ordinance imposes some new, separate and unequal insurance requirements on the *de facto* taxi companies (Mun. Code Sec. 9-115-090). The new obligations

43

are weaker and far less costly to the *de facto* taxi companies than those the City continues to impose on taxis. Among the differences are:

> (i) the insurance is not required to be issued by an insurance company "authorized to do business in the State of Illinois," and "qualified under the laws of Illinois to assume the risk in the amounts" set forth in the Ordinance;

> (ii) the insurance is not required to be primary, as opposed to excess, which means it can be written by a company without the licensure and reserve requirements mandated under Illinois law of primary carriers;

> (iii) the insurance requirement is minimal (currently $20,000) during the period when the driver is driving and awaiting dispatch, a time when drivers are distracted and the risk of accidents is substantial; and

> (iv) no worker's compensation insurance is required.

Thus, while the TNP Ordinance requires the *de facto* taxi companies to carry a policy providing $1 million in coverage during the time when a driver accepts and provides a ride, the coverage is of doubtful effectiveness because it can be obtained via a cheaper excess policy from a substandard insurance company that is not required to maintain reserves as required under Illinois law for primary carriers or to comply with other requirements of insurance companies licensed in Illinois. The result, apart from imposing greater costs and burdens on the Transportation Plaintiffs, is that the City requires less protection to the riding public using the *de facto* taxis.

106. Upon information and belief, Uber and Lyft have obtained nationwide insurance coverage from an excess carrier, James River Insurance, that is unlicensed as a primary carrier in Illinois and does not maintain the reserves Illinois law requires of companies licensed to write

primary coverage in Illinois. Discovery is needed to determine the details of this coverage. Nevertheless, upon information and belief, the James River insurance coverage is much cheaper than the type of insurance the City requires Transportation Plaintiffs to maintain. The City's acceptance of such lower and substandard coverage confers upon the *de facto* taxi companies a substantial competitive advantage while placing the public at risk that insurance coverage will be inadequate.

107. The City's imposition of unequal insurance requirements for companies engaging in the same activity lacks a rational basis, and adds to the competitive disadvantage the City is imposing upon Transportation Plaintiffs.

*Disparate treatment regarding license fees.*

108. The City Taxi Regulations require every taxi to have a medallion, which in recent years cost well over $300,000 per car. In addition, each medallion owner must pay a bi-annual license fee of $1,200 for each non-WAV [wheel chair equipped] vehicle, and each affiliation must pay an annual fee of $500 plus $15 for each medallion licensee affiliated with the affiliation. Mun. Code §§9-112-150(b)(i), 340(l).

109. Prior to the effective date of the TNP Ordinance, the City permitted the *de facto* taxi companies to operate without paying any fees, in violation of the City Taxi Regulations.

110. The TNP Ordinance imposes far lower fees on the *de facto* taxi companies than those imposed on the Transportation Plaintiffs. There is no requirement of a medallion or an equivalent. Rather, each *de facto* taxi company that is issued a Class A license will merely pay $10,000 *for the entire fleet*, regardless of the number of cars it deploys during the year. Mun. Code §9-115-040(a). Thus, if Uber were to deploy only 100 UberX cars, it would pay only $100

per car per year. If it were to deploy 500 cars, it would pay only $50 per car per year. Upon information and belief, Uber has deployed well in excess of 500 UberX cars in Chicago.

111. These fees are minuscule compared to the per car fees the City imposes on the Transportation Plaintiffs, even when the substantial six-figure medallion cost is excluded from the calculus. The additional requirement of purchasing the medallion renders the disparity unconscionable.

112. The City's imposition of unequal license fee requirements for companies engaging in the same activity lacks a rational basis, and adds to the competitive disadvantage the City is imposing upon Transportation Plaintiffs.

*Disparate treatment regarding fares and fees paid by the public.*

113. City Taxi Regulations set maximum meter rates for taxis (*id.* §9-112-600). Uber, for its UberBlack, UberSUV, UberX and UberXL services, sets its own rates based on time and distance metered by smartphone GPS data, as does Lyft.

114. The TNP Ordinance aggravates this disparity by purporting to legalize the *de facto* taxi companies' practice of setting their own fares, including engaging in "surge pricing," while continuing to prohibit the Transportation Plaintiffs (except livery Plaintiffs) from similarly adjusting fares, even when accepting rides via a smartphone application. Mun. Code §9-114-265(a).

115. As stated earlier, the absence of required, uniform rates gives the *de facto* taxi companies a substantial competitive advantage over Transportation Plaintiffs. The *de facto* taxi companies use their computer algorithms determine rates, while the City dictates rates to the Transportation Plaintiffs, even when engaging in the identical transportation activity at the very same time. As a result, the *de facto* taxi companies are permitted to charge below the taximeter

rates when they wish, and to charge higher rates at times of high demand when customer choice is limited. These pricing differences help them attract customers (and build brand loyalty) at certain times and give them an edge over Transportation Plaintiffs in the recruitment of drivers.

116. City Taxi Regulations prohibit a dispatcher from charging fees to drivers, including for radio service (City of Chicago Rules and Regulations for Radio Dispatch Services ("Dispatcher Regs.") R. No. 8(b)). The *de facto* taxi companies receive a share of the fees paid for transportation, thus receiving a fee from the drivers.

117. Uber, through its UberTaxi service, imposes an additional booking fee in addition to the meter rate, and a default "gratuity" of which Uber receives at least the booking fee and a credit card processing fee; the City has permitted Uber to charge the booking fee even though it rejected previous requests by some Transportation Plaintiffs to charge a booking fee.

118. The disparate treatment regarding fares and fees lacks any rational basis, especially for rides arranged in advance through smartphone apps, and adds to the competitive disadvantage the City is imposing upon Transportation Plaintiffs.

*Disparate treatment regarding driver background and qualifications.*

119. City Taxi Regulations prohibit an affiliation from using or dispatching to drivers who do not have a valid chauffeur license. (Mun. Code §9-112-260; City of Chicago Rules and Regulations for Affiliations ("Affiliation Regs.") R. No. 6.1(f); Dispatcher Regs. R. Nos. 4-4.1). City Taxi Regulations similarly prohibit medallion owners from leasing to drivers who are not licensed chauffeurs in good standing or are otherwise below a certain age, have negative driving records or criminal records, or who fail an annual drug test; additionally, medallion owners and drivers must be in compliance with court-ordered child support obligations. (Mun. Code §§ 4-4-

152, 9-104-030, 9-104-080; 9-112-160, 200, 260; City of Chicago Public Chauffeurs Rules and Regulations ("Chauffeur Regs.") CH1.02, CH 1.09, CH 3.08.)

120.     To obtain a chauffeur license, a driver must, *inter alia*, undergo a thorough background check performed by the Chicago Police Department and attend training and safety courses at a community college, a process that takes several weeks.  (Mun. Code § 9-104-030; Chauffeur Regs. CH1.03.)

121.     Prior to the TNP Ordinance, in violation of these provisions, the *de facto* taxi companies dispatched to drivers who did not hold a chauffeur license or have adequate (or any) insurance covering rides for hire.  Thus, the Transportation Plaintiffs had to wait weeks to place new drivers in taxis while the *de facto* taxi companies could do so, and did do so, in a matter of days or hours.  Indeed, upon information and belief, Uber has contracted with former taxi drivers whose chauffeur licenses had been suspended for violations of the City Taxi Regulations

122.     The TNP Ordinance purports to legalize this disparity.  The background check and chauffeur license requirements continue to apply in all respects to drivers for Transportation Plaintiffs.  At the same time, while the TNP Ordinance imposes some requirements on the *de facto* taxi drivers, Mun. Code § 9-115-150(b), the Ordinance allows the *de facto* taxi companies to deploy drivers without chauffeur licenses and to conduct their own background checks (rather than ones conducted by the Chicago Police Department) and training, so long as the companies procure a "Class A" license, which they can obtain if their entire fleet of drivers averages less than 20 hours per week (which means that hundreds of drivers can be working at or near full time, yet not undergo the same scrutiny as taxi drivers, so long as enough part-time drivers bring the average below 20 hours per week).  Mun. Code § 9-115-030(a); 9-115-150(b).

123.    Upon information and belief, the *de facto* taxi companies are procuring Class A licenses, and, therefore, the City will not require them to adhere to the more burdensome (though safety-justified) driver qualifications the City continues to impose upon Transportation Plaintiffs.

124.    Upon information and belief, there have been customer complaints in Chicago and other cities in the country about UberX drivers engaging in sexual assault, sexual harassment, and other inappropriate behavior.  The laxer screening requirements imposed on the *de facto* taxi companies increase the likelihood of such occurrences.

125.    City Taxi Regulations also require affiliations to provide continuing education to drivers (Mun. Code §9-112-350; City of Chicago Rules and Regulations for Affiliations ("Affiliation Regs.") R. No. 2.4); the City does not require the *de facto* taxi companies to provide continuing education.

126.    Among the many ways in which the City is imposing lighter burdens on the *de facto* taxi companies is drug-testing of drivers and enforcement of their child-support obligations.

127.    The drivers for Transportation Plaintiffs must undergo annual drug tests.  The TNP Ordinance only requires the *de facto* taxi companies to maintain and enforce a "zero-tolerance policy" for drugs and alcohol, and drug testing is optional rather than mandatory.  Mun. Code §9-115-150(b)(3).  The TNP Ordinance does not indicate how a non-mandatory program will permit implementing a zero-tolerance policy in the real world.

128.    The TNP Ordinance also permits the *de facto* taxi companies to continue to deploy to drivers who are child-support deadbeats, while continuing to prohibit the Transportation Plaintiffs from doing so.

129.    The foregoing allegations are not made to advocate for a particular policy regarding drug-testing or child support, but to highlight the irrationality of the distinctions the City has drawn between taxi drivers and UberX/UberXL/Lyft/Sidecar drivers.  It is wholly arbitrary to permit one group to engage in For-Hire Transportation while forbidding the other from engaging in the same activity.  Whether more or less strict, the requirements should be substantially the same.  If passing drug tests and compliance with child support are appropriate prerequisites to driving passengers for hire, the criteria should apply to all drivers. Transportation Plaintiffs are harmed by these and many other distinctions the City has drawn.  The distinctions result in serious competitive disadvantages: The *de facto* taxi companies can place and retain drivers in their vehicles more quickly and cheaply than can Transportation Plaintiffs.

130.    The City's disparate treatment regarding driver qualifications lacks a rational basis for several reasons, including the following:  (i) the 20 hour "average" requirement means that the *de facto* taxi companies will be deploying hundreds of ***full-time*** drivers to compete against the full-time drivers of Transportation Plaintiffs in an identical activity without having to undergo the same training and scrutiny; and (ii) the mere fact that a driver is part-time is not rationally related to the public-safety need to ensure that any driver transporting the public has undergone adequate screening and training, or that the public policy interests in child-support enforcement are met.  Indeed, training and scrutiny are at least as important for drivers who drive for a sideline rather than a full-time occupation.  And their children need support just as much as those of full-time drivers.  These arbitrary distinctions add to the competitive disadvantage the City is imposing upon Transportation Plaintiffs.

*Disparate treatment regarding vehicle age and inspections.*

131.   City Taxi Regulations control the age (until the enactment of the TNP Ordinance, no older than four model years for conventional cars and five for hybrids), condition and model of taxi vehicles (City of Chicago Taxicab Medallion License Holder Rules and Regulations ("Taxi Regs.") TX3.01-3.05.)   The TNP Ordinance increases the age-ceiling for hybrids from five to six years.   Chicago Mun. Code §9-112-070(c)(2).

132.   The City permits the d*e facto* taxi companies to dispatch to older vehicles that do not meet these requirements.   The City has permitted, and nothing in the TNP Ordinance prevents, the *de facto* taxi companies (which will hold Class A licenses) from dispatching to cars of any age.

133.   City Taxi Regulations require medallion owners to submit to regular City-performed vehicle inspections (Mun. Code §§9-112-050; Taxi Regs. TX3.03).   Before the TNP Ordinance, these inspections were required twice per year.   The TNP Ordinance relaxed this to annual inspections for cars less than or equal to two years old.   Mun. Code §9-112-050.

134.   Before the TNP Ordinance, the City did not enforce the inspection requirements of the City Taxi Regulations against the *de facto* taxi companies or otherwise require them to follow any inspection protocol for cars they deploy.   The TNP Ordinance requires that the cars deployed by the *de facto* taxi companies submit to inspections, but the inspections will not be performed by the City and will be less thorough and onerous than those still required of Transportation Plaintiffs.   And the TNP Ordinance does not specify how often such *de facto* taxi vehicles must undergo the in-house, lighter inspection protocol.   Mun. Code §9-115-110(a).

135.    City Taxi Regulations require medallion owners to meet specific driver safety equipment requirements, such as a safety shield or camera, which are intended "to maximize chauffeur and passenger safety." (Mun. Code §9-112-140; Taxi Regs. TX6.01-6.03).

136.    The City does not require the *de facto* taxi companies to have such safety features.

137.    The City's disparate treatment regarding vehicle age, condition, inspections and safety features lacks a rational basis, and adds to the competitive disadvantage the City is imposing upon Transportation Plaintiffs.

*Disparate treatment regarding accessibility to persons with disabilities.*

138.    City Taxi Regulations require taxi drivers, medallion owners and affiliations to accept requests for transportation from and to accommodate people with disabilities. Moreover, until the enactment of the TNP Ordinance, licensees with at least 20 taxis were required to deploy 5% of their fleet as wheelchair accessible vehicles ("**WAVs**") (Mun. Code §§9-112-570, 575, 580; Affiliation Regs. R. No. 2.6; Dispatcher Regs. No. 5.3).

139.    The City does not require the *de facto* taxi companies to meet similar requirements. Even worse, in the TNP Ordinance, the City amended the City Taxi Regulations to *more than double* the burden on the Transportation Plaintiffs – potentially requiring licensees with ten or more medallions to deploy a fleet consisting of 10% WAVs by January 1, 2018. (Mun. Code § 9-112-570(b).

140.    The TNP Ordinance imposes lighter WAV requirements on the *de facto* taxi companies. By January 1, 2015, their apps will be required to allow customers to request a WAV, but they can meet this requirement by outsourcing the request to "other persons that dispatch" WAVs. Mun. Code § 9-115-140(b). Thus, even though their fleets consist of

52

hundreds or thousands of cars, the *de facto* taxi companies will not be required to make the capital investment of buying even one WAV.

141.    Each WAV is very expensive, costing about $20,000 more than hybrid cars typically purchased by Transportation Plaintiffs, and generally operate at a loss.  While the City has created a fund to provide partial reimbursement for the cost of WAVs, to which both Transportation Plaintiffs and the *de facto* taxi companies will contribute, it is unknown how large the fund will be and it is likely the burden on Transportation Plaintiffs will remain significant.

142.    The imposition of this WAV burden on owners of 20 or more medallions was part of the price for the exclusivity promise the City had made such medallion owners.  However, by failing to enforce the exclusivity requirements of the City Taxi Regulations, and then eliminating the requirement via the TNP Ordinance, while increasing the WAV obligations imposed on medallion owners, the City has added to the WAV burden while eliminating the exclusivity benefit.  It has thereby irrationally and unfairly saddled additional competitive disadvantages on the Transportation Plaintiffs.

143.    City Taxi Regulations require licensees and affiliations to comply with all Federal, State and City non-discrimination laws; and require drivers not to refuse service to any person regardless of destination unless the driver is en route to pick up another passenger or out-of-service.  Indeed, drivers are prohibited from even asking the passenger's destination before the passenger enters the taxicab.  (Mun. Code § 9-112-180; Chauffeur Regs. CH5.02.).

144.    Prior to the TNP Ordinance, the City permitted the *de facto* taxi companies to, upon information and belief, operate in violation of these Regulations in various respects:

      a.   their drivers may choose to reject passengers based on destination;

b. the rating systems of the smartphone apps result in passengers getting different "grades" from drivers, thereby encouraging subsequent drivers to reject certain "lower-rated" passengers in favor other others with "higher" ratings; and

c. Lyft's profile of each passenger includes a picture of the passenger, thereby enabling their drivers to either avoid or prefer certain passengers based on perceived race, ethnicity, religion, disability or gender. This also creates a public safety issue, since unlicensed drivers without adequate background checks receive photographs and, on information and belief, cellphone numbers of their passengers.

145. While the TNP Ordinance requires the *de facto* taxi companies to respond to requests for service and comply with anti-discrimination laws, Mun. Code § 9-115-180(j), compliance is unlikely to be enforced. Moreover, the TNP Ordinance will still permit their drivers to rate passengers unless the passenger affirmatively opts out of the rating (which serves no function other than to allow drivers to refuse service) and will permit the companies to post pictures of potential passengers to the drivers.

146. City Taxi Regulations require affiliations, medallion owners and taxis to accept cash and debit cards from the Taxi Accessible Program ("TAP") (as well as other similar programs), not just payment by credit cards (Mun. Code § 9-112-510; Taxi Regs. TX5.07; Affiliation Regs. R. No. 2.3; Dispatcher Regs. No. 5.3). Upon information and belief, Uber, Lyft and Sidecar accept only credit card payments, and require that the customers have been pre-approved for credit card charges.

147. The City permitted the *de facto* taxi companies to operate in violation of these Regulations prior to the TNP Ordinance, and the new ordinance is silent about method of

payment, implicitly permitting the *de facto* taxi companies to continue to accept payment only by credit card.

148.    The foregoing disparate treatment regarding accessibility and payment lacks a rational basis, and adds to the competitive disadvantage the City is imposing upon Transportation Plaintiffs.

*Other forms of disparate treatment.*

149.    City Taxi Regulations require affiliations to service and dispatch taxis to underserved areas of the City (Mun. Code § 9-112-320(a); Dispatcher Regs. R. No. 5(c).)  Until the enactment of the TNP Ordinance, neither the City nor the *de facto* taxi companies required drivers to serve any areas.

150.    City Taxi Regulations require a "two-way" radio dispatch system audible to the driver at all times (Mun. Code §9-112-320(c); Dispatcher Regs. R. No. 1(d)). The *de facto* taxi companies have only one-way text transmissions by smartphone (which inevitably creates incidents of driving-while-texting).  The City does not require the *de facto* taxi companies to meet any such requirements.

151.    City Taxi Regulations require every taxi driver to have his or her dispatch radio turned on, and taximeters must be connected to an active dispatch radio (Mun. Code § 9-112-320(c); Taxi Regs. TX5.02(c)(4), 5.10).  The City does not require the *de facto* taxi companies to meet any such requirements.

152.    City Taxi Regulations require the dispatch service to have its principal place of business in Chicago.  (Mun. Code §9-112-550(b); Dispatcher Regs. R. No. 2.)  The City does not require the *de facto* taxi companies to meet this requirement.  Uber dispatches from California; the other *de facto* taxi companies are believed to dispatch from locations outside Chicago.

153. City Taxi Regulations prohibit a single dispatch service from dispatching to both taxis and liveries (limousines). (Dispatcher Regs. R. No. 3.) The City does not require the *de facto* taxi companies to meet this requirement.

154. City Taxi Regulations require affiliations to provide service anywhere in Chicago within 30 minutes of receipt of a request, upon penalty of fines for non-compliance. (Affiliation Regs. R. Nos. 5(g), 5.2; Dispatcher Regs. Nos. 5(e).) Drivers for the *de facto* taxi companies may and do disregard requests at their discretion, and the TNP Ordinance imposes no time limit on responding to requests for service.

155. City Taxi Regulations require medallion owners to equip all taxis with meters that meet standards published by the National Institute of Standards and Technology and that must be active whenever the taxi is engaged for hire in the City, and to have the meters inspected and tested annually. (Mun. Code §9-112-510; Taxi Regs. TX5.02-5.05.) The City does not require the *de facto* taxi companies to meet this requirement. The *de facto* taxi companies use smartphone apps as the metering device, which are not subject to use limits or calibration testing.

156. City Taxi Regulations require livery cars to charge a flat rate fixed in advance. (Mun. Code § 9-114-010, 060.) The City does not require the *de facto* taxi companies to meet this requirement. UberBlack/SUV do not comply because they use GPS metering based on distance and time.

157. Upon information and belief, the *de facto* taxi companies also operate in violation of specific Illinois state law requirements including Illinois law requiring the filing with the State of proof of commercial liability insurance (625 ILCS 5/8-101, 102).

158.    The foregoing is not an exhaustive list of all respects in which the d*e facto* taxi companies provide taxi and limousine services in violation of City and State requirements regarding taxis.

159.    The City has vigorously enforced and continues to vigorously enforce the City Taxi Regulations against the Transportation Plaintiffs, who are regularly required to appear at administrative hearings to respond to citations alleging violations of the Regulations, and sometimes pay substantial fines when the allegations have been sustained.  The City has issued only a few nominal citations and impoundments against the drivers of cars dispatched by the *de facto* taxi companies despite the fact that every ride they dispatched and every dime they charged and collected prior to enactment of the TNP Ordinance was done in open and blatant disregard and violation of the City Taxi Regulations.

**The City's Discrimination On the Basis of Disability, Race and Other Factors**

160.    The City Taxi Regulations contain several regulations intended to make taxi services more accessible to persons with disabilities.

161.    As noted above, prior to the enactment of the TNP Ordinance, a licensee that "owns or controls" 20 or more licenses must operate WAVs for at least five percent of its fleet. (Mun. Code §9-112-570(b).)  The TNP Ordinance increases the burden:  by January 1, 2018, a licensee that "owns or controls" 10 or more licenses must have at least ten percent of its fleet comprised of WAVs.  Upon information and belief, each of the *de facto* taxi companies contracts with and controls more than 20 vehicles, each of which should be licensed under the City Taxi Regulations.  However, upon information and belief, none is wheelchair accessible.

162.    The City Taxi Regulations also provide incentives to licensees and affiliations to provide wheelchair accessible vehicles.  For example, such vehicles may be older than ordinary

57

licensed taxicabs (Mun. Code § 9-112-070); the two-year licensing renewal fee is $1,200 for non-accessible vehicles and $1,000 for wheelchair accessible vehicles (*id.* § 9-117-150(b)(i)); the $200 difference is deposited in a "Wheelchair Accessible Taxicab Fund" administered by the Commissioner to promote wheelchair accessible taxicab vehicles. (*Id.* §9-112-150(b).)

163.    In order to further promote accessibility, the City administers financial benefits to people with disabilities and imposes obligations on the Transportation Plaintiffs.  The City Taxi Regulations require the Transportation Plaintiffs, "[a]s a condition of being licensed, . . . to participate in and comply with [Taxi Access Program, "T.A.P."] or similar program providing for increased access to taxicab service to persons with disabilities."  (Mun. Code § 9-112-580.) Under the T.A.P. program qualified individuals can get their taxi rides subsidized by PACE. Such persons can pay $5.00 for a credit of up to $13.50 per taxicab ride, and redeem the subsidy by swiping a debit card in the credit card reader taxicabs are required to maintain under the City Taxicab Regulations.  "Compliance with T.A.P. includes accepting and processing T.A.P. forms of payment, such as the T.A.P. swipe card."  (*Id.*)  The Transportation Plaintiffs typically do not receive payment from PACE for rides provided to T.A.P. customers for 30-45 days.  Moreover, because PACE sometimes determines that certain riders were not qualified for the subsidy, the reimbursement rate is less than 100%, and the Transportation Plaintiffs lose thousands of dollars each year for such unreimbursed rides.

164.    The City does not require the *de facto* taxi companies to comply with these accessibility obligations.  Prior to the TNP Ordinance, the City did not require them to provide wheelchair accessible vehicles, and the Ordinance does not require them to accept T.A.P. debit cards.  Indeed, because their drivers do not have credit card readers in their cars, they cannot accept such debit cards.  As a result, until January 1, 2015, persons needing a wheelchair

accessible vehicle cannot avail themselves of any of the rides provided by the *de facto* taxi companies, and even then qualified persons with disabilities who are able to gain access to the vehicles deployed by the *de facto* taxi companies will not be able to avail themselves of the substantial governmental discounts to which they are entitled.

165.    The City is aware that the *de facto* taxi companies are not providing accessible vehicles or participating in the T.A.P. program.  The City's inaction prior to January 1, 2015, has not only arbitrarily divided the taxicab industry into two classes (the regulated taxicabs like the Transportation Plaintiffs and the unregulated taxicabs like the *de facto* taxi companies), it has arbitrarily divided the riding public into disabled and non-disabled classes, the first of whom can only request rides from and obtain governmental subsidies through the Transportation Plaintiffs and other regulated taxicab services, while the second of whom can request rides from any actual or *de facto* taxicab, whether or not regulated.

166.    As stated above, the City also failed to require the *de facto* taxi companies to comply with the provisions in the City Taxi Regulations that taxicabs comply with all Federal, State and City anti-discrimination laws, respond to dispatches to anywhere in the City, accept cash, and not refuse a ride based on the passenger's destination.  The *de facto* taxi companies have been free to pick and choose passengers based on who they are, where they will be picked up and where they will be dropped off.  This enabled the *de facto* taxi companies to favor riders and neighborhoods based on perceived race and ethnicity.  Additionally, the City's failure to require the *de facto* taxi companies to accept cash has a disparate impact on poor, elderly and minority populations, large portions of whom do not have smartphones or credit cards.

167.    The TNP Ordinance will require the *de facto* taxi companies and drivers to comply with discrimination laws and respond to requests for service.  (Mun. Code § 9-115-180.)

59

However, it will not require the companies to accept cash or TAP vouchers, and the TNP Ordinance does not erase the fact that the City permitted these companies and their drivers to operate for nearly two years without compliance with discrimination laws.

168.    The City's refusal to require the *de facto* taxi companies to comply with these accessibility, availability and anti-discrimination rules has arbitrarily imposed greater obligations on the Transportation Plaintiffs as compared to the *de facto* taxi companies, thereby exacerbating the competitive advantages they already garner from the City's arbitrary refusal to regulate them.

### Uber Has Admitted that it and the Other *De Facto* Taxi Companies Gain Unfair Advantages When the City Allows Them to Operate in Violation of the City Taxi Regulations

169.    In a television interview, Uber CEO Travis Kalanick candidly admitted the unlawfulness of its business model and how unfair it is for taxi services, like the Transportation Plaintiffs, to be required to compete against unlawful taxi services that do not comply with or operate under the same regulations.[1]  Referring to companies like Lyft and Sidecar, Kalanick said that they were engaging in "regulatory arbitrage," and that each ride they arranged in violation of the law constituted a separate "criminal misdemeanor."  He complained that they operate without carrying insurance.  Because they operate outside the regulatory structure and the costs thereby imposed he said that they "eat you up from the bottom up."

170.    Rather than insist on compliance with the law, Mr. Kalanick admitted that Uber has developed a "playbook" under which it would (and did) join the other lawbreakers in markets, like Chicago, where they operate.  Uber notified municipal authorities that if they did not enforce the law within thirty days against the violators (Lyft and Sidecar), Uber would declare a state of "regulatory ambiguity" to exist, after which Uber would join the other

---

[1]    See http://tech.fortune.cnn.com/2013/07/23/travis-kalanick-uber/

scofflaws in operating a taxi service without licenses and in knowing and disregard of established law (notwithstanding that Uber was already acting in violation of law and subject to the same complaints from Plaintiffs).

171.    Uber also described its "playbook" in a "White Paper" issued on April 12, 2013. In the White Paper, Uber stated that Lyft and Sidecar were regularly violating applicable laws and regulations by providing transportation services in privately-owned vehicles operated by persons without chauffeurs' licenses.  Uber stated that it intended to follow their practices based on the tacit approval of regulatory agencies.  A copy of the White Paper is attached as Exhibit 9.

172.    In the White Paper, Uber identified "a host of clone companies [that] have emerged, most notably Lyft and Sidecar, whose goal is to offer incredibly low-cost transportation by working exclusively with unlicensed, non-commercially insured vehicles and drivers."  Uber stated:

> Over the last year, new startups have sought to compete with Uber by offering transportation services without traditional commercial insurance or licensing. Uber refrained from participating in this technology sector — known as ridesharing — due to regulatory risk that ridesharing drivers may be subject to fines or criminal misdemeanors for participating in non-licensed transportation for compensation.
>
> In most cities across the country, regulators have chosen not to enforce against nonlicensed transportation providers using ridesharing apps. This course of non-action resulted in massive regulatory ambiguity leading to one-sided competition which Uber has not engaged in to its own disadvantage.  It is this ambiguity which we are looking to address with Uber's new policy on ridesharing:
>
> > 1.    Uber will roll out ridesharing on its existing platform in any market where the regulators have given tacit approval;
> >
> > 2.    In the absence of regulatory leadership, Uber will implement safeguards in terms of safety and insurance that

> will go above and beyond what local regulatory bodies
> have in place for commercial transportation.

Uber identified Chicago as a location in which "the regulators have chosen NOT to enforce existing regulations against non-licensed operators." (Uber's emphasis.)

173.    Thereafter, Uber began offering its UberX service in the Chicago area. Uber provides transportation to the public in Chicago from any driver who signs up for the UberX program and uses his or her own car, with no requirement that he or she have a chauffeur license, insurance covering rides-for-hire, or meet the other City and State requirements applicable to taxis and limousines.

174.    As stated in the Uber White Paper, Uber did so based on "tacit approval" from the City.  In the Chicago market, Uber relied upon the tacit approval of the City in providing UberX services without complying with the City Taxi Regulations.  The City provided its tacit approval by not taking meaningful action to enforce the City Taxi Regulations in the face of Uber's public challenge to regulators stated in the White Paper, and repeated requests for enforcement from Plaintiffs and others.  The City's tacit approval was also reflected by a public statement of Spielfogel in late 2012 that enforcing rules against Uber and other *de facto* taxi companies had been put on indefinite hold.  That approval was codified and ratified with the enactment of the TNP Ordinance, which purports to legalize the operations of the *de facto* taxi companies without requiring them to comply with the City Taxi Regulations.  The actions of Uber and the City constitute and reflect the existence of an agreement between them not to enforce the City Taxi Regulations against Uber and other *de facto* taxi companies.

175.    Contrary to Uber's assertion in the White Paper, there has not been any regulatory ambiguity concerning the relevant law and regulations.  The extensive City Taxi Regulations are clear.  By permitting the *de facto* taxi companies to operate in violation of these laws and

regulations, and by tacitly agreeing to (and then ratifying) such violations after Uber notified the City of its intent to violate the law, the City has aided, abetted and enabled the *de facto* taxi companies to damage Plaintiffs and to destroy Transportation Plaintiffs' businesses.

176.    The City's tacit agreement with Uber was particularly egregious because Uber's White Paper and other public pronouncements falsely convey a concern for public safety that is belied by the actual terms of Uber's contract with the public who use its services.  For example:

e.  Uber's White Paper states, "Extensive and strict background checks will be performed on any ridesharing transportation provider allowed on the Uber platform. The criteria for which a driver will be disqualified will be stricter than what any existing local regulatory body already has in place for commercial transportation providers." Ex. 9 at 6.  This is false.  Uber's Terms and Conditions in its smartphone app (last viewed on September 18, 2014, and dated May 17, 2013) expressly state in capital letters that Uber will not conduct background checks or be liable for any injury caused by their drivers:  "THE COMPANY MAY INTRODUCE YOU TO THIRD PARTY TRANSPORTATION PROVIDERS FOR THE PURPOSES OF PROVIDING TRANSPORTATION. WE WILL NOT ASSESS THE SUITABILITY, LEGALITY OR ABILITY OF ANY THIRD PARTY TRANSPORTATION PROVIDERS AND YOU EXPRESSLY WAIVE AND RELEASE THE COMPANY FROM ANY AND ALL ANY [*SIC*] LIABILITY, CLAIMS OR DAMAGES ARISING FROM OR IN ANY WAY RELATED TO THE THIRD PARTY TRANSPORTATION PROVIDER.    YOU    ACKNOWLEDGE    THAT    THIRD    PARTY TRANSPORTATION    PROVIDERS    PROVIDING    TRANSPORTATION

SERVICES REQUESTED THROUGH UBERX MAY OFFER RIDESHARING OR PEER-TO-PEER TRANSPORTATION SERVICES AND MAY NOT BE PROFESSIONALLY LICENSED OR PERMITTED. THE COMPANY WILL NOT BE A PARTY TO DISPUTES, NEGOTIATIONS OF DISPUTES BETWEEN YOU AND ANY THIRD PARTY PROVIDERS. WE CANNOT AND WILL NOT PLAY ANY ROLE IN MANAGING PAYMENTS BETWEEN YOU AND THE THIRD PARTY PROVIDERS. RESPONSIBILITY FOR THE DECISIONS YOU MAKE REGARDING SERVICES OFFERED VIA THE APPLICATION OR SERVICE (WITH ALL ITS IMPLICATIONS) RESTS SOLELY WITH YOU. WE WILL NOT ASSESS THE SUITABILITY, LEGALITY OR ABILITY OF ANY SUCH THIRD PARTIES AND YOU EXPRESSLY WAIVE AND RELEASE THE COMPANY FROM ANY AND ALL LIABILITY CLAIMS, CAUSES OF ACTION OR DAMAGES ARISING FROM YOUR USE OF THE APPLICATION OR SERVICE, OR IN ANY WAY RELATED TO THE THIRD PARTIES INTRODUCED TO YOU BY THE APPLICATION OR SERVICE."

f. Contrary to Uber's extensive limitations on its responsibilities to its passengers quoted above, Uber's White Paper states: "Innovation and consumer safety are at the core of Uber's culture. . . . We wanted to set the rules in a place where everyone would agree that safety and welfare of consumers was taken care of." Ex. 9 at 6. This is false. It is contradicted by the language quoted above, as well as by additional disclaimers in its app's terms and conditions: "THE QUALITY OF THE TRANSPORTATION SERVICES SCHEDULED THROUGH THE

USE OF THE SERVICE OR APPLICATION IS ENTIRELY THE RESPONSIBILITY OF THE THIRD PARTY PROVIDER WHO ULTIMATELY PROVIDES SUCH TRANSPORTATION SERVICES TO YOU. YOU UNDERSTAND, THEREFORE, THAT BY USING THE APPLICATION AND THE SERVICE, YOU MAY BE EXPOSED TO TRANSPORTATION THAT IS POTENTIALLY DANGEROUS, OFFENSIVE, HARMFUL TO MINORS, UNSAFE OR OTHERWISE OBJECTIONABLE AND THAT YOU USE THE APPLICATION AND THE SERVICE AT YOUR OWN RISK."

g. Uber's White Paper states: "At minimum, there will be a $2,000,000 insurance policy applicable to ridesharing trips. This insurance applies to any ridesharing trip requested through the Uber technology platform." Ex. 9 at 5. This is either false or highly misleading. Upon information and belief, at the time the statement was made, Uber's policy was only an "excess" policy that does not provide coverage unless the driver's personal liability policy provides coverage, which it does not. Uber has refused to release its insurance policies publicly or file them (or the policies of its drivers) with the State as required by 625 ILCS 5/8-101. Even if such coverage actually existed regarding so-called ridesharing trips, it is misleading and illusory for Uber to tout coverage for liability because the very same disclaimers of liability quoted above purport to hold Uber harmless from any potential claim for damages that an insurer may have to defend from a passenger involved in an accident.

177. The falsity of Uber's insurance representations was exposed in connection with an accident in San Francisco in late 2013 in which an UberX driver caused the death of a six-year

old pedestrian. Uber has publicly asserted that it is not responsible for an accident caused by this driver.

178.    Uber's purported disclaimers of liability not only contradict its false assertions of concern about public safety, they violate Illinois law. Notwithstanding Uber's attempts to characterize itself as a mere matchmaker of riders and drivers, Uber (as well as the other *de facto* taxi companies) is a common carrier as a matter of law. A common carrier owes its passengers the duty to use the highest degree of care consistent with the type of vehicle used in the practical operation of its business. *Rotheli v. Chicago Transit Authority*, 7 Ill. 2d 172, 177 (1955). Illinois law prohibits the *de facto* taxi companies from disclaiming liability for their own negligence or other breaches of their duty to use the "highest degree of care."

179.    While the TNP Ordinance appears to render Uber's contractual disclaimers of liability void as contrary to public policy, Mun. Code § 9-115-180(n), the City had previously tolerated Uber's operations notwithstanding this contractual language and its open and notorious flouting of the City Taxi Regulations.

180.    Uber has also admitted that it cannot compete with the Transportation Plaintiffs on a level playing field. Its business model depends upon the "regulatory arbitrage" through which it can "eat" Transportation Plaintiffs "from the bottom up" by operating in an unrestricted fashion while traditional taxicab companies operate by the rules, which include the substantial expense of carrying primary commercial insurance and remaining potentially liable to the riding public.

181.    This truth was highlighted in November 2012, when the Commissioner published draft proposed rules that would have expressly prevented Uber from using the GPS function on smartphones to calculate fares on a time and distance basis for its UberBlack livery service. (In

fact, these proposed rules only clarified existing rules that already prohibited limousine fares from being calculated on a time-distance basis and required taximeters for time-distance calculation of fares for taxicabs.)  Uber responded to these proposed regulations via a lobbying and public relations campaign in which it admitted that such regulations, if enacted and enforced, would prohibit Uber's UberBlack service.  Upon information and belief, it was shortly after Uber's objection to the proposed regulations that Spielfogel quietly directed the Commissioner not to implement the regulations and instituted the general moratorium on enforcement of the City Taxi Regulations against Uber and the other *de facto* taxi companies.

182.    Plaintiffs' representatives and others have repeatedly requested that the City enforce the City Taxi Regulations against the *de facto* taxi companies.  Except for minor, isolated actions, the City has refused to do so, despite its knowledge that the *de facto* taxi companies are operating without adequate insurance covering injuries to passengers or pedestrians, while continuing to enforce those regulations vigorously against the Transportation Plaintiffs.

183.    The prior Commissioner admitted the lawlessness and public danger created by the uninsured and unlicensed operation of *de facto* taxicabs by the *de facto* taxi companies.  In several "tweets" posted on her Twitter account, she urged the public to take only licensed and insured Chicago-medallion taxicabs or liveries.  A true and correct copy of some of these tweets is attached as Group Exhibit 10.  For example:

a. In a tweet on August 9, 2013 (Ex. 10A), she tweeted "It's the weekend.  Make the safe choice!  It's easy:  Remember '4 digits or less' on license plate!  LY & TX." Posted below the text is a heading, "Make the safe choice:  Ride in a licensed Chicago taxi!"  While the focus of this tweet was to choose Chicago taxis over

suburban taxis, her reasons for doing so apply even more so to the Unlicensed

Transportation Providers, who:

> don't go through the following rigorous City inspections: + Annual Chauffeur drug test + Annual Chauffeur physical exam + Monthly reviews of Chauffeur's red light violations + Monthly reviews of Chauffeur's Secretary of State record + Bi weekly revise of CPD arrests and violations + 311 complaint numbers + Mandated continuing education classes for Chauffeurs + Twice annual mechanical inspection of vehicle

b. In a tweet on August 16, 2013 (Ex. 10B), she tweeted "It's Friday – be safe!  And remember 4 digits or less with a TX or LY on the plate!  Posted below the text is a photo of a patient in a hospital bed in traction with the caption, "Look at me!  I saved a dollar riding in an unlicensed cab."

c. In a tweet on October 11, 2013 (Ex. 10C), she tweeted "Be an educated consumer – know what you're getting into.  Have a safe holiday weekend."  Posted below the text is a heading stating "EDUCATE YOURSELF!  KNOW THE TERMS & CONDITIONS."  Beneath the heading is a photo of a crumpled wreck of a car with a caption quoting from an "Actual Sentence From A Company's Discliamer [*sic*]," "YOU UNDERSTAND, THEREFORE, THAT BY USING THE APPLICATION AND THE SERVICE, YOU MAY BE EXPOSED TO TRANSPORTATION THAT IS POTENTIALLY DANGEROUS, OFFENSIVE, HARMFUL TO MINORS, UNSAFE OR OTHERWISE OBJECTIONABLE, AND THAT YOU USE THE APPLICATION AND THE SERVICE AT YOUR OWN RISK."  This language comes from Uber's terms and conditions, quoted above in Paragraph 175.

      d.   In a tweet on October 25, 2013 (Ex. 10D), she tweeted "It's the Friday night—Stay safe. Take only licensed taxis!" Posted below that text is a heading "Ridesharing: Are you covered?" over a photo of a totally wrecked car, followed by the caption: "Standard Auto Insurance will not pay for loss 'which occurs while [your personal vehicle] is being used as a public or livery conveyance.'"

184. The Commissioner's tweets have been symbolic and ineffectual because there has been no systematic enforcement to support them, due, upon information and belief, to direction from the Office of the Mayor. Exhortation via Twitter is not enforcement.

185. In sum, the *de facto* taxi companies were engaging in systematic, intentional, brazen, open and notorious lawlessness that the City has enabled, aided and abetted. With the knowledge of the City, they deployed unlicensed, uninspected and non-accessible vehicles, many older than four years; they were driven by unlicensed and unchecked drivers using smartphones while driving; the drivers were permitted to reject any passenger or destination; they provided no or inadequate insurance against injuries to the public; they attempted to disclaim any liability to the public they are serving; they charged rates often far in excess of those set by City law; and those rates are calculated by uncalibrated smartphone devices.

186. Under the TNP Ordinance the City codifies and ratifies the many types of disparate treatment described in paragraphs 96-158 above, including, among other things, allowing the *de facto* taxi companies to (i) carry weaker, cheaper insurance; (ii) charge more flexible rates; (iii) dispatch to drivers with less training and scrutiny; and (iv) dispatch to older, less safe vehicles.

187. As a result of the foregoing, lawful operators of taxi and limousine services, like the Transportation Plaintiffs, are required to compete at a government-sanctioned disadvantage

with the *de facto* taxi companies. The resulting unlawful discrimination against lawful operators will continue to worsen unless this Court requires the City apply substantially uniform regulations impartially and in a non-arbitrary manner to all similarly-situated transportation providers while respecting the investment-backed expectations the City has created and fostered.

188. The City's failure to enforce the City Taxi Regulations has already begun to impact the market value of taxi medallions.

189. As noted above, until recently, the market value of medallions was about $360,000 or more. In a typical medallion sale, the purchaser would pay 25% of the price in cash and borrow 75% of the price from entities like Plaintiff Funding, Plaintiff Tri Global or commercial banks such as Capital One. Typically, the loans would be secured by the medallions and personal guarantees.

190. Plaintiffs Funding, Tri Global (and other entities with similar business models) are particularly prejudiced from the City's failure to enforce the City Taxi Regulations. Funding and Tri Global borrow money from commercial lenders, which they then loan to purchasers of medallions, secured by the medallions and personal guaranties. Funding and Tri Global's loan agreements with their lenders require them to maintain a loan-to-value ratio in their portfolio of loans of no greater than 70% to 75% of the trailing three-month rolling average of medallion values. They are required to file periodic certificates with their lenders, incorporating data showing the prices from recent medallion sales, to demonstrate that the requisite ratio is maintained. If medallion values drop, the certificates would reflect the decline. In that event, to avoid default Funding and Tri Global would be required to post additional cash or collateral to restore the ratio to no greater than the 70% or 75% figure in the relevant agreement. The collective value of Funding and Tri Global's loan portfolios exceeds $250 million. If medallion

values drop, Funding and Tri Global would be required to post tens of millions of dollars in cash or collateral to avoid default.

191.     Because of the City's failure to require the *de facto* taxi companies to comply with the City Taxi Regulations, medallion values have already begun to fall, and if the trend continues, the consequences to Transportation Plaintiffs and other medallion owners and lenders would be catastrophic:  defaults will occur, medallion values will fall further, lenders will not finance future sales of medallions, medallion owners will be unable to sell, and the system, including owners, lenders, brokers and affiliations, will collapse.

192.     The *de facto* taxi companies have not been required to purchase medallions and outlay the cash or incur the debt to do so.  This – along with their failure to obtain adequate insurance covering injuries to the public, require newer, inspected vehicles, deploy licensed drivers and comply with the myriad other regulations – gives them a huge and unfair competitive advantage over Transportation Plaintiffs, an advantage the City has inexplicably permitted to occur and grow.

193.     The violations alleged in this Complaint arise from an official policy or practice of the City acting through the Office of the Mayor and the Commissioner, the officer charged by City law with the duty to enforce the City Taxi Regulations.

## Class Allegations – Medallion Class

194.     The plaintiffs that own medallions, YC Medallion Owners, CM6, 111 Medallion Owners and Assabill ("**Medallion Owner Plaintiffs**"), seek damages on behalf of themselves and all other medallion owners within the class alleged below pursuant to Rules 23(a), (b)(2), (b)(3), and (g) of the Federal Rules of Civil Procedure.  This class ("**Medallion Class**") consists of:

All individuals or entities that owned a City of Chicago taxicab medallion at any time between January 1, 2012 to the present.

195.    The Medallion Class satisfies all of the prerequisites stated in Rule 23(a):

(1) The Medallion Class is numerous.  There are approximately 6,800 medallions owned by at least 2,000 persons or entities.

(2) There are questions of law and fact common to all members of the Medallion Class, including without limitation whether the City has violated the Takings Clause, Equal Protection Clause, Due Process Clause and breached the contracts it has with each member of the Medallion Class.

(3) The claims of the Medallion Owner Plaintiffs are typical of the claims of the members of the Medallion Class.  They stand in an identical relationship with the City and have identical reciprocal rights and obligations concerning the City.

(4) The Medallion Owner Plaintiffs will fairly and adequately represent the interests of the Medallion Class.  They have no interests antagonistic to the Medallion Class. They seek injunctive relief and damages on behalf of, and which will benefit, all members of the Medallion Class.   They are represented by counsel who are competent and experienced in civil rights and class action litigation, and who should be appointed as class counsel pursuant to Rule 23(g).

196.    The Medallion Class satisfies Rule 23(b)(2) because the City has been acting in a manner that applies generally to the Medallion Class, so that final declaratory and injunctive relief in favor of the Medallion Class as a whole is appropriate.

197.    The Medallion Class satisfies Rule 23(b)(3) because questions of law and fact common to Medallion Class members predominate over any questions affecting only individual

members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## Count I – Violation of the Takings Clause

198. Plaintiffs incorporate and reallege paragraphs 1-196.

199. The Takings Clause of the Fifth Amendment to the United States Constitution, incorporated as to the states under the Due Process Clause of the Fourteenth Amendment, provides that the City may not take property unless it is for a public purpose and just compensation is paid to the property owner.

200. Medallions are property as a matter of Illinois law.

201. Security interests in medallions are property as a matter of Illinois law.

202. Medallion Owner Plaintiffs, the Medallion Class and Plaintiffs Funding and Tri Global (which hold security interests in medallions) own property that may not be taken by the City without payment of just compensation.

203. Without compensation to the Medallion Class or the lenders holding security interests in the medallions, the City has permitted and, via the enactment of the TNP Ordinance has expressly authorized, the *de facto* taxi companies to usurp and trespass upon the exclusive property and contract rights of the Medallion Class members by providing *de facto* taxi services without buying or leasing medallions or otherwise complying with the City Taxi Regulations. The City has thereby taken those exclusive property and contract rights from the Medallion Class without any compensation, let alone the just compensation that the Takings Clause requires.

204. Plaintiffs and the Medallion Class are entitled to the following relief under Count I:

a. An injunction enjoining the City from continuing to violate the Takings Clause Act by allowing the *de facto* taxi companies to operate *de facto* taxis without medallions or compliance with the City Taxi Regulations;

b. Just compensation resulting from the City's takings, which consists of:

   i. For the Medallion Owner Plaintiffs and the Medallion Class, an amount equal to the diminution in medallion value caused by the City's failure to require the *de facto* taxi companies to acquire medallions and otherwise to enforce the City Taxi Regulations against the *de facto* taxi companies and/or amounts of cash or the value of other collateral they may be required to provide to their lenders to maintain the loan-to-value ratio required under their financing agreements;

   ii. For Plaintiffs Funding and Tri Global, who extended loans to medallion owners secured by the medallions, an amount of cash sufficient to restore the ratio of loan amount to medallion value that existed prior to the diminution in medallion value caused by the City's failure to require the *de facto* taxi companies to acquire medallions and otherwise to enforce the City Taxi Regulations against the *de facto* taxi companies;

c. An award of the Plaintiffs' attorneys' fees and litigation expenses;

d. Such other relief as the Court deems appropriate.

### Count II – Violation of the Equal Protection Clause
### (Before Enactment of TNP Ordinance)

205. Plaintiffs reallege paragraphs 1-203.

206. The City's actions in enforcing the City Taxi Regulations against the Transportation Plaintiffs but not against the *de facto* taxi companies before enactment of the TNP

Ordinance denied Plaintiffs and the Medallion Class equal protection of the laws in that the *de facto* taxi companies were permitted to offer taxi services to the public without complying with the City Taxi Regulations, while the Transportation Plaintiffs and the Medallion Class were not so permitted.

207.    The Medallion Owner Plaintiffs and Medallion Class members, who have purchased costly medallions, and the Transportation Plaintiffs whose businesses depend upon the medallion system as the exclusive means to enter the taxi business, constitute a distinct business classification that was created and supported by long-standing City laws, regulations and practices, including by the City's support of the medallion system. Against this unique historical background, the City violated the equal protection rights of the Medallion Class and the Transportation Plaintiffs by intentionally permitting and facilitating *de facto* taxi operations by the *de facto* taxi companies on an uneven playing field.

208.    The City had no rational justification for the unequal application of the City Taxi Regulations prior to the enactment of the TNP Ordinance. As described herein, the City's decision to apply the City Taxi Regulations unequally was not rationally related to any legitimate governmental interest, particularly because the administration was obligated to enforce its Regulations.

209.    In the alternative, Plaintiffs are entitled to discovery to determine whether the City administration's disparate treatment regarding the enforcement of the City Taxi Regulations was motivated by special animus toward the Transportation Plaintiffs and/or special favoritism toward the *de facto* taxi companies. The standards for such an inquiry have not been settled in the Seventh Circuit, but a majority of the Court has found that an equal protection claim may be brought by the victim of discrimination intentionally visited on him by governmental actors who

knew or should have known that they had no justification, based on their public duties, for singling him out for unfavorable treatment—who acted in other words for personal reasons, with discriminatory intent and effect. Del Marcelle v. Brown County Corp., 680 F.3d 887, 889 (7th Cir. 2012) (opinion of Posner, J.); *id.* at 917 (opinion of Wood, J.).

210.    The *Chicago Sun-Times* revealed earlier this year that Mayor Rahm Emanuel's brother, Ari, is an investor (through his company) in Uber (along with Google, Goldman Sachs and others) and stands to profit enormously if Uber continues to grow and launches a successful Initial Public Offering of its stock. (According to public reports, Uber's value has increased at least sixty-fold over the past three years.) Enrichment of a mayoral relative is not a legitimate governmental interest, and would constitute "personal reasons" lacking in justification under public duties, if in fact that was the motivation for the directions from Mr. Spielfogel of the Mayor's office to the Commissioner described in paragraphs 69-72, 173 and 180 above restraining the Commissioner from enforcing the City Taxi Regulations against the *de facto* taxi companies.  (The Mayor replaced the Commissioner (Ms. Krimbel) in or about January 2014.) Discovery is needed to determine whether the personal interest of the Mayor's brother was mere coincidence or was motivation for the direction from the administration to let Uber operate (and prosper) without consequence in open and notorious violation of the City's own laws for nearly two years, while simultaneously continuing to saddle the taxi industry with burdensome and expensive regulations.

211.    The Transportation Plaintiffs and the Medallion Class suffered and will continue to suffer direct and tangible injury and damages from the City's actions and inactions in that, without limitation, (i) the market and collateral value of the medallions and their marketability have been reduced by the unequal application of the City Taxi Regulations, (ii) all who operate

taxis directly or lease vehicles with medallions to drivers were injured in that the revenues derived from their lawful operations have been and will continue to be reduced as a result of the *de facto* taxi companies' unlawful operation of unlicensed taxis, and (iii) all who operate affiliations and dispatch services are required to meet and comply with a host of costly and burdensome City Taxi Regulations when the *de facto* taxi companies were not required to comply.

212.     The City's actions and inaction were intentional.  The City and the Commissioner were fully aware that the *de facto* taxi companies were operating in violation of the City Taxi Regulations.  The City has known at least since the Court's decision in *Mustfov v. Rice et al and City of Chicago*, 663 F. Supp. 1255, 1262-63 (N.D. Ill. 1987), that the Equal Protection Clause of the United States Constitution is applicable to the City's unequal application of the City laws to some but not all taxi and limousine drivers.

213.     Transportation Plaintiffs and the Medallion Class are entitled to the following relief under Count II:

      a.     Damages resulting from the City's unequal enforcement of the City Taxi Regulations;

      b.     An award of their attorneys' fees and litigation expenses;

      c.     Such other relief as the Court deems appropriate.

### Count III – Violation of Equal Protection
### (After Enactment of TNP Ordinance)

214.     Plaintiffs reallege paragraphs 1-203.

215.     The City's actions in continuing to enforce the City Taxi Regulations against the Transportation Plaintiffs but not against the *de facto* taxi companies, while ratifying its prior irrational and unequal treatment through the TNP Ordinance, has denied and continues to deny

Plaintiffs and the Medallion Class equal protection of the laws in that the *de facto* taxi companies are permitted to offer taxi services to the public under regulations far less costly and burdensome than the City Taxi Regulations, while the Transportation Plaintiffs and the Medallion Class are not so permitted.

216.    The Medallion Owner Plaintiffs and Medallion Class members, who have purchased costly medallions, and the Transportation Plaintiffs whose businesses depend upon the medallion system as the exclusive means to enter the taxi business, constitute a distinct business classification that was created and supported by long-standing City laws, regulations and practices, including by the City's support of the medallion system.  Against this unique historical background, the City violated the equal protection rights of the Medallion Class and the Transportation Plaintiffs through the TNP Ordinance by intentionally permitting and facilitating *de facto* taxi operations by the *de facto* taxi companies on an uneven playing field.

217.    The City has no rational justification for the unequal application of two sets of laws to persons engaging in substantially the same business activity:  applying the City Taxi Regulations to Transportation Plaintiffs while applying the far less restrictive and costly TNP Ordinance to the *de facto* taxi companies.  As described herein, the City's decision to apply the City Taxi Regulations and TNP Ordinance unequally is not rationally related to any legitimate governmental interest.

218.    The Transportation Plaintiffs and the Medallion Class are suffering and will continue to suffer direct and tangible injury and damages from the City's actions and inactions in that, without limitation, (i) the market and collateral value of the medallions and their marketability are being or will be reduced by the unequal application of the City Taxi Regulations and TNP Ordinance, (ii) all who operate taxis directly or lease vehicles with

medallions to drivers are being injured in that the revenues derived from their lawful operations have been and will continue to be reduced as a result of the *de facto* taxi companies' operation under the TNP Ordinance, and (iii) all who operate affiliations and dispatch services are required to meet and comply with a host of costly and burdensome City Taxi Regulations when the *de facto* taxi companies are not required to comply.

219.   The City's actions and inaction are intentional.  The City and the Commissioner were fully aware that the *de facto* taxi companies were operating in violation of the City Taxi Regulations, and that the TNP Ordinance ratifies a host of provisions that treat these companies far more favorably than the Transportation Plaintiffs.  The City has known at least since the Court's decision in *Mustfov v. Rice et al and City of Chicago*, 663 F. Supp. 1255, 1262-63 (N.D. Ill. 1987), that the Equal Protection Clause of the United States Constitution is applicable to the City's unequal application of the City laws to some but not all taxi and limousine drivers.

220.   Plaintiffs and the Medallion Class are entitled to the following relief under Count III:

    a.   An injunction enjoining the City from unequal enforcement of the City Taxi Regulations and the TNP Ordinance;

    b.   Damages to the Transportation Plaintiffs and the Medallion Class resulting from the City's unequal enforcement of the City Taxi Regulations and the TNP Ordinance;

    c.   An award of their attorneys' fees and litigation expenses;

    d.   Such other relief as the Court deems appropriate..

### Count IV – Violation of Substantive Due Process Rights

221.   Plaintiffs reallege paragraphs 1-203.

222.    The City's administration of the City Taxi Regulations, applying them to the Transportation Plaintiffs, the Medallion Class and other licensed dispatch operators and affiliations, while choosing not to apply them to the *de facto* taxi companies, was arbitrary and capricious and deprived Plaintiffs of their property interests in their medallions and in the businesses they operate based upon the City Taxi Regulations.

223.    Prior to the TNP Ordinance, neither State law nor City ordinances provided a basis for the City to ignore or effectively repeal the City Taxi Regulations as applied to the *de facto* taxi companies.

224.    The Commissioner was not authorized to grant express or tacit approval to the *de facto* taxi companies to operate in violation of the City Taxi Regulations.  Neither Spielfogel nor the Mayor was authorized to grant express or tacit approval to the *de facto* taxi companies to operate in violation of the City Taxi Regulations.

225.    The City was well aware that it was obligated to enforce City Taxi Regulations and that executive officers of the City, such as the Commissioner or Spielfogel, are not empowered to suspend the operation of the City Taxi Regulations.

226.    Such knowledge was based, among other things, upon the fact that in 1982 the City Commissioner of Consumer Affairs, the Commissioner's predecessor, suspended the operation of City Taxi Regulations that required the City to permit the transfer of taxi medallions. In the ensuing lawsuit brought under 42 U.S.C § 1983 against the Commissioner and the City, the court held that the action constituted a violation of substantive due process rights.

227.    In *Flower Cab Co. v. Petitte et al.*, 658 F. Supp. 1170, 1179-80 (N.D. Ill. 1987), the court stated:

> . . . even the City Council cannot unilaterally suspend the enforcement of one of its ordinances.  It follows that the Commissioner, an administrative

agent whose powers and functions derive from ordinances passed by the Council, possessed no legal authority to issue the moratorium announced in July of 1982. Reference to the statute outlining her duties establishes that the City Council has never authorized the Commissioner to take this sort of action. Chap. 16, § 16–4 of the Municipal Code defines the scope of the Commissioner's power and authority. It contains no reference to the unprecedented action taken in this case. In fact, its provisions place significant constraints on the Commissioner's ability to affect the existing terms of the taxicab ordinance and clearly establishes the impropriety of her conduct.

* * * * *

Thus, the responsibility for revising and changing the code clearly lies with the Mayor and the City Council. Nothing in the City's ordinances authorized the Commissioner's unexpected and unprecedented imposition of this moratorium. This court implicitly recognized the invalidity of the Commissioner's action in its order granting the preliminary injunction. *See* Transcript of Proceedings, Friday, January 22, 1982 at 12–13, 15–16. Accordingly, the court finds that the Commissioner's imposition of this moratorium was arbitrary and had no basis in law. Therefore, the court concludes that the moratorium deprived plaintiffs of their substantive due process rights.

228.    The present case is controlled by the principles stated in *Flower Cab.*

229.    Transportation Plaintiffs and the Medallion Class are entitled to the following relief under Count IV:

    a.    Damages resulting from the City's failure prior to enactment of the TNP Ordinance to enforce the City Taxi Regulations against the *de facto* taxi companies;

    b.    An award of Plaintiffs' attorneys' fees and litigation expenses;

    c.    Such other relief as the Court deems appropriate.

## Count V – Breach of Contract

230.    Plaintiffs reallege paragraphs 1-203.

231.    The City Taxi Regulations, coupled with the Transportation Plaintiffs' and Medallion Class members' reliance on such Regulations and their expenditure of very large sums of money to purchase medallions and operate the Transportation Plaintiffs' taxi-related businesses, including the businesses of dispatching taxis, operating taxi affiliations, leasing the right to operate taxis pursuant to licenses from the City, and loaning money to purchase medallions secured by the medallions subject to the City Taxi Regulations, give rise to contractual rights on the part of the Transportation Plaintiffs.

232.    The resulting licenses to operate affiliations, dispatch services and to own medallions and the right to operate taxis pursuant to the ownership of licenses, give rise to a binding contractual relationship between the City and each of the Transportation Plaintiffs and member of the Medallion Class (the "**Regulated Taxi Operators' Contract**").

233.    Illinois law recognizes that the relationship between taxi operators and the City, although structured as a "license," is also a contract.  The Illinois Supreme Court so held in *Yellow Cab Co. v. City of Chicago*, 396 Ill. 388, 401-02 (1947):

> *The question to be determined in the case at bar is whether or not a licensing ordinance can constitute a contract between the city and the licensees. It is the opinion of this court that the licensing ordinances in the case at bar did create a contract between the city and the licensees.* In the case of Peoria Railway Co. v. Peoria Railway Terminal Co., 252 Ill. 73, 96 N.E. 689, we held that the privilege to use the streets of a city having been granted by an ordinance was not recoverable at the will of the city after it had been accepted by the license had been also held that where the license had been acted upon in a substantial manner and the revocation thereof would be inequitable, the same could not be revoked. This court in the case of American Can Co. v. Emerson, 288 Ill. 289, 123 N.E. 581, held that a license granted to a foreign corporation to do business in the State of Illinois constitutes a contract between the foreign corporation and the State of Illinois.  (Italics added.)

234.     Likewise, in the present case, the Transportation Plaintiffs and the Medallion Class acted in reliance upon the licenses granted by the City in many important respects, including by paying large amounts for taxi medallions (including a 5% City of Chicago transfer tax) and creating businesses that relied upon the even-handed enforcement of the City Taxi Regulations against all who operate taxi-service businesses.  It would be inequitable for the City to act in disregard of the contract rights that have arisen as a result of the City Taxi Regulations and the City's history of enforcement thereof.

235.     A principal term of the rights created by the Regulated Taxi Operators' Contract is that the City agreed to require all who purport to operate taxi affiliations, taxi dispatch services, taxis or limousines to do so only pursuant to the comprehensive City Taxi Regulations.

236.     Until it was amended in the TNP Ordinance, the City's taxi ordinance stated that "the city grants *exclusive* permission and authority to the licensees hereunder to operate the taxicab vehicles licensed hereunder unless rescinded, terminated, or revoked as hereinafter provided."  (Italics added.)  The Regulated Taxi Operators' Contract between the City and the Plaintiffs, therefore, grants to the Plaintiffs and the Medallion Class the *exclusive* right to operate taxis, taxi affiliation and taxi dispatch services pursuant to the City Taxi Regulations.   In exchange, the Transportation Plaintiffs and the Medallion Class members, among other things, have paid substantial amounts to the City in the form of payments for taxi medallions and taxes and have otherwise incurred additional expense complying with extensive regulations and requirements, including requirements to provide services in otherwise underserved areas of the City.

237.     The City has materially breached the Regulated Taxi Operators' Contract by allowing the *de facto* taxi companies to offer services that are virtually identical to the services

offered by the Transportation Plaintiffs and the Medallion Class, but without requiring that they obtain licenses or otherwise comply with comparable law and regulations.

238.    The City's breach of the Regulated Taxi Operators' Contract has damaged the Transportation Plaintiffs and the Medallion Class by causing loss of revenues and profits, and reducing the value of their businesses, assets and their taxi licenses.

239.    The City is liable to Plaintiffs for all damages incurred.

240.    To the extent such damages are difficult to compute or otherwise incapable of full compensation by money damages, Plaintiffs' remedies at law are inadequate, and Plaintiffs are entitled to injunctive relief.

241.    Plaintiffs and the Medallion Class are entitled to the following relief under Count V:

     a.    An award of their damages to the Transportation Plaintiffs and the Medallion Class for the City's breach of the Regulated Taxi Operators' Contract;

     b.    An injunction enjoining the City from further breaches of the Regulated Taxi Operators' Contract;

     c.    An injunction requiring the City to enforce the exclusive licensing rules contained in the City Taxi Regulations against the *de facto* taxi companies, or to otherwise permit Transportation Plaintiffs and the *de facto* taxi companies to operate under substantially the same rules;

     d.    Such other relief as the Court deems appropriate.

### Count VI – Promissory Estoppel

242.    Plaintiffs reallege paragraphs 1-203.

243.    Count V is pleaded in the alternative to Count IV.

244. The City has agreed with and promised the Transportation Plaintiffs and the Medallion Class by means of the City Taxi Regulations and by the City's conduct in implementing them to maintain the exclusive rights of medallion owners to operate taxis and to maintain the market value of medallions, as more fully described in paragraphs 58-62 above.

245. The Transportation Plaintiffs and Medallion Class relied on such promises by, *inter alia,* investing millions of dollars to purchase medallions, to finance medallions and/or to create and operate taxi affiliations, as more fully described above.

246. The Transportation Plaintiffs' and Medallion Class members' reliance on the City Taxi Regulations and City conduct in implementing the Regulations was expected and foreseeable by the City. Indeed, the City intentionally induced such reliance to create and maintain a well-regulated, safe and orderly taxi system in Chicago, and to realize for the City the large amounts of revenues (estimated at more than $24 million annually) that result from the operation of the Chicago taxi system pursuant to the City Taxi Regulations.

247. The Transportation Plaintiffs and Medallion Class members relied on the promises and actions of the City to their detriment.

248. Transportation Plaintiffs and the Medallion Class are entitled to the following relief under Count VI:

   a. An award of their damages for the City's breach of their promises;

   b. An injunction enjoining the City from further breaches of their promises;

   c. An injunction requiring the City to enforce the exclusive licensing rules contained in the City Taxi Regulations against the *de facto* taxi companies, or to otherwise permit Transportation Plaintiffs and the *de facto* taxi companies to operate under substantially the same rules;

      d.   Such other relief as the Court deems appropriate.

## Count VII – Equitable Estoppel

249.    Plaintiffs reallege paragraphs 1-203.

250.    The City's enactment and past enforcement of the City Taxi Regulations, as well as its sales of medallions, constitute affirmative acts by the City over the course of decades.

251.    The Transportation Plaintiffs and Medallion Class members substantially and reasonably relied to their detriment upon these affirmative City acts by, *inter alia,* investing millions of dollars through purchasing medallions, financing medallions and/or creating and operating taxi affiliations.

252.    The City is estopped from enabling and condoning a system of *de facto* taxi operation by *de facto* taxi companies that are not required to comply with the many obligations the City imposes upon the Transportation Plaintiffs and Medallion Class.  Estoppel is necessary to remedy a serious injustice.

253.    Transportation Plaintiffs and the Medallion Class are entitled to the following relief under Count VII:

      a.   An award of their damages caused by the City's failure to enforce the City Taxi Regulations;

      b.   An injunction requiring the City to enforce the exclusive licensing rules contained in the City Taxi Regulations against the *de facto* taxi companies, or to otherwise permit Transportation Plaintiffs and the *de facto* taxi companies to operate under substantially the same rules;

      c.   Such other relief as the Court deems appropriate.

\* \* \* \* \* \*

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL CLAIMS TRIABLE TO A JURY.**


Dated:  September 19, 2014                    Respectfully submitted,

                                             Plaintiffs,

                                             By:    /s/ Edward W. Feldman

                                                   One of their attorneys

Michael L. Shakman
Edward W. Feldman
Stuart M. Widman
Melissa B. Pryor
**MILLER SHAKMAN & BEEM LLP**
180 N. LaSalle Street, Suite 3600
Chicago, Illinois 60601
312-263-3700

**APPENDIX 1 – LIST OF THE 111 MEDALLION OWNER PLAINTIFFS**

The following is a list of the plaintiff entities comprising the 111 Medallion Owner Association, each of which owns one or more medallions:

Ample Sun Cab Corp.
Aqua Zone Cab Co.
Argentine Open Corp.
August Cab Corp.
Baby Cab Corp.
Baby Sienna Cab Corp.
Barbie In Chicago Cab Corp.
Barometer II Hacking Corp.
Blue Eyes Cab Corp.
Bonus Taxi, Inc.
Bori Bus, Inc.
Brown Eyes Cab Corp.
Chicago Auction Cab Co.
Chicago Polo I, Inc.
Chicago Polo II, Inc.
Chicago Polo III, Inc.
Chicago Polo IV, Inc.
Chicago Polo IX, Inc.
Chicago Polo V, Inc.
Chicago Polo VI, Inc.
Chicago Polo VII, Inc.
Chicago Polo VIII, Inc.
Chicago Polo X, Inc.
Chicago Polo XI, Inc.
Chicago Polo XII, Inc.
Chicago Polo XIII, Inc.
Chicago Polo XIV, Inc.
Chicago Polo XV, Inc.
Chicago Polo XVI, Inc.
Chicago Polo XVII, Inc.
Chicago Seven Cab, Inc.
Chicago Seven, Inc.
Chicago Shane Hacking Corp.
Crazy Jeffrey Cab Corp.
D&G Cab Corp.
Damma Cab Corp.
Daniella Cab Corp.
Dolce Cab Corp.
Dolfina Taxi, Inc.
Enetochka Taxi, Inc.
Five Kids Hacking Corp.

Forcast II Hacking Corp.
Funny Monica in Chicago Inc.
Gala Cab Corp.
Galina Cab Corp.
Gap Cab Corp.
Gem and R Cab Corp.
Geri's Cab Corp.
Green Eyes Cab Corp.
Green Tea Cab Corp.
Hail Hacking Corp.
Humidity II Hacking Corp.
I&B Midwest Enterprise, Inc.
Jasmin Taxi, Inc.
July Cab Corp.
June Cab Corp.
Killer Dog Cab Corp.
King Edward Cab Corp.
Koshechka Taxi, Inc.
Kukla Cab Corp.
Light Breeze Cab Corp.
Lilly Cab Corp.
Lucky Four Cab Corp.
Lucky in Chicago, Inc.
Lucky Seven Chicago One, Inc.
Lucky Seven Chicago Three, Inc.
Lucky Seven Chicago Two, Inc.
Lucky Seven Chicago, Inc.
Magenta Zone Cab Corp.
Mama Four Cab Corp.
Mauve Zone Cab Corp.
Misha Cat Cab Corp.
Moisture II Hacking Corp.
Monaco Taxi, Inc.
Moneta Taxi, Inc.
MZ Chicago Cab Corp.
Nev Cab Co.
November Cab Corp.
Pink Zone Cab Corp.
Playing Polo in Chicago, Inc.
Pretty Rachel in Chicago, Inc.
Princess Taxi, Inc.
Rachel Taxi, Inc.
Rainstorm II Hacking Corp.
Reservoir II Hacking Corp.
Samson Cab Corp.
Samuel Taxi Corp.

Scorpion Cab Co.
Shane Taxi, Inc.
Shaun Jr. Taxi, Inc.
Shaun Loves Chicago, Inc.
Showers II Hacking Corp.
Sienna Zone Cab Corp.
Siro, Inc.
Sleet Hacking Corporation
SLSJET Cab Corp.
SLSJETS I Cab Corp.
SLSJETS II Cab Corp.
SLSJETS III Cab Corp.
SLSJETS IV Cab Corp.
SLSJETS V Cab Corp.
Snowblind Cab Corp.
Snowfall II Hacking Corp.
Snowstorm II Hacking Corp.
Susan Cab Corp.
Taxale Taxi, Inc.
Thin Ice Hacking Corp.
Tyler Crazy About Chicago, Inc.
Valex Cab Corp.
Violet Zone Cab Corp.
Zhanet Cab Corp.